UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:25-cv-20757-JB

JANE DOE,

    Plaintiff,

v.

STEVEN K. BONNELL II,

    Defendant.

_____/

## DECLARATION OF STEVEN K. BONNELL, II

I, Steven K. Bonnell, II, declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the defendant in the above-captioned action. I am over 18 years of age and competent to provide testimony under oath. I submit this declaration in opposition to Plaintiff's Motion for Preliminary Injunction.

2. I have personal knowledge of the matters herein, and, if called to testify in this matter, I could and would provide testimony consistent with the facts contained herein.

3. I am a live streamer and progressive political commentator, commonly known online as "Destiny."

4. Plaintiff Jane Doe is also an online streamer who uses the screenname "Pxie." Plaintiff does not use her legal name in connection with her public online streaming.

5. I met Plaintiff online. We debated each other on Twitch, an online streaming platform. After the debate, on October 23, 2019, Plaintiff sent me a private message. We developed a friendship and began discussing our sex lives. Multiple times Plaintiff offered to send me, and in fact did send me, sexually explicit videos of herself and her partner(s) and encouraged me to

send her similar videos of myself with partners.  Attached hereto as **Exhibit A** are true and correct copies of Plaintiff's correspondence with me from March 17 to March 19, 2020.  Notwithstanding her January 3, 2025 post in which she (falsely) claimed, "I have never ever sent videos of other people to steven ever," the attached correspondence, including a screen of her sending me four separate videos on March 19, 2020 reflects that Plaintiff wanted to and, in fact did, share multiple sexually explicit videos of herself with third parties.

6. In another message Plaintiff sent me at 5:12 a.m. EST on March 19, 2020, she suggested that we meet and "make some videos together." Plaintiff repeated this suggestion on September 6, 2020—six days before we met in person. Attached hereto as **Exhibit B** are true and correct copies of Plaintiff's aforementioned correspondence from March and September 2020.

7. On or about September 12, 2020, Plaintiff and I met and agreed to record our sexual encounter (the "Video"). At that time, I was engaged to be married. I told Plaintiff that my then-fiancée and I enjoyed watching such videos of each other. Plaintiff did not object to me showing the Video to my then- fiancée, or to anyone else. Based on our correspondence and the content she previously shared with me, Plaintiff demonstrated that she was comfortable sending videos of herself with other sex partners.

8. In early 2022, I was contacted on Discord by an individual who used the screen name "Rose." Rose and I maintained an online friendship through 2023. During our friendship we shared sexually explicit messages and content with each other, including the Video that Plaintiff and I made together. I never identified Plaintiff by her legal name, her screen name, or otherwise in my communications with Rose.  Likewise, Rose never identified Plaintiff by name or otherwise.

9. Based on information and belief, I have not sent the Video to anyone other than Rose. I certainly have not sent the Video to anyone *since* I sent the Video to Rose on April 9, 2022.

Attached hereto as **Exhibit C**, is a true and correct copy of my Discord exchange with Rose, dated April 9, 2022, beginning at 8:06 p.m. EDT. On page 2 of the Exhibit, because it is a screenshot from Rose's side of the conversation, the date of the transmission is reflected in European format (i.e., day/month/year). The timestamps on page 2 of the Exhibit reflect that Rose was corresponding from a time zone five hours ahead of me in Miami, Florida. It was April 10, 2022, at 1:06 a.m. UTC (i.e., April 9, 2022 at 8:06 p.m. EDT), when Rose and I began corresponding regarding the Video.

10. Since April 9, 2022, I have not shared, or otherwise transmitted the Video to any other third party and *will not do so*.

11. Plaintiff falsely claims that at least 15 potential witnesses contacted her claiming to have evidence that I shared the Video with them. I did no such thing. Indeed, in support of her Motion for a Preliminary Injunction, despite boasting about how much evidence she had, Plaintiff provided only *one* declaration from a person named Hannah Daniels Brooke. Despite that she uses the same defined term, the statements in Ms. Brooke's declaration have nothing to do with the actual Video at the center of this dispute. The "Video" to which Ms. Brooke refers in her declaration (Brooke Decl. ¶¶ 5-7) is a completely unrelated video featuring me and another friend that has nothing to do with Plaintiff or her claims against me in this case.

12. When I woke up on November 29, 2024, I learned that I was the victim of revenge pornography when a great deal of my personal correspondence with third parties, including certain sexually explicit content of mine was published, without my permission or consent, to a website called KiwiFarms. I do not know the identity of the person or persons who leaked and unlawfully published this content online, but I suspect it was someone with access (whether lawfully or not)

3

to Rose's Discord chats with me. Among the materials that were unlawfully published to the KiwiFarms site was the Video that Plaintiff and I recorded together.

13. Later that same day, Plaintiff contacted me about the leak. Plaintiff made it clear that she did not want to be identified in the Video and wrote that she was "100% denying it's me . . . since it's not super clear [it's] my face or anything like that." Attached hereto as **Exhibit D** is a true and correct copy of the message Plaintiff sent me at 9:06 p.m. EST on November 29, 2024. At that time, Plaintiff also asked me to delete the Videos. Doe Decl. ¶ 9.

14. In or about the first week of December 2024, I retained specialized legal counsel, with expertise in revenge pornography matters, to assist me in connection with having my sexually explicit content, including the Video I made with Plaintiff, removed from the Internet.

15. Thereafter, Plaintiff and I communicated about my efforts to have that content, including our Video, removed from any website on which it was unlawfully published. I provided Plaintiff with updates on my progress with respect to the removal efforts by me and my attorneys. Plaintiff also had the ability and legal right to seek removal of the Video from the online platforms on which it was hosted. However, I am not aware of any efforts that Plaintiff made to have the Video removed from any site, including KiwiFarms.

16. On December 11, 2024, Plaintiff's tone towards me turned hostile and threatening in messages she sent me. I also began receiving hostile messages from one of Plaintiff's friends, Lauren Dreeben Hayden that same day.

17. I then contacted a mutual friend of Plaintiff and me to see if there was anything I could do to help Plaintiff. After speaking with Plaintiff, our mutual friend advised me that I should offer Plaintiff money, and that Plaintiff was settling on a figure sufficient to cover her future tuition fees.

4

18. In a message to me that Plaintiff has since deleted, at 2:13 a.m. EST on December 12, 2024, Plaintiff wrote, "I feel like whatever I ask you to cover will be too high a price . . . ." Attached hereto as **Exhibit E**, is a true and correct copy of Plaintiff's correspondence to me, dated December 12, 2024.

19. On or about January 22, 2025, I received a document preservation demand letter from Plaintiff's attorneys. On January 31, 2025, Plaintiff's attorneys sent a follow-up letter demanding, among other things, that I immediately pay Plaintiff $15 million for alleged damages incurred and that I take measures to prevent the further dissemination and/or distribution of the Video that Plaintiff and I made together. Based on the federal statute Plaintiff threatened to sue me under, even if Plaintiff were successful in her lawsuit, her damages are capped at $150,000, 15 U.S.C. § 6851(b)(3)(A)(i). After learning this fact, I believed her demand was absurd, outrageous, and unlawful.

20. Upon receipt of the initial demand letter, I took steps to preserve all documents and correspondence pertaining to Plaintiff's purported claims. Specifically, with respect to the messages transmitted via Discord, I used the program called Discord Log Exporter to export *all* relevant messages into an HTML file.

21. Contrary to the allegations in Plaintiff's motion, I have not permanently deleted or destroyed *any* evidence pertaining to this lawsuit, or the allegations asserted therein. All my efforts to remove the unauthorized published content, including the Video, were made to protect not only my privacy, but also Plaintiff's privacy. I undertook those efforts only *after* I took adequate steps to preserve all such evidence, as Plaintiff's counsel demanded I do. To date, I have not been requested to produce any documents in this case.

22. Notwithstanding my compliance with all document preservation obligations, Plaintiff and her attorneys continue to falsely accuse me of "systematically deleting and destroying evidence." Ironically, it is Plaintiff who has engaged in spoliation of evidence. *See* Ex. E. As reflected on page 2 of that Exhibit, on or about January 20, 2025, Plaintiff deleted the response she sent me at 2:13 a.m. on December 12, 2024, in which she wrote, "I feel like whatever I ask you to cover will be too high a price . . . ." Less than one week after Plaintiff deleted this message, I received the letter from her lawyers demanding that I pay $15 million, or face a public lawsuit. By that point, as a result of the leaks and the public allegations that Plaintiff made against me, my reputation had been significantly damaged, especially within the streaming community. I have been subjected to endless criticism online and elsewhere. To date, I have lost tens of thousands of subscribers and an estimated $300,000 in revenue.

23. In addition to the harm she caused me by spreading false rumors about me, Plaintiff played a huge role in exacerbating the harm that she allegedly suffered by posting a public statement about the leaks on her Substack page. Plaintiff's Substack post, which is still active, is available at https://pxie412.substack.com/p/i-will-be-suing-steven-kenneth-bonnell (last visited Apr. 25, 2025). In that Substack post, Plaintiff falsely accused me of intentionally distributing "pornographic content" featuring Plaintiff and "using a proxy to widely distribute" that content (i.e., the Video). In no uncertain terms, Plaintiff falsely accused me of masterminding the widespread leak of the Video for self-promotional reasons. Nothing could be farther from the truth. In reality, I was the primary target of the leaks, both reputationally and personally. The content was disseminated by an individual or individuals on a forum known for its explicit hostility towards me, with users openly expressing a coordinated intent to damage my career and personal life. Plaintiff's false accusations and public narrative not only mischaracterized the events, but also

6

amplified the spread of the leaked materials, including the Video, thereby exacerbating the harm Plaintiff attributes solely to me.

24. In the same Substack post, Plaintiff also indicated that she was planning to file a lawsuit against me. Plaintiff used her social media accounts to advertise and promote her Substack post. Attached hereto as **Exhibit F** are true and correct copies of Plaintiff's posts on X and BlueSky Social in which she wrote, "I will be suing [Destiny] in federal court. Here's my story," and provided a link to her Substack post. Plaintiff's commentary drew significant attention online and caused innumerable people to search for and download the Video from the KiwiFarms website.

25. The owner and Operator of the KiwiFarms site (who uses the handle @Null) is aware of this lawsuit and the fact that the Video is being hosted there. Attached hereto as **Exhibit G** are a true and correct copies of posts that the owner of KiwiFarms published acknowledging the lawsuit and the claims that Plaintiff alleged against me.

26. Plaintiff and her friend, Ms. Hayden, also created a GiveSendGo page (similar to a GoFundMe page) to raise money not for Plaintiff's medical treatment for alleged trauma, but to cover Plaintiff's *legal fees* in her lawsuit against me. Plaintiff's GiveSendGo page, which is still active, is available at https://www.givesendgo.com/suedestiny (last visited Apr. 25, 2025). The GiveSendGo page includes a link to Plaintiff's Substack post about her allegations against me. To date, Plaintiff has raised approximately $50,000 of her $130,000 fundraising goal. Plaintiff increased her fundraising goal to $130,000 after she met her originally established fundraising goal of $25,000. Attached hereto as **Exhibit H** is a true and correct copy of the GiveSendGo page as it originally appeared on January 20, 2025.

27. In addition to her Substack and GiveSendGo pages, Plaintiff has posted numerous messages online, including on X (using the handle @pxielove), about me, my attorneys, and the

allegations in her lawsuit. Attached hereto as **Exhibit I** are true and correct copies of some of Plaintiff's social media posts. In one of the posts to X from January 20, 2025, Plaintiff wrote: "My goal here is not public humiliation of Steven, or even all the money in the world, it's him receiving such a financial hit/penalty that he will permanently learn his lesson."

28. Plaintiff's public comments have led to more interest in the Video. Indeed, in some of her public posts, including in her own motion papers. Rather than filing her papers under seal, in her brief, Plaintiff identifies specific websites on which the Video is available for viewing and/or download and provides URLs to those sites. *See* Mot. at 7-8 (listing multiple websites and providing search terms to find the Video). Until reading Plaintiff's motion, I had no idea whether the Video was available on some of those sites.

29. To date, I have lost over $300,000 in revenue from streaming platforms. To the extent a preliminary injunction is entered against me and I am unable to defend myself online, I will lose significantly more revenue, in addition to substantial out-of-pocket costs and fees that I will be forced to incur in connection with attempted compliance. To that end, Plaintiff should be required to post security in an amount no less than $500,000, in the event the Court grants her motion for a preliminary injunction.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed on April 25, 2025.

*Steven Bonnell*
Steven K. Bonnell II