# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:25-cv-20757-JB/Torres

JANE DOE,

Plaintiff,

vs.

STEVEN K. BONNELL II,

Defendant.

_____________________________/

CONFIDENTIAL

Video-RECORDED DEPOSITION OF

STEVEN K. BONNELL II

Thursday, April 30, 2026
10:16 a.m. - 6:19 p.m.

201 ALHAMBRA CIRCLE, SUITE 1205
CORAL GABLES, FLORIDA

- - -

Reported By:

Katiana Louis
Notary Public, State of Florida
Miami Office #448104

APPEARANCES:

On behalf of the Plaintiff:

JSP LAW, LLC
838 Neapolitan Way, #91
Naples, Florida 34103
(305) 299-4759

By: JOAN SCHLUMP PETERS, ESQUIRE
Petersjoan@bellsouth.net

SANCHEZ-MEDINA, GONZALEZ, QUESADA, LAGE, GOMEZ & MACHADO, LLP
201 Alhambra Circle, Suite 1205
Coral Gables, Florida 33134
(305) 377-1000

By: VICTOR CORRIAS, ESQUIRE
Vcorrias@smgqlaw.com

CARLOS GARCIA PEREZ, ESQUIRE
Cgarciaperez@smgqlaw.com

On behalf of the Defendant:

BERK BRETTLER LLP
9119 West Sunset Boulevard
West Hollywood, California 90069
(310) 278-2111

By: ANDREW BRAD BRETTLER, ESQUIRE
Abrettler@berkbrettler.com

JOEL SICHEL, ESQUIRE
Jsichel@berkbrettler.com

Also Present:
MARIA LUGO, Videographer
ANDREA GARCIA
DANI GARCIA

# I N D E X


| Examinations | Page |
|---|---|
| STEVEN K. BONNELL II | |
| DIRECT EXAMINATION BY MS. SCHLUMP PETERS | 5 |
| CROSS-EXAMINATION BY MR. BRETTLER | 366 |
| REDIRECT EXAMINATION BY MS. SCHLUMP PETERS | 367 |
| CERTIFICATE OF OATH | 372 |
| REPORTER'S DEPOSITION CERTIFICATE | 373 |
| READ LETTER | 374 |
| ERRATA SHEET | 375 |


# E X H I B I T S


| No. | Description | Page |
|---|---|---|
| 1 | SB000550-SB001616 | 25 |
| 2 | Declaration of Steven K. Bonnell II April 25, 2025 | 72 |
| 3 | November 29, 2024, Solo to Destiny | 101 |
| 4 | SB002391 | 105 |
| 5 | Screenshot of a Kiwi Farms Post | 107 |
| 6 | SB002404 | 146 |
| 7 | preliminary injunction hearing Transcript page 72 | 151 |
| 8 | RustleSearch | 160 |
| 9 | Declaration of Steven K. Bonnell II dated September 19, 2025 | 176 |
| 10 | Declaration of Steven K. Bonnell II January 30, 2026 | 176 |
| 11 | SB002392 | 179 |
| 12 | SB002480-97 | 190 |
| 13 | SB000063-168 | 211 |
| 14 | screenshot of Abby's November 3, 2023, message | 218 |
| 15 | Docket 213-5 | 220 |
| 16 | ECF132-6 | 229 |
| 17 | SB00004-5 | 278 |
| 18 | First Audio | 310 |
| 19 | First Video | 310 |
| 20 | Second Audio | 318 |
| 21 | Second Video | 319 |
| 22 | SB002393-4 | 333 |
| 23 | October 29, 2025, X Post | 348 |
| 24 | October 29, 2025, X Repost | 353 |
| 25 | December 6, 2025, X Post | 357 |
| 26 | Subpoena requesting the identity of the Vultr accountholder for a certain IP address on July 14, 2025, and January 18, 2025 | 362 |

THE VIDEOGRAPHER: We're now on the record. My name is Maria Lugo. I'm the videographer with Lexitas. Today is Thursday, April 30th. And the time is 10:16 a.m.

This deposition is being held at 201 Alhambra Circle, Suite 1205, Miami, Florida 33134 in the matter of Jane Doe versus Steven Bonnell II. The deponent is Steven Bonnell II.

Would counsel and all present please introduce themselves after which the court reporter, Katiana Louis, will swear in the witness.

You may proceed.

MR. BRETTLER: Andrew Brettler and Joel Sichel of Berk Brettler LLP on behalf of the witness Steven Bonnell.

MS. SCHLUMP PETERS: Joan Schlump Peters on behalf of the plaintiff Jane Doe. And I'm joined today by my colleagues Victor Corrias, Andrea Garcia and Dani Garcia.

Thereupon:

STEVEN K. BONNELL II

was called as a witness, and having been first duly sworn and responding, "Yes," was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, have you ever been deposed before?**

A. No.

**Q. And other than the preliminary junction hearing in this case, have you ever testified in court before?**

A. Not for anything like this, no. I've had traffic tickets.

**Q. You've had traffic tickets. Anything else?**

A. No.

**Q. What documents did you review in preparation for this deposition?**

A. My declarations and whatever I have submitted to the court and the complaint.

**Q. When you say whatever you submitted to the court, you mean the declarations and the exhibits?**

A. Yeah, attached exhibits, yeah.

**Q. Anything else?**

A. No.
**Q. And you met with counsel to prepare?**
A. Yes.
**Q. How long did you meet for?**
A. Maybe 30 minutes.
**Q. And you attended the deposition of the plaintiff on Monday; correct?**
A. Yes.
**Q. So you are aware that at the beginning of the deposition, Mr. Lopez designated the entire deposition confidential pursuant to the court order?**
A. I heard him say that, yes.
**Q. And yet you immediately proceeded to violate that court order, didn't you?**
MR. BRETTLER: Objection.
Do not answer that question.
BY MS. SCHLUMP PETERS:
**Q. Did you immediately proceed to go on to your DGG website chat and post specifics about the deposition?**
A. Yes.
**Q. So you disregarded the court order; correct?**
MR. BRETTLER: Objection. There is

no court order. You can answer.
THE WITNESS: No, I don't believe so.
BY MS. SCHLUMP PETERS:
**Q. Did you attend college?**
A. Briefly, yes.
**Q. Which college?**
A. UNO, the University of Nebraska at Omaha.
**Q. Did you graduate?**
A. No.
**Q. Why not?**
A. I didn't attend long enough.
**Q. You dropped out?**
A. Yes.
**Q. What did you after you dropped out of college?**
A. I worked as a carpet cleaner.
**Q. How long did you do that?**
A. Maybe about a year.
**Q. And why did you stop working as a carpet cleaner?**
A. I started streaming.
**Q. And approximately when was that that you started streaming?**

A. Maybe early 2010.
**Q. And you were more specifically a gaming streamer then; correct?**
A. Yes.
**Q. When did you start becoming -- going into politics?**
A. Around 2016.
**Q. And you go by the screen name Destiny online; correct?**
A. That's what I'm mainly known by, yes.
**Q. What else are you known by?**
A. I've had various gaming names. Some variation of Destiny, NeoDestiny or OmniDestiny and then some people know me just as my name, Steven Bonnell.
**Q. So you said OmniDestiny. What else?**
A. NeoDestiny, whatever name --
**Q. NeoDestiny?**
A. Sure. Yeah.
**Q. And when do you use NeoDestiny?**
A. Sometimes the main name is taken because it's a common noun so I add a prefix to it to take it on same gaming platform.
**Q. So usually for gaming purposes?**
A. Generally, yeah.

**Q. And you're currently a full-time professional live streamer?**
A. Yes.
**Q. And that's your primary source of income?**
A. Yes.
**Q. And you stream on multiple platforms?**
A. Yes.
**Q. YouTube?**
A. Yes.
**Q. Kick?**
A. Yes.
**Q. Previously on Twitch?**
A. Yes.
**Q. Any other platforms?**
A. Several.
**Q. What are they?**
A. Livestream.com, Youstream.com, Twitch used to be known as Justin.TV.
**Q. And are those other platforms for your political streaming?**
A. No, I'm not sure how many of those even exist anymore. Those were older platforms.
**Q. Those were from a while ago?**
A. Yes.

**Q. So currently you stream on YouTube and Kick?**
A. Yes.
**Q. And why did you stop streaming on Twitch?**
A. I was banned from that platform.
**Q. Why?**
MR. BRETTLER: If you know, you can answer.
THE WITNESS: The stated reason was for transphobic activity.
BY MS. SCHLUMP PETERS:
**Q. Transphobic activity?**
A. Yeah.
**Q. Could you explain that?**
A. That's all they gave me in my ban information.
I was fighting with another content creator. I said that their community, I thought -- I think I used the word this community on Twitter is inbred. Twitch interpreted that as me attacking all trans people and not just that person and their friends. And then I was banned for hateful conduct for being transphobic.
**Q. Hateful conduct?**

A. Is what the official banned listed reason I believe is, yes.

**Q. Now, you have a website; right?**

A. Yes.

**Q. And it's Destiny GG?**

A. Destiny.gg.

**Q. You personally own and operate Destiny.gg?**

A. It's all under my name, yes.

**Q. And the way it works, it embeds Destiny.gg -- Destiny.gg embeds your YouTube live streams; right?**

A. Yes.

**Q. And runs as a separate chat panel?**

A. Yes.

**Q. Call DGG Chat?**

A. Colloquially, yeah.

**Q. So DGG Chat is something under your control, correct, not YouTube's?**

A. Correct.

**Q. And you and anybody on your team that works with you can ban users?**

A. Yes.

**Q. You can delete messages?**

A. Not really. It depends on -- can you

rephrase that.

**Q. On your DGG Chat, can you as the controlling moderator of the chat, can you delete messages from it?**

A. I think when you ban a user, the messages might show up as deleted, but if the messages are already loaded in somebody's browser, I mean it could still be there. I can't, you know --

**Q. Let's say you have not banned a user, can you delete messages from the chat?**

A. I don't believe so, no.

**Q. Now, Destiny GG has a paid subscription tier?**

A. Yes.

**Q. And that's separate from YouTube and Kick; correct?**

A. Yes.

**Q. Approximately how many Destiny.gg subscribers do you have today?**

A. I don't know off the top of my head.

**Q. Approximately? A hundred?**

A. Maybe around -- anywhere from one to two thousand.

**Q. Has that changed from one year ago**

**today?**

A. Maybe not from one year ago, but maybe from two years ago, yeah.

**Q. Okay. About when are you referring to?**

A. Around the -- January, February, the start of this lawsuit.

**Q. Okay. So January, February 2025?**

A. Yeah. Yes.

**Q. Okay. And so in January, February 2025 did you have more subscribers than you have now?**

A. Yes.

**Q. How many more?**

A. I don't remember exactly, but I know I lost several hundred subscribers at the commencement of the lawsuit.

**Q. And they haven't come back?**

A. It's hard to say.

**Q. Why is that hard to say?**

A. You could have 2,000 subs and then in a year maybe you would have 2,500 subs. If nothing happened, you could have 2,000 subs, an event could happen, you lose 500, and then over the next year, you gain 500. So your number might be the same, but it doesn't mean that the last 500 came back. So it's hard to say.

**Q. So they could be --**
A. Different people.
**Q. -- new subscribers?**
A. Correct.
**Q. So your subscribers fluctuate based on events; correct?**
A. They -- yeah. Yes.
**Q. And approximately how much revenue do you receive from Destiny.gg subscriptions on a monthly basis?**
A. If I had to guess, I would ballpark it at maybe $20,000.
**Q. Have you been married?**
A. Yes.
**Q. How many times?**
A. Twice.
**Q. Who were you first married to?**
A. Her name was Katherine Nelson.
**Q. And when did you marry her?**
A. 2008.
**Q. And you divorced?**
A. Yes.
**Q. When?**
A. I can't recall. I think we broke up maybe about a year-ish after, but on paper it

might have been a couple of years after that.

**Q. So a year-ish after you got married, you're saying?**

A. Yeah, so maybe we broke up in 2009, but on paper, maybe not divorced for another year or two later. I don't know.

**Q. And why did you get divorced?**

A. We were both at the end of the relationship.

**Q. And you had a child together; correct?**

A. No.

**Q. You do have a son?**

A. Yes.

**Q. Who is the mother of your son?**

A. Her name is Rachel.

**Q. And you were never married to Rachel?**

A. No.

**Q. And then what is Rachel's last name?**

A. Mass, M-a-s-s.

**Q. And what was your -- who was your second marriage to?**

A. Melina.

**Q. And when did you first meet Melina?**

A. I believe it was 2020.

**Q. And when did you get married?**

A. I'm not 100 percent sure. Maybe 2022.

**Q. And when did you get divorced?**

A. I think 2024.

**Q. And then why did your marriage with Melina end?**

A. We were both at the end of the relationship.

**Q. Did she find out you were having an affair with somebody else?**

A. No.

**Q. She never found that out?**

MR. BRETTLER: Objection. Assumes facts not in evidence.

You can answer.

THE WITNESS: Can you rephrase the question.

BY MS. SCHLUMP PETERS:

**Q. Did you get divorced because she found out about your affair with Lauren Southern?**

MR. BRETTLER: Objection to form.

THE WITNESS: No.

BY MS. SCHLUMP PETERS:

**Q. When did you last communicate with Melina?**

A. I would say maybe two years ago.

**Q. When was the substance of that communication?**

A. Basically running over the divorce, going over the outcome and everything.

**Q. Okay. And after November 29, 2024, have you communicated with Melina?**

A. No.

**Q. You never discussed with Melina plaintiff's efforts to depose her?**

A. No.

**Q. And you shared sexually intimate images of Melina with random individuals; correct?**

MR. BRETTLER: Objection. Vague and ambiguous. Calls for speculation.

And if you know, you can answer.

THE WITNESS: I would say no.

BY MS. SCHLUMP PETERS:

**Q. You didn't share sexually explicit images of your own wife?**

MR. BRETTLER: Objection. Asked and answered.

THE WITNESS: That sounds different than the last question you asked.

BY MS. SCHLUMP PETERS:

**Q. Who did you share sexually explicit**

**images of your wife with?**
MR. BRETTLER: Objection. Assumes facts not in evidence.
You can answer the question, if you understand it.
THE WITNESS: I wouldn't be able to recall.
BY MS. SCHLUMP PETERS:
**Q. That many people that you can't recall?**
MR. BRETTLER: Objection. Assumes facts not in evidence. And it misstates the witness's testimony.
THE WITNESS: I just wouldn't be able to recall.
MS. SCHLUMP PETERS: I prefer you keep your objections to a minimum. Speaking objections are not allowed here. So no coaching of the witness. Thank you,
MR. BRETTLER: I'm not coaching the witness.
BY MS. SCHLUMP PETERS:
**Q. Now, after November 29, 2024, you are aware that Melina posted a video stating that you had shared her sexually explicit images without**

**her consent; right?**

MR. BRETTLER: Objection. It assumes facts not in evidence.

If you understand the question, you can answer it.

THE WITNESS: I'm not specifically aware, no.

BY MS. SCHLUMP PETERS:

**Q. You didn't see the video that she posted?**

MR. BRETTLER: Objection. Asked and answered.

THE WITNESS: No.

BY MS. SCHLUMP PETERS:

**Q. Are you aware that she signed on to the telephonic link to the hearing on the motion for continuance last week?**

A. I don't believe that's true.

**Q. So you are not aware then?**

A. I guess not, no.

**Q. Now, you're bisexual; correct?**

MR. BRETTLER: Objection. I mean that's an absolutely outrageous question. You can answer it if you want to, but you don't have to answer that

question.

THE WITNESS: Sure.

BY MS. SCHLUMP PETERS:

**Q. Have you ever been arrested or had any encounters with law enforcement other than your traffic citations?**

A. No. I'm sorry, encounters with law enforcement?

**Q. Yes, encounters.**

A. I've been swatted a few times.

**Q. By law enforcement?**

A. Well, by another person who attempts to summon law enforcement to your house or apartment.

**Q. So law enforcement came to --**

A. My apartment.

**Q. -- to deal with that?**

A. Yeah.

**Q. Have you ever been under investigation by law enforcement?**

A. I don't think I would know. I don't think I could answer that.

**Q. Has the FBI ever contacted you?**

A. Yes.

**Q. So that's law enforcement?**

A. I'm aware, but I don't know that that counts as an investigation.

**Q. So you've stated that the FBI has contacted you. When was that?**

A. I wouldn't be able to recall. Several times.

**Q. Several times?**

A. Uh-huh.

**Q. Give me an approximate idea of when. In the last year?**

A. Yes.

**Q. And were all those contacts fro, the FBI in the past year or prior to that?**

A. It's been prior to that as well.

**Q. So what was the reason, the first time the FBI contacted you?**

A. The very first time might have been ten years ago. Somebody online said that I was threatening to kill somebody so the FBI comes and they usually perform an interview and they leave afterwards.

**Q. And had you threatened to kill somebody?**

A. No.

**Q. When was the next time?**

A. I don't remember off the top of my head.

**Q. What was the reason that the FBI contacted you again?**

A. Some variation of that. Somebody will claim that I'm threatening to blow up a school or bomb a church or murder somebody so either local law enforcement or federal law enforcement will have to come out and ask questions to verify the online complaints.

**Q. Okay. What about the next time they contacted you?**

A. I don't remember.

**Q. You said they contacted you this past year?**

A. Correct.

**Q. When was that about?**

A. One time was because an online content creator had threatened to kill me. Another time was because a not-online person, a private person apparently was making plans to kill me. I think there are a couple of other times, but there are a multitude of these types of encounters.

**Q. And did you meet in person?**

A. Yes. I think three times.

**Q. Has anybody -- did the FBI ever ask to see your electronic devices?**

A. No.
**Q. Or did they request any documents or any data from you?**
A. Maybe like a phone number or an e-mail address, but that's it.
**Q. So they never served you with a search warrant?**
A. Never.
**Q. Now, are you aware of any complaints that have been filed with the police about you?**
A. Can you clarify what you mean by "aware."
**Q. What do you think "aware" means?**
MR. BRETTLER: Don't argue with the witness.
MS. SCHLUMP PETERS: I'm asking him.
MR. BRETTLER: He's asking you to rephrase the question.
MS. SCHLUMP PETERS: No, he didn't.
MR. BRETTLER: I'm asking you to rephrase the question.
BY MS. SCHLUMP PETERS:
**Q. What do you think "aware" means?**
A. It could mean that they have made me

aware or that somebody has claimed as such.

**Q. Okay. So on either of those bases, are you aware that a police report or complaint has been filed against you?**

MR. BRETTLER: Objection. It's vague and ambiguous. And it's a compound question, but if you understand it, you can answer.

THE WITNESS: From the police, no, I have never been made aware of that before.

BY MS. SCHLUMP PETERS:

**Q. But you have been made aware of it by online posts about it?**

A. I have heard people claim that, yes.

**Q. And you were present at plaintiff's deposition; right?**

MR. BRETTLER: Asked and answered.

THE WITNESS: Yes.

BY MS. SCHLUMP PETERS:

**Q. So you are aware that she filed a complaint with the police?**

A. I heard her say that, yes.

**Q. So currently there is no ongoing criminal investigations against you?**

A. I have no way of knowing that.
**Q. If you know -- so you don't know of any?**
A. I don't know.
MS. SCHLUMP PETERS: All right. I'd like to mark as Exhibit 1 a document bearing production numbers SB0000550 through SB014452. We actually have them in two separate binders so we're going to mark them as -- .
Off the record for one minute.
THE VIDEOGRAPHER: We're going off the record. The time is 10:36 a.m.
(Off the record.)
THE VIDEOGRAPHER: We're back on the record. The time is 10:37 a.m.
(Plaintiff's Exhibit No. 1 was marked for identification.)
MS. SCHLUMP PETERS: I want to clarify that Exhibit 1, which we have just marked, is a document bearing production numbers SB0000550 through SB1616.
BY MS. SCHLUMP PETERS:
**Q. So you have the entire exhibit in front of you, Mr. Bonnell?**

A. Yes.

**Q. Now, you produced this document; correct?**

MR. BRETTLER: Objection. This is a one-thousand-page document. You can take as much time as you need on the record to review this exhibit, this one-thousand-page exhibit and then determine if this is something that you produced. And take all the time you need.

THE WITNESS: On cursory glance, assuming the Bates stamps and everything are correct, this appears to be my production, yes.

BY MS. SCHLUMP PETERS:

**Q. And this production consists of what you produced in response to a request for your communications between you and the plaintiff in this case; correct?**

MR. BRETTLER: Objection. Vague and ambiguous.

You can answer.

THE WITNESS: Yes.

BY MS. SCHLUMP PETERS:

**Q. Do these -- does this Exhibit 1 reflect all of the messages and communications --**

MR. BRETTLER: Objection.

BY MS. SCHLUMP PETERS:

**Q. -- between you and plaintiff over the years --**

MR. BRETTLER: Objection.

BY MS. SCHLUMP PETERS:

**Q. -- to your understanding?**

MR. BRETTLER: Objection.

It's impossible for you to answer that based on the fact that she just threw a thousand pages of material in front of you, but you can answer if --

MS. SCHLUMP PETERS: Mr. Brettler.

MR. BRETTLER: You can answer if you understand.

MS. SCHLUMP PETERS: Please.

THE WITNESS: I'm sorry. Could you repeat the question.

MS. SCHLUMP PETERS: Yes.

BY MS. SCHLUMP PETERS:

**Q. So you produced these in response to the request for all of your communications between you and plaintiff?**

MR. BRETTLER: Same objection.
If you understand the question, you can answer it.
THE WITNESS: Yes, I produced these in response to the request for all the communications between me and plaintiff, yes.
BY MS. SCHLUMP PETERS:
**Q. So you are affirming today that this represents all of your communications between you and the plaintiff; correct?**
MR. BRETTLER: Objection.
Objection. This is --
MS. SCHLUMP PETERS: Mr. Brettler.
MR. BRETTLER: Excuse me. I'm stating an objection.
MS. SCHLUMP PETERS: Speaking objections are not permitted.
MR. BRETTLER: That's great. I'm objecting to your question on the grounds that you just put a one thousand plus page document in front of my client and you are asking him to tell you without giving him more than a few minutes to look whether or not it's

comprehensive of all of his communications. That's an improper question.

He can answer it to the best of his ability.

MS. SCHLUMP PETERS: He produced these documents. It has his Bates stamp numbers on them. So I think he would know if there were other things besides what was produced in this chat thread.

MR. BRETTLER: Same objection and same instructions.

THE WITNESS: These were all the communications between me and plaintiff that I was able to produce, yes.

BY MS. SCHLUMP PETERS:

**Q. That you were able to produce; can you clarify that, please?**

A. It's possible that we might have messaged each other on a game or something. I wouldn't have access to that communication or something like that.

**Q. Okay. Thank you for that clarification.**

**When did you first communicate with plaintiff about -- approximately?**

A. I would say sometime in late 2019.
**Q. October 2019?**
A. Based on my production it would probably be about then, yes. I believe the first message she sent me was pretty quickly after we had an online panel together. So my guess is it would have been a few days before the 23rd of October 2019.
**Q. And that online panel that you had together was that the first time you met plaintiff?**
A. I believe so.
**Q. And that was in person?**
A. No.
**Q. That was online?**
A. Yes.
**Q. When did you first meet her in person?**
A. I believe it was September 11, 2020.
**Q. So --**
A. Or I can check in here if that seems to be incorrect.
**Q. No, that's okay. So approximately September 11, 2020, is the first time you met her. Just for purposes of clarity, are you referring to when you met her at the hotel?**

A. In person, yes.
**Q. So that was the first time you met her?**
A. In person, yes.
**Q. And my understanding is that date was September 12, 2020, if that refreshes your recollection.**
MR. BRETTLER: You don't need to accept that as true. If it refreshes your recollection, great.
THE WITNESS: If you give me a minute, I can go through these and it will be clearly --
BY MS. SCHLUMP PETERS:
**Q. That's okay. We'll get to it.**
**When was the last time you directly communicated with the plaintiff?**
A. I believe it would have been maybe December 12th of 2024 or maybe a couple of days after that.
**Q. And so your relationship started on a professional level?**
MR. BRETTLER: Objection. Vague and ambiguous.
You can answer.
THE WITNESS: I suppose you could

say that.
BY MS. SCHLUMP PETERS:
**Q. You were an established streamer at the time; right?**
A. Yeah, I don't think she was though, so professional, I guess.
**Q. Well, was she trying to establish herself as a streamer at that time?**
MR. BRETTLER: Objection. Calls for speculation.
THE WITNESS: I wouldn't know.
BY MS. SCHLUMP PETERS:
**Q. Why was she on the panel with you?**
MR. BRETTLER: Objection. Calls for speculation.
THE WITNESS: Anybody can join those panels.
BY MS. SCHLUMP PETERS:
**Q. Did she join as a streamer or did she just join as some random individual?**
MR. BRETTLER: Objection. Calls for speculation.
THE WITNESS: I couldn't know.
BY MS. SCHLUMP PETERS:
**Q. You couldn't know, but you were on the**

**panel with her?**
A. As a streamer I was, yes.
**Q. You are aware though, based on your communications with plaintiff, though that she was trying to establish herself as a streamer, aren't you?**
A. At what point?
**Q. After you met her.**
MR. BRETTLER: Objection. Vague and ambiguous.
THE WITNESS: My understanding is plaintiff has gone back and forth between several potential career paths or ideas. So it depends on when, at what point in time.
BY MS. SCHLUMP PETERS:
**Q. So my question was when you met her. Let's say late 2019.**
A. I'm not aware of that. I don't remember.
**Q. And you developed a friendship with her in your messaging; correct?**
A. Yes.
**Q. And after October 2019, you were messaging each other almost daily; right?**

A. Assuming you're characterizing the chat logs correctly, yes, but I don't remember specifically.

**Q. Do you want to skim through it and verify that?**

MR. BRETTLER: Take as much time as you need.

MS. SCHLUMP PETERS: You can just look at the dates and --

MR. BRETTLER: You can look at whatever you'd like for as long as you like while we're on the record.

MS. SCHLUMP PETERS: Mr. Brettler, I will instruct the deponent. You don't need to tell him your ground rules. These are my ground rules.

MR. BRETTLER: You can take as much time as you need to review as many documents as you'd like.

MS. SCHLUMP PETERS: You can take as much time as I allow, Mr. Bonnell.

MR. BRETTLER: We are on the record. She has 6 hours and 31 minutes left.

MS. SCHLUMP PETERS: And I would

very much appreciate if you would stop your speaking commentary, which is not allowed under the rules, Mr. Brettler.

THE WITNESS: I would say we communicated frequently in the first month or two of our communications, yes.

BY MS. SCHLUMP PETERS:

**Q. And do you recall how old plaintiff was when you met her?**

A. At the hotel, 21.

**Q. Okay. So if that was in 2020 and you met her in 2019?**

MR. BRETTLER: Objection. Misstates the witness's testimony.

BY MS. SCHLUMP PETERS:

**Q. You did state that you met her in 2019; correct?**

MR. BRETTLER: Objection. Misstates the witness's testimony.

THE WITNESS: Can you clarify on met? In person or online?

BY MS. SCHLUMP PETERS:

**Q. I meant met online. I'm sorry.**

A. Online in 2019, yes, I believe she was 20 when we first talked online.

**Q. And how old were you when you first talked online?**

A. I believe 30.

**Q. That would have been 2019?**

A. Yeah.

**Q. And take a look at the document marked as SB614. It's page 000614.**

**Do you see the date on the document?**

A. Correct.

**Q. And what is that date?**

A. November 25, 2019.

**Q. Okay. And at 4:11 a.m., the plaintiff confided in you that she was a virgin; correct?**

A. Yes.

**Q. And then you continued conversing with her. And if you now turn to the document marked SB0000636, what is the date on that document?**

A. January 24, 2020.

**Q. And do you see that at 5:34 a.m. you asked the plaintiff what are you into sexually?**

MR. BRETTLER: Excuse me. I don't see that on page 636 at that date and timestamp.

BY MS. SCHLUMP PETERS:

**Q. Do you see it, Mr. Bonnell?**

A. No.
**Q. Can you look at page 637?**
A. Okay.
**Q. At 5:34 a.m.**
A. I see multiple messages at 5:34 a.m.
**Q. Do you see that you asked plaintiff at 5:34 a.m. what are you into sexually?**
A. Yes.
**Q. And what was her response?**
A. To that -- directly to that message, the next thing that she responded to or --
**Q. To your question.**
A. What?
**Q. You said what are you into sexually?**
MR. BRETTLER: Are you asking him to read this document?
BY MS. SCHLUMP PETERS:
**Q. I'm asking you, Mr. Bonnell, to read her response into the record.**
MR. BRETTLER: You can read the response.
THE WITNESS: The next sentence she types is, "LOL for me being a virgin it's a really long list."
BY MS. SCHLUMP PETERS:

[redacted]

BY MS. SCHLUMP PETERS:

**Q. And she confided in you because she trusted you; right?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: Possibly.

BY MS. SCHLUMP PETERS:

**Q. And you had developed a friendship with her; right?**

MR. BRETTLER: Asked and answered.

You can answer again.

THE WITNESS: An online one, yes.

BY MS. SCHLUMP PETERS:

[redacted]

[redacted]

MR. BRETTLER: Objection. Calls for speculation. It's vague and ambiguous.

THE WITNESS: No, I would say she steered.

BY MS. SCHLUMP PETERS:

**Q. Oh. Let's turn to SB699 -- actually take a quick look at SB698 first and just skim through the content of that page,**

MR. BRETTLER: Take as much time you need.

BY MS. SCHLUMP PETERS:

**Q. It's nothing sexual, is it?**

A. This is Bates stamped 698; correct?

**Q. Correct.**

MR. BRETTLER: Take as much time as you need to review the context.

THE WITNESS: I would say correct, your characterization was correct.

BY MS. SCHLUMP PETERS:

**Q. And now, turn to the next page Bates stamped SB699 and at the top of the page, you write, "I fell back asleep since the last message and had sexy dreams about you. Nice."**

**Do you see that?**
A. Uh-huh.
**Q. And you messaged that to her; right?**
A. Correct.
**Q. And plaintiff was very clear with you in her communications with you that she did not want anyone to know about you having sex with her; right?**
MR. BRETTLER: Objection. Vague and ambiguous. Calls for speculation, but you can answer.
THE WITNESS: No -- or I would need further --
BY MS. SCHLUMP PETERS:
**Q. No, she was not clear or no, she did not want anyone to know about you having sex?**
MR. BRETTLER: Same objection.
THE WITNESS: No, she did not want anybody to not know about -- I'm sorry. Let me rephrase.
There were people that knew -- there necessarily were people that knew we had sex and were having sex.
BY MS. SCHLUMP PETERS:
**Q. My question to you was:**

**Did plaintiff communicate to you that she did not want anyone to know that you had sex together?**

A. No.

MR. BRETTLER: Same objection.

THE WITNESS: No.

BY MS. SCHLUMP PETERS:

**Q. That's correct; right?**

MR. BRETTLER: No, you're --

THE WITNESS: No, she did not communicate that, no.

BY MS. SCHLUMP PETERS:

**Q. She didn't?**

A. Or she might have communicated, but that's not accurate.

**Q. So let's look at SB776 to 77. And then do you see your message at 9:58 p.m.?**

A. Yes.

**Q. And you asked Pxie "How do you want to handle this publicly? Do you want people to know that we're hanging out, that you're staying in LA, etcetera? You should consider the pros, cons of this."**

A. I see that message, yes.

**Q. And then what was her response at**

**10:20 p.m. on February 26, 2020?**

A. Plaintiff types, "So, one, publicly, I'm okay with people knowing we're hanging out, but if anyone asks questions about us having sex or anything along those lines, I'd rather deny and keep that private between us.

"Two, preferably, I would stay with you since you are the person I know best in LA, but I do know you get tired with other people easily, so I could also try finding another place if that would make things easier for you/on you."

**Q. And then on the next page 777 at 10:24 p.m., Pxie says "Don't worry. I totally trust you and you have been very clear with how seriously you take consent and I also feel that you have been very honest with me so I trust you and your words."**

**Do you see that?**

A. Yes.

**Q. Now, when she said to you, I don't want anyone to know that we're having sex, that we had sex, or will have sex --**

MR. BRETTLER: Objection.

Misstates the document.

BY MS. SCHLUMP PETERS:

**Q. What was your understanding of that?**

MR. BRETTLER: Same objection. It misstates the document, but you can answer the question if you understand it.

THE WITNESS: Can you clarify which message you're referring to.

BY MS. SCHLUMP PETERS:

**Q. I'm referring to the one at 10:20 p.m. that you read aloud into the record "Publicly I'm okay with people knowing we're hanging out, but if anyone asks questions about us having sex or anything along those lines, I'd rather deny and keep that private between us." What did that mean to you?**

A. So as streamers or public figures, we have public lives and we have private lives. A public statement would be me on stream or on YouTube stating I've hooked up with somebody or had a sexual relationship with somebody. Private would mean just between, like, a group of friends, or offline, not publicly available on social media.

**Q. So she says, I'd like it to be kept private between us. She meant you and her;**

**right?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: Absolutely not.

BY MS. SCHLUMP PETERS:

**Q. She didn't just mean private between us? She was only talking to you in this communication; correct?**

A. In this communication she was only talking to me, but there is no way that she could have just meant that.

**Q. Was she an established streamer at that time?**

MR. BRETTLER: Objection. Calls for speculation. It's vague and ambiguous.

THE WITNESS: I don't remember.

BY MS. SCHLUMP PETERS:

**Q. Okay. And so, how would you interpret "private between us" as meaning anything other than that?**

A. I would repeat what I said earlier. There is a private -- like a group of friends that you have offline that you talk about things with and then publicly there are statements that

you make online that everybody knows about.
**Q. Did she say that?**
A. I would say from the totality of interactions that was obviously the case.
**Q. She didn't say that there though, did she?**
A. No, but our interactions span more than a single message --
**Q. Can you point to any?**
MR. BRETTLER: Excuse me.
Ms. Peters, do not interrupt the witness when he's answering a question.
You can finish your answer, and then she can ask you another question.
BY MS. SCHLUMP PETERS:
**Q. Mr. Bonnell, can you point to any evidence where she made that distinction that you've made today?**
MR. BRETTLER: Objection. This is not a demonstrative exercise.
You need not point to any evidence. You can answer yes or no.
THE WITNESS: I mean, given more time, I'm sure I could find messages or something, but.

BY MS. SCHLUMP PETERS:

**Q. You think you could find a message where she says it's okay if --**

A. Well, given that the -- I mean, the complaint is about a video that at the very least even plaintiff has claimed that I've been allowed to share with my wife and with her boyfriend. That would be at least two other people, outside of a private, just between me and her that would have known about us having sex.

**Q. This isn't talking about that. We'll get to those specifics in a minute, but right now she's talking about keeping any sexual relationship between the two of you private; correct?**

MR. BRETTLER: It says you, Ms. Peters.

You need not express -- you know, adopt that as truth. You may answer the question.

MS. SCHLUMP PETERS: Mr. Brettler, your speaking objections are not permissible.

MR. BRETTLER: You can answer.

MS. SCHLUMP PETERS: I think you

know the federal rules by now.

MR. BRETTLER: You can answer.

THE WITNESS: So going by this message and the one before, the conversation we're having seems to be one of public and private with regards to streamer life, not with regards to absolutely secrecy about some hook up event.

BY MS. SCHLUMP PETERS:

**Q. There is no evidence in the record, is there --**

MR. BRETTLER: Don't answer.

BY MS. SCHLUMP PETERS:

**Q. -- that she made any such distinction?**

MR. BRETTLER: Don't answer.

THE WITNESS: I would have to go through the totality of everything submitted to find that, but it does not seem to be consistent with everything else, that she would have wanted this to be only between me and her.

BY MS. SCHLUMP PETERS:

**Q. And turn to page SB000703, please.**

A. 703?

[redacted]

Q. Did you ever tell plaintiff before you

**recorded your sexual encounter with her that you like to take videos of yourself having sex with other people and then share them with random people?**

MR. BRETTLER: Objection. It's compound. Vague and ambiguous, but if you understand, you can answer that question.

THE WITNESS: It's possible at some point. I don't recall every conversation we've had.

BY MS. SCHLUMP PETERS:

**Q. Okay. So if it's not in the documents you produced, you probably did not say it; correct?**

MR. BRETTLER: Objection. It calls for speculation.

THE WITNESS: No, that's not necessarily true. We had phone calls as well.

BY MS. SCHLUMP PETERS:

**Q. And is it your testimony here today under oath that you told her this in a phone conversation?**

A. No, my testimony is that I don't recall

I specifically ever said that.

**Q. Now, in -- let's look at SB001297.**

MR. BRETTLER: Next binder.

BY MS. SCHLUMP PETERS:

**Q. Now this is March 4, 2023; correct?**

A. Yes.

**Q. And around this date, did another content creator named Lav allege that you and plaintiff had had sexual relations?**

A. Yes.

**Q. Okay.**

A. Or wait. I'm so sorry. Could you restate that question?

**Q. I said that in March 2023 did another content creator named Lav allege you and plaintiff had sexual relations?**

A. I don't remember exactly what she alleged, but it might have been. I don't remember exactly what she alleged.

**Q. Something along those lines?**

A. It's possible, but I don't remember exactly.

**Q. Well, maybe it will refresh your recollection to look at the messages starting at 8:46 p.m. on March 4, 2023. You can just read to**

**yourself Pxie's message.**

A. Yes.

**Q. Okay. And then can you read into the record your response at 1:20 a.m. on March 5, 2023.**

A. I type "Just as a heads-up, I don't think I've told anyone except Melina that we hooked up. So if Max/Lav are claiming that, I don't know if they're just assuming it or if you've told someone. I don't care if it gets out or anything. I just don't want you to think I'm like talking a bunch of shit behind your back or anything."

**Q. So you specifically told the plaintiff that you hadn't told anyone except Melina about your sexual relations; correct?**

A. Correct.

**Q. In 2023 -- and she was very concerned that you wouldn't tell anybody; right?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: She was concerned that I wouldn't tell anybody?

BY MS. SCHLUMP PETERS:

**Q. Anybody besides Melina; correct?**

MR. BRETTLER: Again it calls for speculation.

I don't know how you could know, but if you do, you can answer.

BY MS. SCHLUMP PETERS:

**Q. Well, you can look at the next page, SB001298 and she says, "No one knows either on my end except my ex-boyfriend. I trust you, believe you. Do you think they are going to make up a bunch of stuff?" You see that?**

A. I do.

**Q. So she was concerned about anybody finding out; correct?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: I don't get that from these messages. It seems like she's concerned about a specific person finding out.

BY MS. SCHLUMP PETERS:

**Q. Well, that person was streaming about it; correct?**

MR. BRETTLER: Objection. Vague and ambiguous. Assumes facts not in evidence.

BY MS. SCHLUMP PETERS:
**Q. Lav was a streamer?**
A. Not really.
**Q. Sort of?**
MR. BRETTLER: Objection. Vague and ambiguous.
If you understand, you can answer.
THE WITNESS: Not really, no.
BY MS. SCHLUMP PETERS:
**Q. So how did Lav post or tell people that you and Pxie were intimate?**
MR. BRETTLER: Objection. Calls for speculation.
If you know, you can answer.
THE WITNESS: On some social media platform.
BY MS. SCHLUMP PETERS:
**Q. Social media platform. And when you told the plaintiff that the only other person that you had told was Melina, that was a lie, wasn't it?**
A. That's not an accurate characterization of my message, so I can't answer that.
**Q. Well, you had already shared the video with Rose; right?**

MR. BRETTLER: Objection. Assumes facts not in evidence.
You can answer.
THE WITNESS: What is the question?
BY MS. SCHLUMP PETERS:
**Q. My question is that in your statement, at SB001297 you state, "I don't think I've told anyone except Melina that we hooked up."**
A. Yes.
**Q. That wasn't true; right?**
A. It wasn't true that at that point in time, I didn't think I told anybody besides Melina that we'd hooked up? No, I think that was true.
**Q. It was true? But you had already shared the video with Rose?**
MR. BRETTLER: Objection. Assumes facts not in evidence and assumes that sending a video is the same as telling someone.
THE WITNESS: I sent a video, but that is not what is being discussed here.
BY MS. SCHLUMP PETERS:
**Q. What did that video depict?**

A. Me hooking up with somebody.

**Q. You hooking up with the plaintiff; correct?**

A. The plaintiff is not universally known by all.

**Q. But her face was visible, wasn't it?**

MR. BRETTLER: Objection. Calls for speculation, but if you know, you can answer.

THE WITNESS: Partially.

BY MS. SCHLUMP PETERS:

**Q. And she was identifiable, wasn't see?**

MR. BRETTLER: Objection. Calls for speculation. Vague and ambiguous as to what she means by identifiable.

THE WITNESS: By a family member or a friend, maybe.

BY MS. SCHLUMP PETERS:

**Q. Okay. We'll get to that.**

**Then at 1298, March 5, 2023, at 2:45 a.m., can you read into the record what Pxie wrote there?**

A. At 2:45 a.m. she writes "Okay. One last question. You promised me you haven't leaked it out to anyone else; right? I just need to know

100 percent before I go nuclear."

**Q. And your response?**

A. My response at 2:46 a.m. "I am trying to rack my brain so hard LOL. I'm sure Dan and MrMouton know because we were literally there together with them, but I don't think they would have told anyone. That would be so weird. I don't know if it's worth blowing it up though, because there's not much to gain and if somehow they do have something linking us as hooking up, it would look bad."

**Q. Who are Dan and MrMouton?**

A. They were two friends that were present at the hotel when me and Pxie met in real life.

**Q. So they knew that you were there together?**

A. Yes.

**Q. Did they know that you were there and engaged in sexual relations?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: I can't know what was in their minds, but it would be an incredibly reasonable assumption, yes.

BY MS. SCHLUMP PETERS:

**Q. But they didn't witness that; correct?**
A. Not to my knowledge, no. I'm sorry; they didn't witness --
**Q. You having sex with plaintiff?**
A. No, but they knew we were staying in the hotel together.
**Q. So when she says "Promise me you haven't leaked it out to anyone else; right," you didn't tell her that you had sent the video to Rose in response, did you?**
MR. BRETTLER: Objection. It assumes facts not in evidence.
You can answer if you know.
THE WITNESS: That's not the reply to her message, no.
BY MS. SCHLUMP PETERS:
**Q. And you had already sent the video to Rose; right?**
MR. BRETTLER: Objection. Assumes facts not in evidence. You're referring to a video that we haven't even brought up to date, but you can answer if you know.
THE WITNESS: Yeah, but it's not responsive to her prompt.

BY MS. SCHLUMP PETERS:

**Q. That's not responsive to "You promise me you haven't leaked it to anyone else"?**

MR. BRETTLER: Objection. It's argumentative. You need not answer that question.

You can ask another question.

MS. SCHLUMP PETERS: You can answer the question, Mr. Bonnell.

MR. BRETTLER: Same objection.

THE WITNESS: I don't believe so, no.

BY MS. SCHLUMP PETERS:

**Q. You don't believe that. I see.**

A. She was asking with regard to public knowledge. It wasn't public knowledge at that time, which was evidenced by the fight that they had where Lav did not have knowledge of that event.

**Q. So how many people do you think you could share the sexually explicit video of plaintiff with that wouldn't violate her asking you to promise not to leak it out?**

MR. BRETTLER: Objection. Vague and ambiguous.

If you understand that question,
you can answer it, but I don't think it
was a proper question.
THE WITNESS: I can't possibly know
the answer to that question.
BY MS. SCHLUMP PETERS:
**Q. Why can't you possibly know the answer?**
MR. BRETTLER: Objection.
Argumentative.
THE WITNESS: I could share the
video with the PewDiePie, the most
popular YouTuber of all time, and
everybody would know. I could share the
video with a million people in Australia
and nobody would know. So it doesn't --
BY MS. SCHLUMP PETERS:
**Q. But you know that when you share**
**something, a video, confidential information, to**
**one person it can spread; right? You know that?**
MR. BRETTLER: Objection. It's an
incomplete hypothetical.
MS. SCHLUMP PETERS: Please stop
the speaking objections.
MR. BRETTLER: Excuse me,
Ms. Peters, that is not a speaking

objection.

MS. SCHLUMP PETERS: Yes, it is.

MR. BRETTLER: It's an improper question. You are asking an incomplete hypothetical.

If you understand the question, you can answer it, but it's a hypothetical that you need not answer.

MS. SCHLUMP PETERS: If he doesn't understand the question, he can ask me to rephrase it.

MR. BRETTLER: And I can make objections for the record. Don't get frustrated with me.

MS. SCHLUMP PETERS: I am getting frustrated because you are doing speaking objections.

MR. BRETTLER: Just like you and your colleagues have done at every deposition, we have noticed, in this case.

MS. SCHLUMP PETERS: No.

MR. BRETTLER: Until you were put on mute at the last deposition. Yes.

MS. SCHLUMP PETERS: No, Mr. Lopez

only objected as to form and that is a proper objection in Florida.

So let's continue, Mr. Bonnell.

BY MS. SCHLUMP PETERS:

**Q. So it seems based on everything we have reviewed so far, plaintiff was quite explicit with you that she didn't want anyone to know about your sexual relations together, would you agree?**

MR. BRETTLER: Objection. That misstates the testimony today. It misstates the documents and it assumes facts not in evidence, but you can answer.

THE WITNESS: That doesn't seem to be what I've read, no.

BY MS. SCHLUMP PETERS:

**Q. She didn't say promise me you haven't leaked it out to anyone else?**

MR. BRETTLER: Objection. Same objection.

THE WITNESS: She did, but between the two of us, we have brought up at least four other people that know that we had a sexual encounter and she didn't

seem to have a negative response to
that.
BY MS. SCHLUMP PETERS:
**Q. Well, you just said Dan and MrMouton were not present when you were having sex; correct?**
A. No, but I responded in the affirmative that they probably assumed that we did and she didn't seem to care.
**Q. She didn't seem to care. That's how you interpret that? Interesting.**
**Now, at some point you and plaintiff agreed to meet for purposes of a sexual encounter; correct?**
A. Correct.
**Q. Whose idea was that?**
A. I don't remember.
**Q. And where did you meet?**
A. I don't remember.
**Q. Was it at a hotel?**
A. Yes.
**Q. Who reserved the hotel room?**
A. I don't remember, but it probably would have been me.
**Q. And you lived in Miami at the time;**

**right?**
A. I don't believe so.
**Q. 2020?**
A. I think I would have lived in California.
**Q. So you were just visiting in Miami at the time?**
MR. BRETTLER: Objection. Assumes facts not in evidence.
THE WITNESS: Yes.
BY MS. SCHLUMP PETERS:
**Q. Now, you testified during the preliminary injunction hearing that you don't recall your conversations at the hotel before recording the video; is that right?**
A. Yes.
**Q. Plaintiff in her deposition does recall -- you heard her testimony -- she does recall the conversations; right?**
MR. BRETTLER: Objection. Vague and ambiguous.
THE WITNESS: I wouldn't agree, but.
BY MS. SCHLUMP PETERS:
**Q. But you heard her testimony that she**

**does recall? Yes?**

A. I recall hearing what I felt like was conflicting testimony at times about our conversations at the preliminary injunction hearing.

**Q. I'm talking about her testimony at her deposition.**

A. At her deposition?

**Q. Yes.**

MR. BRETTLER: It's vague and ambiguous. I don't even think we talked about that.

THE WITNESS: I don't recall hearing her testify to the conversations we had at the hotel at the deposition.

I only recall her testifying to that at the preliminary injunction evidentiary hearing.

BY MS. SCHLUMP PETERS:

**Q. So do you recall that she asked you if it was okay if she could share the video with her boyfriend at the time?**

A. No.

**Q. You don't recall that?**

A. Never.

**Q. So normally when you record a video with another individual, male or female, do you make sure that your face is not visible?**

A. No.

**Q. You don't?**

A. No.

**Q. But in the videos you recorded with the plaintiff, your face is not visible; correct?**

A. In the video or --

**Q. Well --**

A. In the video -- I believe my face is not visible in the video, correct, but my voice is.

**Q. Your voice but not your face; correct?**

A. Correct.

**Q. But the plaintiff's face is visible; right? You said that?**

MR. BRETTLER: Asked and answered.

THE WITNESS: Partially, yes.

MR. BRETTLER: We've been going for about an hour. I'd like to take a five-minute break. We can go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 11:17 a.m.

(A brief break was had.)

THE VIDEOGRAPHER: We're back on the record. The time is 11:26 a.m.
BY MS. SCHLUMP PETERS:
**Q. Before the break, Mr. Bonnell, we were talking about September 12, 2020, and you're at the hotel with the plaintiff. Do you recall whether at the hotel you said to her is it okay if I share any of the videos we record?**
A. No.
**Q. You don't recall?**
A. Not specifically, no. I'm sure we had a conversation about it, but I don't recall the specifics of the conversation.
**Q. And at the hotel, you video recorded the sexual interactions?**
A. Yes. Not all of them, but some of them, yes.
**Q. Some of them. How many videos did you record?**
A. I believe three.
**Q. And how did you record them?**
A. With my phone.
**Q. And you were holding the phone while you recorded?**
A. Yes.

**Q. Okay. And you were making sure your face was not visible; correct?**

MR. BRETTLER: Objection. Asked and answered.

THE WITNESS: No.

BY MS. SCHLUMP PETERS:

**Q. Okay. So when I asked you and you made sure your face was not visible and you said no, you were not making sure or you were making sure?**

A. I was not making sure that my face was not visible. If my face is or isn't visible, it's probably going to be a byproduct of whatever we're doing, not an intentional choice by me to obscure my face.

**Q. Nevertheless your face was not visible; correct?**

MR. BRETTLER: Objection. Asked and answered.

THE WITNESS: I don't recall. I believe one video is the subject of this complaint. I haven't seen the other two in a long time so I don't recall.

BY MS. SCHLUMP PETERS:

**Q. But the video that is the subject of this complaint, your face is not visible;**

**correct?**

A. Only my voice but not my face.

**Q. And after you recorded the videos, did you share them with the plaintiff?**

A. Yes.

**Q. How did you share them?**

A. I believe I uploaded them to a -- I think it was a Google Drive folder and then I think I sent her links to the videos.

**Q. So you did not share them with her while you were at the hotel via AirDrop perhaps?**

A. No. Well, I'm sorry, that was a compound question.

I shared them with her while I was at the hotel, but it wasn't via an AirDrop because I don't believe I had an iPhone at the time so it would have been with Google Drive.

**Q. Okay. So what you're saying is at the hotel you uploaded the three videos on to a Google Drive and then shared them to the plaintiff while you were at the hotel?**

A. I believe so, yes.

**Q. And so these three videos were then stored on that same Google Drive?**

A. Same as what?

**Q. Your Google Drive that you uploaded them to?**

A. I uploaded them to a Google Drive and then I shared the three links to the individual videos with the plaintiff, yes.

**Q. And are those videos still on that Google Drive that you uploaded them to?**

MR. BRETTLER: Objection. Calls for speculation, but if you know, you can answer.

THE WITNESS: No.

BY MS. SCHLUMP PETERS:

**Q. They're not?**

A. No.

**Q. And why aren't they?**

A. I imagine because I removed them years ago.

**Q. When do you think you removed them?**

A. I don't recall.

**Q. You deleted that Google Drive, didn't you?**

A. Can you specify when you say the Google Drive, what do you mean by that?

**Q. The Google Drive that you just told me you uploaded those videos to?**

A. The Google Drive is attached to a Google account. The entire account still exists. The individual links, the files themselves were removed from the Google Drive, yes.

**Q. Who else did you share the videos of plaintiff to besides plaintiff?**

A. I can't recall. My belief is nobody beyond the other person in the complaint, Rose.

**Q. Rose. What about Melina?**

A. I don't think so, but I don't remember.

**Q. So I believe in a declaration to the court you did state that you showed them to Melina?**

MR. BRETTLER: Objection.

MS. SCHLUMP PETERS: You don't recall that?

MR. BRETTLER: Objection. Misstates testimony, but you can answer.

BY MS. SCHLUMP PETERS:

**Q. I'm asking if you recall, Mr. Bonnell.**

A. I could, but that's different than the question you asked me before. It's possible I showed them to Melina, but I didn't send her the files.

**Q. So you're saying there is a distinction**

**between showing the video and transferring the video?**

A. I think everybody would say that, yes.

**Q. So you -- to clarify you showed the video to --**

A. My testimony is I don't recall --

**Q. -- Melina?**

A. -- exactly. I could have showed it to her. I don't believe I sent it to her, but I don't recall. This would have been six years ago at this point.

MS. SCHLUMP PETERS: Now, I want you to take a look at what we're going to mark as Exhibit 2 and it's Docket Entry 421.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MS. SCHLUMP PETERS:

**Q. Now, so if you look at -- this is your declaration; correct?**

A. Correct.

**Q. Dated April 25, 2025?**

A. Correct.

**Q. And if you look at paragraph 9, do you see the second sentence, "I certainly have not**

**sent the video to anyone since I sent the video to Rose on April 9, 2022"?**

A. I see that sentence on paragraph 9, yes.

**Q. Okay. And you made this declaration under penalty of perjury; correct?**

A. As all court documents are, yeah.

**Q. But only a few months earlier you weren't that certain about it, right, as to whether or not you had shared the video to anybody else?**

MR. BRETTLER: Objection. Vague and ambiguous.

You can answer if you understand.

THE WITNESS: Can you restate that question.

BY MS. SCHLUMP PETERS:

**Q. Yeah. Only a few months before you submitted this declaration, you were not that certain about whether or not you had sent the video to anyone besides Rose?**

MR. BRETTLER: Objection. Vague and ambiguous.

You can answer if you understand.

THE WITNESS: I don't know if I would be able to recall the level of

certainty I had about whether or not I transmitted a sexual video prior to digging through all of my logs and archives to see if I had. No, but at the time I made this declaration, I was certain of it.
BY MS. SCHLUMP PETERS:
**Q. So I'm going to direct you back to Exhibit 1, SB1448. And at December 10, 2024, at 7:02 p.m.**
A. At 7:02?
**Q. Yes.**
A. Pxie says "Did you ever send the BJ video to anyone beyond that girl?"
**Q. And what's your response?**
A. "The only other person who saw it, I'm pretty sure, was just Melina when we were together."
**Q. So on December 10, 2024, you were pretty sure; right?**
A. Correct.
**Q. But not certain?**
A. Correct.
**Q. And then you thought maybe you had sent it to other individuals?**

MR. BRETTLER: Objection. Vague and ambiguous. Calls for speculation. And misstates prior testimony.

BY MS. SCHLUMP PETERS:

**Q. You thought there was a possibility; correct?**

MR. BRETTLER: Objection.

THE WITNESS: It's possible.

BY MS. SCHLUMP PETERS:

**Q. And then --**

A. Or at the time I believed it was possible.

**Q. Right. And then let's look at SB --**

A. Or actually -- I'm so sorry. The question that you just said was, did I send it to anybody else?

Just to clarify, my statement in here is the only other person who saw it I'm pretty sure was just Melina when we were together. So even in this sentence, I don't mention sending it to Melina, just that she saw it, yes.

**Q. Okay. But she asked you -- plaintiff asked you, to be clear, did you ever send the video; right?**

A. Correct.

**Q. And that was your response?**
A. Correct.
**Q. Okay. Let's look at SB000550. So on January 18, 2025, plaintiff says "I need to know how many people. I'm not joking, Steven. If something else of mine gets leaked and I don't have the mental headsup fortitude surrounding it, I will 100 percent kill myself. I can't continue to live my life every morning waking up sick to my stomach wondering if someone is going to blast the most vulnerable and intimate parts of my life for thousands to see." Do you see that? Right?**
A. Yes.
**Q. And what was your response?**
A. "Don't think so, the KF," which stands for Kiwi Farms "The KF people are always going to shit stir. Reading them probably doesn't help anything much."
**Q. So on January 18, 2025, you still were not sure whether you had sent the video to anybody else; right?**
A. The video was recorded five years prior to this. So I'm not sure if I sent it to Melina, for instance, but I was pretty sure I hadn't.
**Q. But you had already said -- told her**

**that you had shared it with Melina?**
A. I told her Melina had seen it not that I sent the video.
**Q. Right, that's calling sharing.**
MR. BRETTLER: Objection.
MS. SCHLUMP PETERS: That's sharing.
MR. BRETTLER: It misstates the witness's testimony and it's your own testimony, Joan.
THE WITNESS: To be absolutely clear from my perspective, sharing as in showing something or sending a file are two very different things.
BY MR. BRETTLER:
**Q. Okay. Well, Mr. Bonnell, you didn't write the statute and the statute will be interpreted according to the law.**
MR. BRETTLER: That's not a question.
THE WITNESS: I'm not speaking as --
MR. BRETTLER: You don't need to argue with her. It's a silly thing for her to say.

MS. SCHLUMP PETERS: I don't appreciate your commentary, Mr. Brettler. And I would --

MR. BRETTLER: You are arguing with my witness.

MS. SCHLUMP PETERS: You need to stop making speaking objections.

MR. BRETTLER: You are arguing with my witness, and if you are going to do that, I will object.

MS. SCHLUMP PETERS: No, I can argue with the witness. And you need to stop.

MR. BRETTLER: You can argue with the witness? That is your statement that you are allowed to argue with the witness? Under what rule are you allowed to argue with the witness?

MS. SCHLUMP PETERS: You are mischaracterizing it. That is not what I said --

MR. BRETTLER: You just said I can argue with the witness. Those are your words.

MS. SCHLUMP PETERS: Stop

interrupting, please.

MR. BRETTLER: Okay. Don't get frustrated with me.

MS. SCHLUMP PETERS: I am.

MR. BRETTLER: I know.

MS. SCHLUMP PETERS: You are deliberately doing so.

MR. BRETTLER: Deliberately.

MS. SCHLUMP PETERS: Yes, you are.

MR. BRETTLER: Deliberately doing what?

MR. CORRIAS: Making speaking objections, deliberately, again and again and again.

MS. SCHLUMP PETERS: Yes, over and over again.

MR. BRETTLER: I'm not. You are arguing with the witness.

BY MS. SCHLUMP PETERS:

**Q. So -- and as of January 18th, then, 2025, based on this last document, the document that's in front of you right now, before plaintiff filed the lawsuit, you were still unsure whether you'd share with the video with anyone besides Rose and Melina; correct?**

MR. BRETTLER: Objection. It misstates the witness's prior testimony. It calls for speculation. And it's also vague and ambiguous.

You can answer.

MS. SCHLUMP PETERS: Again a speaking objection. Go ahead, Mr. Bonnell.

THE WITNESS: I hadn't done an exhaustive search of every message that I had ever sent, but my understanding was up to that point, I hadn't sent it to anybody else.

BY MS. SCHLUMP PETERS:

**Q. Then in your declaration, if you could go back to that, which is Exhibit 2, Docket Entry 421, paragraph 9, your first sentence is "Based on information and belief I have not sent the video to anyone other than Rose." Correct?**

A. Correct.

**Q. But then you go on to say "I certainly have not sent the video to anyone else since April 9, 2022."**

**So are you admitting here that prior to April 9, 2022, you might have shared the video to**

**a third party?**

MR. BRETTLER: Objection.
Misstates the testimony, but you can answer.

THE WITNESS: No.

BY MS. SCHLUMP PETERS:

**Q. So what is the distinction here? You didn't say "I certainly did not send the video to anyone other than Rose"; right?**

A. "I certainly have not sent the video to anyone since I sent the video to Rose on April 9, 2022."

**Q. Right, but prior to April 9, 2022, you didn't have that same level of certainty, did you?**

A. Well, I would have shared it with Pxie at the least.

**Q. I don't think that is what your statement is about.**

MR. BRETTLER: Objection. You are arguing with the witness again.

No need to answer that.

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, is that what you were trying to say that maybe you had sent it to the**

**plaintiff, that first sentence?**
A. I mean, I had sent it to the plaintiff, yes.
**Q. Yes?**
A. I had sent it to the plaintiff, yes.
**Q. That's in the complaint that you had sent it to the plaintiff.**
A. Okay.
**Q. But you are saying here, "Based on information and belief," you didn't send the video to anyone other than Rose. You didn't say "With certainty I didn't send the video to anyone but Rose," did you?**
MR. BRETTLER: Objection. It's argumentative.
BY MS. SCHLUMP PETERS:
**Q. Did you?**
MR. BRETTLER: Excuse me. Objection. It's argumentative.
You can answer the question.
THE WITNESS: I'm reading the words. You are correct in reading the words that that is what I said in the declaration, correct.
BY MS. SCHLUMP PETERS:

**Q. Thank you. And then in paragraph 7, you write -- you testify in this declaration, "Plaintiff did not object to me showing the video to my then fiancee or to anyone else."**
**Is that a true statement?**
A. It's in my declaration, yes, that was a true statement, correct.
**Q. So did she tell you she didn't object to you sharing the video with anyone else?**
A. I don't believe you -- or --
**Q. She didn't tell you that, did she?**
A. Can you restate the question.
**Q. You said, plaintiff did not object to you showing the video to anyone else. She told you that she didn't object?**
MR. BRETTLER: Objection. That's a -- it's vague and it's ambiguous, but you can answer.
MS. SCHLUMP PETERS: Go ahead, Mr. Bonnell.
THE WITNESS: Plaintiff did not object to me showing the video to anybody else. She never voiced an objection or made an objection to me showing the video to anyone else,

correct.

BY MS. SCHLUMP PETERS:

**Q. She never told you she wanted it to be private?**

A. No, that wouldn't have made sense because we shared the video with our respective partners at the time.

**Q. Well, that's very different then, isn't it, than sending it to strangers?**

MR. BRETTLER: Objection. Again it's argumentative.

BY MS. SCHLUMP PETERS:

**Q. Is that not different, Mr. Bonnell?**

A. It would, but I feel we have used three different definitions for "private" at this point, so I'm not entirely sure what definition you're working on.

**Q. What three definitions have we used?**

A. Earlier it sounded like "private" was just between me and Pxie. Then I clarified that "private" was just an offline group of friends. And now you're saying that "private" means, me, Pxie and both of our partners so I'm not sure.

**Q. But to be clear, Pxie has never told you it was okay to share the video with your offline**

**friends; right?**

A. She never specifically said that.

**Q. She never said that. Okay.**

**Now --**

A. Just to clarify, she never said it was okay that I share the video with my offline friends. It's just not a statement that she's made, but she was okay with me sharing it with my wife who depending on --

**Q. She was your wife and you were in an open relationship with your wife; correct?**

A. Sure.

**Q. Yes?**

A. Yes.

**Q. Now, sorry to be jumping around, but can you go back to SB00550. It's open in front of you?**

A. Correct.

**Q. So at the top of that page, the plaintiff includes a screenshot of a post on Kiwi Farms by an individual with the screen name Disastercabbage; right? Do you see that?**

A. It's small to read here, but I'm familiar with this message, yes.

**Q. Okay. Who is Disastercabbage?**

A. I don't know.

**Q. And you had a subpoena served on Kiwi Farms to try to find out who Disastercabbage is; right?**

A. Yes.

**Q. And do you recall -- if you can read it -- I know it's small print, but this Disastercabbage was claiming in his or her post that you had sent videos of you having sex with the plaintiff to Disastercabbage's friend; correct?**

A. This account on Kiwi Farms, the anonymous account posted that, yes.

**Q. So were you trying to find out who Disastercabbage was so you could see who else you might have shared the video with?**

MR. BRETTLER: Objection. To the extent that it calls for attorney-client communication, I instruct you not to answer, but outside of any discussions that you may have had with your lawyers, you can answer that question.

THE WITNESS: So in my best efforts to answer all of the interrogatories and to produce the extent of discovery that

I'm obligated to for this case, I wanted to know who this person was to see if I had ever shared any videos of the plaintiff with this person, yes.

BY MS. SCHLUMP PETERS:

**Q. So you thought it might be a possibility that you had; correct?**

MR. BRETTLER: Objection. Misstates the witness's testimony.

THE WITNESS: I did not say that. I don't believe it was a possibility. I can't -- the statement itself is incredibly suspicious. The user was an anonymous account. It had a lot of markings of being a fictitious or falsified post.

BY MS. SCHLUMP PETERS:

**Q. How often do you share sexually intimate videos with other people?**

MR. BRETTLER: Objection. Vague and ambiguous.

You can answer if that question makes sense to you.

THE WITNESS: I don't know exactly.

BY MS. SCHLUMP PETERS:

**Q. On a weekly basis?**
MR. BRETTLER: Same objection.
THE WITNESS: Depends on the week. I can't speculate. I'm not sure.
BY MS. SCHLUMP PETERS:
**Q. Have you shared in the past, let's say, two years, hundreds of videos?**
MR. BRETTLER: Objection. Vague and ambiguous.
THE WITNESS: That sounds very high. No.
BY MS. SCHLUMP PETERS:
**Q. It sounds high. Okay.**
**But you didn't have certainty when plaintiff was asking you in December and again in January as to how many people you shared the video with because you do share videos a lot; right?**
MR. BRETTLER: Objection. It's a compound question. It assumes facts not in evidence and it misstates your prior testimony.
THE WITNESS: I would say those two statements are not related to each other. Just because I share videos

doesn't mean I share videos of plaintiff, certainly not. And I believe in every statement to the plaintiff, I said I was fairly certain that I hadn't shown anybody else, which I now know is true.

BY MS. SCHLUMP PETERS:

**Q. But it was your norm to share videos with other people; right?**

MR. BRETTLER: Objection. Misstates the witness's prior testimony. Assumes facts not in evidence.

THE WITNESS: That's a very broad question. The norm? I'm not entirely sure how to answer that.

BY MS. SCHLUMP PETERS:

**Q. Okay. So you testified in court at the preliminary injunction hearing, "I just have a lot of videos that I've recorded with people in the past, have also recorded videos of me. And I would argue it's kind of the norm that we just kind of trade stuff around basically."**

**Does that refresh your recollection that this is the norm for you?**

MR. BRETTLER: Objection. It's two

separate questions, but you can answer.
THE WITNESS: Can I ask what question I was responding to for that? Can you read that?
BY MS. SCHLUMP PETERS:
**Q. Whether it is the norm for you to share these videos with other people?**
A. And was that a question from the judge or from --
**Q. We can pull that up if you'd like.**
MS. SCHLUMP PETERS: Can we see the page 72 of the preliminary injunction transcript, please.
BY MS. SCHLUMP PETERS:
**Q. Here you go.**
A. Okay. I have read this transcript. What is the question?
**Q. Okay. So you told the Court that it's the norm for you to record videos with other people and kind of trade them around; right?**
MR. BRETTLER: Objection. Where are you looking? This doesn't say "the norm" anywhere on this page that you handed me.
THE WITNESS: I'd say line 14.

MR. BRETTLER: I apologize. Go ahead.

THE WITNESS: So the judge had asked a question with regards to video sharing. With all respect to the judge and everything else, it seems like he's a slightly older gentleman and the concept of recording and sharing videos was very not normal, I would say, to that group of people.

And when I said here that there is a norm around recording videos, I wasn't speaking to the quantity of videos recorded or how commonly it occurred, just that it wouldn't be out of the ordinary or incredulous or unbelievable that people in my community would have a sexual encounter and record a video and share it with others.

BY MS. SCHLUMP PETERS:

**Q. But you did specifically say, "I just have a lot of videos." You were talking about yourself having a lot of videos; right?**

A. Yes, but to somebody -- to clarify to the Court, to the judge asking the question, I

imagine, four or five years recorded like that would be a lot to him, not hundreds or thousands with other people.

**Q. It's -- but you're talking about yourself here, not about what the judge would think. So what would be a lot of videos for you? You said I just have a lot of videos. What's that? What would that number be?**

A. I'm testifying to what I answered to the judge when he asked me a question and I'm clarifying to you what I meant when I said "norm" there. It didn't mean hundreds of different people or hundreds of videos with different people, just that it was a norm for people in my community to record sexual videos with each other and potentially share them.

**Q. And then you start that response by saying that you can't speak on behalf of the plaintiff; right? That's just your interpretation of the norm; right?**

A. Well, I would --

**Q. You say "I won't speak for the plaintiff"; correct?**

A. Correct. Give me one second to read the prior -- hold on.

**Q. Sure.**
A. I see here that I say "I won't speak for the plaintiff." It seems to be more a polite thing than anything else. Both of us took the stand that day. Both of us answered questions. I'm just responding to the judge what my perspective was on things. I don't believe the judge was asking me for what he thought the plaintiff's perspective was on it. So I was just speaking for -- my perception of the community, the communities we existed in, yes.
**Q. And do you recall whether in plaintiff's testimony she talked about it being a norm to just kind of trade videos around?**
A. In her testimony in this case, of course not.
**Q. No. Yeah. Now, when did you first find out that your private information was being leaked by Solotinyleaks?**
A. Can you specify what you mean by private information.
**Q. The first -- your private information, your private messages.**
MR. BRETTLER: Objection. Vague and ambiguous.

BY MS. SCHLUMP PETERS:
**Q. Your videos?**
MR. BRETTLER: Now it's compound.
THE WITNESS: Well, the videos, I believe, the first time I was made aware that they were posted was when plaintiff -- I think it was when plaintiff messaged me on Discord.
BY MS. SCHLUMP PETERS:
**Q. Okay. Prior -- that's November 29th; correct?**
A. Assuming you are stating it correctly, yeah.
**Q. But prior to that, Solotinyleaks made a partial leak -- isn't that correct -- of your private information that you had sent to Rose?**
A. I believe he posted some private messages between me and a third party, yes.
**Q. Okay.**
A. Or fourth party, I don't know how you would say it.
**Q. Let's just call that the partial leak.**
A. It was a leak of the messages, yeah.
**Q. And that was at least a week before November 29th; do you recall that?**

A. I don't recall the exact days. Maybe within a week.

**Q. Well, this is a little blurry, but I'm going to show you a message from Jstlk to you, if this refreshes your recollection?**

MR. BRETTLER: Do you have copies?

MS. SCHLUMP PETERS: Yes.

THE WITNESS: Do you have any more information regarding this?

BY MS. SCHLUMP PETERS:

**Q. What is the date of this message from Jstlk to you?**

A. It appears to be November 20, 2024.

**Q. Right. And the leak wasn't until -- the leak of the video wasn't until November 29th, right, nine days later?**

A. Correct, but I don't know if this leak is referring to stuff that Solo posted or if this is some other type of leak. That's why I'm asking for additional context.

**Q. Were there other leaks besides what Solo posted in November 2024?**

A. I'm a public figure. Stuff gets leaked about me pretty frequently and I see that in Jstlk's message here, he references "sexual shit"

is one of the phrases he uses. And I don't believe that Solo had posted sexual information about me. It's possible, but I only recall the DMs between me and another party being posted that were not sexual in nature. That is why I was asking for additional context around this message.

**Q. Were those DMs between you and Lauren Sutherland?**

A. Lauren Southern, yes --

**Q. Southern.**

A. -- but they were not sexual in nature.

**Q. Southern?**

A. They were not sexual in nature, though.

**Q. But you were in love with Lauren Southern at the time; correct?**

A. It's a complicated question.

**Q. Yes or no?**

A. I don't know if I can give a straight answer to that.

**Q. You were in a relationship with Lauren Southern?**

A. That's a complicated question. I think my generation uses the term "situationship," we'll say.

**Q. I'm not familiar with that term.**
**At this time, November 2024, you were still married to Melina; correct?**
A. Correct, in an open relationship, but yes.
**Q. And was she aware of your situationship with Lauren?**
A. Yes.
**Q. So the November 20th leak also included some DMs between you and Rose; right?**
A. I don't remember.
**Q. You don't remember. But you knew based on Jstlk's message to you that there were more leaks coming; right?**
MR. BRETTLER: Objection. Calls for speculation. Vague and ambiguous.
THE WITNESS: I have no idea. Jstlk was not the leaker, and he wouldn't know so I have no way of knowing that.
BY MS. SCHLUMP PETERS:
**Q. But he told you that there would be; correct?**
A. I don't see that in front of me and I don't recall all my --

**Q. "This is a partial leak. There is more."**

A. Can you tell me what "there is more" is referring to?

**Q. It says "there is more sexual shit."**

A. I understand, but this message is "This is a partial leak. There is more."

**Q. "Sexual shit."**

A. Yeah, but it sounds like -- so -- I don't want to speculate, but it sounds like he's showing me a thing and then he's saying there's other stuff and he's asking if he wants to show me more, but I don't believe he's saying that there is more on the way. I don't know how he could ever know that.

**Q. Wasn't Jstlk in contact with Solo?**

MR. BRETTLER: Objection. Calls for speculation.

BY MS. SCHLUMP PETERS:

**Q. To your knowledge?**

MR. BRETTLER: Calls for speculation.

THE WITNESS: I think Solo reached out to him.

BY MS. SCHLUMP PETERS:

**Q. So he might have had some information, right? That's why he was reaching out to you?**
A. He never communicated that to me.
**Q. Well, he's communicating it to you right here, "This is a partial leak. There is more sexual shit." Right?**
A. He's absolutely not communicating that. You would need more of this conversation to demonstrate that.
**Q. But at this time the leaks between you and Lauren had already happened; correct?**
A. Yes.
**Q. And -- so, what did you do after that partial leak? Did you take any steps to protect your private information?**
A. I believe I started to delete my conversation with the Rose account.
**Q. Did you delete the Pxie video from your Discord chat thread with Rose?**
A. I believe I deleted every media post.
**Q. Prior to November 29th?**
A. I believe so, yes.
**Q. So let's be clear. What exactly did you delete prior to -- between the November 20th partial leak and the November 29th?**

A. I'm not going to have an exact memory of that.

**Q. Well, give me your best recollection.**

A. I'm pretty sure I deleted all the media that we had exchanged between the two of us.

**Q. Between you and Rose?**

A. Yes.

**Q. And that would be Discord messages?**

A. In Discord, yes.

**Q. Any other?**

A. No.

**Q. Twitter?**

A. You can't delete Twitter messages, so no.

**Q. So it's your testimony today that you deleted the Pxie video attachment from the Discord chat with Rose prior to November 29th?**

MR. BRETTLER: Objection. It misstates the witness's testimony, but you can answer.

THE WITNESS: Not specifically, but I imagine it would have been deleted, yes.

BY MS. SCHLUMP PETERS:

**Q. And after the partial leak, Solo**

**communicated with you; right?**
A. Yes.
**Q. What did he -- what was the substance of his communication with you?**
A. He seemed to be enjoying himself. He tried to, I think, extort me to come on stream.
I think he claimed he was going to leak more stuff. I believe -- I don't recall exactly, but I believe he sent me a message in the early morning claiming he was going to leak more stuff. I think I read it. I think I fell asleep again and I think when I woke up there was more stuff posted online.
MS. SCHLUMP PETERS: I'm going to show you what we're going to mark as Exhibit 3.
(Plaintiff's Exhibit No. 3 was marked for identification.)
THE WITNESS: Can I ask a question? Am I allowed to ask things to be marked?
MR. BRETTLER: No. Just leave it.
BY MS. SCHLUMP PETERS:
**Q. So this is a screenshot of a message from Solo to you on November 29, 2024; correct?**
A. Correct.

**Q. Now, there is no Bates stamp on here, is there?**

A. Correct, I don't see one, yeah,

**Q. So you didn't produce this document; right?**

A. If there is no Bates stamp on it -- I don't know if I produced something similar to this, but if there is no Bates stamp on this, then I imagine I did not produce this document, correct.

**Q. Okay. So in this -- if you could just read the message to refresh your recollection, please.**

A. Sure.

MR. BRETTLER: Do you want him to read it out loud?

MS. SCHLUMP PETERS: No, just to himself.

MR. BRETTLER: Take as much time as you need.

THE WITNESS: Okay. I've read it.

BY MS. SCHLUMP PETERS:

**Q. And this message was sent to you at 10:43 a.m.?**

A. According to the screenshot, yes.

**Q. And in it he says -- he asked you to talk on stream, "Otherwise I will be leaking the full DMs, including all images, videos shared from you to Rose, and the information about Rose's age, and full Twitter DMs, in which you were negligent in verifying age even after you joked about her looking so young that you would need ID to make sure she was really even 18."**

**Do you see that?**

A. I see that in this image, yes.

**Q. And did you ever respond to this message?**

A. I don't believe so, no.

**Q. So he didn't leak all of these DMs that he's referring to here until the evening of November 29th; correct?**

MR. BRETTLER: Objection. Calls for speculation.

If you know, you can answer.

THE WITNESS: I don't remember the exact time.

BY MS. SCHLUMP PETERS:

**Q. But it was later; right?**

MR. BRETTLER: Objection. Vague and ambiguous. Asked and answered.

THE WITNESS: It would have been after 10:43 a.m. in the timestamp in the time zone that this was taken, I imagine, yes.
BY MS. SCHLUMP PETERS:
**Q. Okay. We can get to the time in a minute.**
**But -- so between November 20th and November 29th, you could have deleted the Pxie video from Rose's thread and prevented its leak; correct?**
A. No, I'm pretty sure I deleted it the day I saw that the account was leaking messages.
**Q. So later that day, the video of you and plaintiff was published by Solo; correct?**
A. Among other videos, yes.
**Q. What else was published?**
A. I think some -- if I can recall, I think it was 27 videos total, I think; 20, or so, of them were of just me. I believe seven of them were of me and others depicted in the videos.
**Q. And all of your entire DM thread, right, with you --**
MR. BRETTLER: Objection. Vague and ambiguous.

BY MS. SCHLUMP PETERS:
**Q. -- with you and Rose?**
A. No, I don't believe so, not the entire thread.
**Q. Parts of it?**
A. Yes.
MS. SCHLUMP PETERS: And then I'm going to ask you to look -- and we're going to mark this document SB002391.
(Plaintiff's Exhibit No. 4 was marked for identification.)
BY MS. SCHLUMP PETERS:
**Q. Now you see this is a message exchanged between you and Straighterade; correct?**
A. I see that, yes.
**Q. Who is Straighterade?**
A. A mutual friend of me and Pxie.
**Q. And on November 9, 2024, at 9:06 p.m., she says to you "More stuff is leaking. There's a vid of you and Pxie on Kiwi." Do you see that?**
A. Yes.
**Q. So she immediately identified the plaintiff, didn't she?**
MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: I'm not sure.
BY MS. SCHLUMP PETERS:
**Q. Well, she says it. "There's a video of you and Pxie on Kiwi."**
A. That's not the same as the question you asked.
**Q. She identified Pxie in the video, didn't she?**
A. I don't know that.
**Q. Well, you think she lied when she said that?**
A. Pxie could have told her that she's the one that's in the video and that's how she knows.
**Q. Is that what you believe?**
MR. BRETTLER: Objection.
THE WITNESS: I don't know.
BY MS. SCHLUMP PETERS:
**Q. You don't know?**
A. I'm not sure.
**Q. You don't know?**
A. You have to ask her. I'm not sure.
**Q. Do you think Pxie called her friend, Erin, and told her it was her in the video; is that your testimony today?**
MR. BRETTLER: Objection. It calls

for speculation and it misstates his testimony today.
BY MS. SCHLUMP PETERS:
**Q. Is that your testimony today, Mr. Bonnell?**
A. I wish I could testify to Pxie's conversations with Erin, but I have none of those so --
**Q. But you are not aware of any conversation to that effect, are you?**
A. I'm not aware of -- I am aware that they talked a lot about this because of stuff that has been posted publicly, but I don't know what their specific conversations were.
**Q. And you don't actually know if they talked about this before 9:06 p.m.; right?**
MR. BRETTLER: Same objection. It calls for speculation.
BY MS. SCHLUMP PETERS:
**Q. You don't know that; right?**
A. Given that they were very close friends, I would definitely assume that.
(Plaintiff's Exhibit No. 5 was marked for identification.)
BY MS. SCHLUMP PETERS:

**Q. So let's look at -- I'm going to mark another Exhibit 5. And this is a Kiwi Farms -- a screenshot of a Kiwi Farms post; correct?**

A. Yes.

**Q. And it shows a date of November 29, 2024, on it?**

A. That's what's in the image, yes.

**Q. And this is a post by someone with the screen name Frunc?**

A. I don't think so, but it might be. The name might be in red. That is unreadable above it. I don't know if Frunk is part of the YouTube link or not. I don't imagine it matters, but I see the post from the person, yes.

**Q. And the post says, "So he has genuinely fucked all his orbiters. So he went to that canvassing and him and Pxie and Straighterade were hanging out it was because they were fucking having threesomes." Do you see that?**

A. Yes.

**Q. And what are the images that are depicted in that screenshot?**

A. I see an image of what I imagine is a picture of Pxie that she posted somewhere and then I see three, what appear to be, excerpts

from the video that is the subject of this complaint.

**Q. And what is it focusing in on on those three images that are taken from the video?**

MR. BRETTLER: Objection. Calls for speculation.

You can answer if you know.

THE WITNESS: Her arm or shoulder.

BY MS. SCHLUMP PETERS:

**Q. Do you see the two moles?**

A. Yes.

**Q. And then you see in the photo of the plaintiff, her shoulder with the two moles?**

A. Yes.

**Q. So she was immediately identified by people in Kiwi Farms; right?**

MR. BRETTLER: Objection.

BY MS. SCHLUMP PETERS:

**Q. And they posted about this; correct?**

MR. BRETTLER: Objection. It calls for speculation.

You can't possibly know.

MR. CORRIAS: That's a speaking objection.

MR. BRETTLER: Excuse me. Who is

taking the deposition?

MR. CORRIAS: It doesn't matter.

MR. BRETTLER: Excuse me. We can stop the deposition today if you both want to ask questions today.

MR. CORRIAS: I'm not asking questions.

MR. BRETTLER: I don't need your commentary.

MR. CORRIAS: I don't need your speaking objections.

MR. BRETTLER: You are not taking the deposition today.

MR. CORRIAS: That's fine.

MR. BRETTLER: You are second chairing this deposition.

MR. CORRIAS: That's fine.

MR. BRETTLER: Sit there quietly.

MR. CORRIAS: No, I --

MS. SCHLUMP PETERS: You are not in charge of this deposition, Mr. Brettler.

MR. BRETTLER: One person takes the deposition.

MS. SCHLUMP PETERS: This is my deposition.

MR. BRETTLER: Then you take it. I don't need to hear from your colleague.

MS. SCHLUMP PETERS: You can hear from whoever speaks if I allow them to speak.

MR. BRETTLER: We will see if the Court finds that proper.

MS. SCHLUMP PETERS: Well, let's see if the Court finds it proper all your speaking objections despite my --

MR. BRETTLER: Same objections that you made.

MS. SCHLUMP PETERS: -- repeated objections.

MR. BRETTLER: Same objections that you've made at prior depositions.

MS. SCHLUMP PETERS: No, I have never made such speaking objections.

MR. BRETTLER: I've admonished you multiple times for making improper objections.

MS. SCHLUMP PETERS: The record speaks for itself.

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, immediately after the leak**

**there was a lot of discussion on Kiwi Farms; correct?**

MR. BRETTLER: Objection.

BY MS. SCHLUMP PETERS:

**Q. About plaintiff being in the video?**

MR. BRETTLER: Objection. Vague and ambiguous.

BY MS. SCHLUMP PETERS:

**Q. Do you recall that?**

MR. BRETTLER: Can you please let me finish my objections?

MS. SCHLUMP PETERS: No, because you are doing speaking objections that are not proper.

MR. BRETTLER: I don't care what you determine as proper or not. It's irrelevant to me.

MS. SCHLUMP PETERS: Well, they are not proper.

MR. BRETTLER: Your questions are improper which is why I am objecting to them.

If you don't let me finish my objection, I'm going to have to restate it.

So I object to the question on the grounds that it's vague and ambiguous and it also calls for you to speculate.

THE WITNESS: The question was -- can you restate it one more time.

BY MS. SCHLUMP PETERS:

**Q. If -- after the leak on November 29th was there a lot of commentary on Kiwi Farms about plaintiff being in the video with you that had been leaked?**

MR. BRETTLER: Objection. The question calls for speculation.

MS. SCHLUMP PETERS: You already said your objection.

MR. BRETTLER: Excuse me. You asked the question again.

MS. SCHLUMP PETERS: Mr. Brettler.

MR. BRETTLER: You asked the question a second time.

MS. SCHLUMP PETERS: He asked me to repeat it.

MR. BRETTLER: And I'm going to repeat my objection.

MS. SCHLUMP PETERS: You are wasting our time.

MR. BRETTLER: You have 5 and 12 minutes left on the record. Ask proper questions.

MS. SCHLUMP PETERS: You're wasting time.

MR. BRETTLER: Ask proper questions. Your question calls for speculation and it's vague and ambiguous.

MS. SCHLUMP PETERS: Mr. Bonnell, please answer.

THE WITNESS: So I believe that there was a lot of discussion around the totality of the leaks. I don't believe there was much discussion about the plaintiff in particular.

BY MS. SCHLUMP PETERS:

**Q. Now, so your testimony today is that she was not identified on Kiwi Farms?**

MR. BRETTLER: Objection. That misstates the witness's testimony.

BY MS. SCHLUMP PETERS:

**Q. Within the few days, weeks after the November 29th --**

A. No, I said that --

**Q. -- post?**
A. No, what I said was that she was not the main subject of discussion. There was a lot of discussion, because there was a lot of material that was leaked.
**Q. So do you agree that she was identified by people on Kiwi Farms?**
MR. BRETTLER: Objection. Calls for speculation.
BY MS. SCHLUMP PETERS:
**Q. Is that correct? Is that correct, Mr. Bonnell?**
MR. BRETTLER: Calls for speculation.
THE WITNESS: There were people that posted pictures of her that looked similar to her in the video. So insofar as we say that that was identified, then sure, but there was no, like, absolute confirmation that it was absolutely her, but there were people on Kiwi Farms speculating that it was her in that video.
BY MS. SCHLUMP PETERS:
**Q. And that is why she was so nervous about**

**it; correct?**

MR. BRETTLER: Objection. Calls for speculation.

BY MS. SCHLUMP PETERS:

**Q. She communicated those fear to you about her having been identified; correct?**

A. No, in the beginning, she communicated that she felt very confident that she would be able to claim it wasn't her and she would ignore it. That was her initial claim.

**Q. But that didn't hold up; right?**

MR. BRETTLER: Objection. Vague and ambiguous.

BY MS. SCHLUMP PETERS:

**Q. Because it became very public that it was her; right?**

A. No, I don't believe so.

MR. BRETTLER: Not until your client filed this lawsuit.

MS. SCHLUMP PETERS: Are you testifying today, Mr. Brettler?

MR. BRETTLER: No.

MS. SCHLUMP PETERS: Are you testifying on behalf of Mr. Bonnell?

MR. BRETTLER: Absolutely not.

MS. SCHLUMP PETERS: Well, then I'd prefer you don't.
MR. BRETTLER: I'm not.
MS. SCHLUMP PETERS: Well, you just did.
BY MS. SCHLUMP PETERS:
**Q. Now, before plaintiff's Substack was posted and we'll get to that, there was live streams done by President Sunday; you are familiar with him?**
A. Yes.
**Q. And he live streamed about plaintiff being in that video with you; correct?**
A. I don't recall.
**Q. You don't recall that?**
A. I don't believe so.
**Q. Now, Pxie posted her Substack in January and you posted your public statement shortly after; correct?**
A. That sounds right.
**Q. And in that statement you stated that you were actively pursuing criminal and civil litigation on these matters against multiple parties; do you recall that?**
A. I'm uncomfortable without my statement

right in front of me, but if you're asking me to the best of my recollection, I believe I said something akin to that, yes.

**Q. So did you pursue any criminal and civil litigation?**

A. Yes.

**Q. What did you do?**

MR. BRETTLER: Objection.

To the extent that it calls for the disclosure of any of your communications with your lawyers, not just me, I'm directing you not to answer that question; otherwise, you can answer.

THE WITNESS: I pursued civil and hopefully eventually criminal penalties against the person who'd leaked the material online.

BY MS. SCHLUMP PETERS:

**Q. How did you do that?**

A. By reaching out to a law firm.

**Q. What was that law firm?**

MR. BRETTLER: You can answer.

THE WITNESS: I don't actually know the name, but it would be Carrie and Roxanne. I don't know if it's called

Carrie and Roxanne Partners or whatever, but it was their law firm up in New York City.

BY MS. SCHLUMP PETERS:

**Q. And did they file a criminal complaint against Solo?**

MR. BRETTLER: Objection.

To the extent that it requires for the disclosure of attorney-client communication, I instruct you not to answer. If you know outside of that, you can answer.

THE WITNESS: I'm not aware if individuals can file criminal complaints and I don't think I want to divulge the communications between me and my New York law firm.

BY MS. SCHLUMP PETERS:

**Q. But you didn't even know who Solo was at that time, did you?**

A. Correct.

**Q. So you couldn't have made a criminal complaint against him, right, because you didn't know who he was?**

MR. BRETTLER: Objection.

MS. SCHLUMP PETERS: Correct?
MR. BRETTLER: Misstates the testimony.
THE WITNESS: No, I think I can still file a lawsuit.
BY MS. SCHLUMP PETERS:
**Q. And did you file a lawsuit against Solo?**
A. I was not able to, no.
**Q. Why not?**
A. Because I -- I got wrapped up in our current lawsuit.
**Q. That's the reason you didn't file a lawsuit against Solo?**
MR. BRETTLER: Objection.
I also caution you not to disclose any attorney-client communications and instruct you not to answer on that basis.
THE WITNESS: Yes, but not insofar as I was directed not to by any litigation team, but just that I don't personally have the resources to engage in multiple lawsuits at once.
BY MS. SCHLUMP PETERS:
**Q. So you didn't actually pursue criminal**

**and civil litigation against Solo; correct?**

MR. BRETTLER: Objection.
Misstates the witness's testimony.

THE WITNESS: No, I would say I did
pursue it, yes.

BY MS. SCHLUMP PETERS:

**Q. For -- but you didn't actually accomplish -- you didn't do anything? You didn't file anything; correct?**

MR. BRETTLER: Objection.
Misstates the witness's testimony. And
it's also vague and ambiguous.

BY MS. SCHLUMP PETERS:

**Q. Did you file anything?**

MR. BRETTLER: And it's also vague
and ambiguous as to what you mean by
"file anything."

THE WITNESS: If you are asking if
I filed a lawsuit personally --

MS. SCHLUMP PETERS: Yes.

THE WITNESS: -- or represented by
another person to file a lawsuit, no,
but I don't take that to mean the same
thing as pursued.

BY MS. SCHLUMP PETERS:

**Q. Did plaintiff ever tell you you could share the video with Rose?**

MR. BRETTLER: Objection. Asked and answered.

THE WITNESS: Specifically, no.

BY MS. SCHLUMP PETERS:

**Q. Did she ever write a message to you, text, DM, e-mail, anything else saying you could share the video with Rose?**

A. Specifically, no.

**Q. Did she ever tell you on a phone call, on a Discord call that you could share the video with Rose?**

A. Specifically, no.

**Q. Can you identify any document, any message, document, recording or anything, whereby plaintiff gave you permission to share the video with Rose?**

A. Specifically, Rose, no.

**Q. Did she ever tell you you could share the video with Abby?**

A. No.

**Q. Did she ever tell you in writing that you could share the video with Melina?**

A. No, I don't believe so.

**Q. Did she ever tell you that you could share the video with anyone else, any specific person?**

A. Tell me, even verbally?

**Q. Verbally or written.**

A. I don't recall. It would have been a conversation we had at the hotel.

**Q. But you don't recall that conversation; correct?**

A. No, and there wouldn't have been a specific person listed; it would have been a general statement.

**Q. And then you didn't ask plaintiff for permission before you shared the video to Rose; right?**

A. No, not specifically Rose.

**Q. Did you ask plaintiff for permission to share the video with another individual?**

A. There would have been some general --

**Q. No, I'm asking you specifics.**

MR. BRETTLER: Excuse me. You can finish your answer.

THE WITNESS: There would have been a general conversation at the hotel, but I don't believe specific names, neither

my fiancee at the time nor Pxie's boyfriend at the time would have ever been brought up specifically, no.

BY MS. SCHLUMP PETERS:

**Q. So when you agreed to record the video with the plaintiff, did she specifically say to you you can distribute this video to other people?**

A. Yes, we would have had a conversation that we were allowed to show the video with some select group of people.

**Q. A select group of people?**

A. Yes.

**Q. But you told the Court you don't remember that conversation; right?**

MR. BRETTLER: Objection.

Misstates the witness's prior testimony.

BY MS. SCHLUMP PETERS:

**Q. Did you tell the Court that?**

A. I believe so. During the preliminary injunction hearing?

**Q. Yes.**

A. There were no specific individuals. I don't remember the specifics of the conversation, but we would have had a conversation about

sharing the video but not posting it, like, to an online website.

**Q. Not posting it to an online website. So you remember -- you remember that, that she said --**

A. Vaguely.

**Q. -- don't post it on an online website; is that what's your recollection today?**

A. Vaguely. I have had similar conversations in the past, I vaguely remember, with her and I believe that her testimony at the evidentiary hearing stated about as much. I think she said "Don't spread it around" so don't post it to, like, an online website or some publicly accessible place, yes.

**Q. So are you saying today that she told you you could distribute the video to people she did not even know?**

MR. BRETTLER: Objection. Misstates the witness's testimony.

THE WITNESS: Can you -- that question was --

BY MS. SCHLUMP PETERS:

**Q. Did she tell you you could distribute that video to people she does not know?**

A. Yes, she didn't know my fiancee at the time.

**Q. She told you that specifically? No, she knew who your fiancee was.**

A. Knowing who somebody --

**Q. We're talking about other people?**

A. Knowing who somebody is and knowing them, I would say, are two totally different things.

**Q. Let's, for the moment, keep Melina out of this.**

A. Okay.

**Q. And did she tell you specifically that you could share the video with other individuals?**

A. There were no individuals named. It would have been a more general statement.

**Q. What would that general statement be that you suddenly remember?**

MR. BRETTLER: Objection. Argumentative. It's vague and ambiguous. It's also been asked and answered.

THE WITNESS: The general statement like share it with partners but don't post it online to, like, some publicly

accessible place, basically.
BY MS. SCHLUMP PETERS:
**Q. So your recollection is that plaintiff told you that you could share it with any of your sexual partners?**
MR. BRETTLER: Objection. Misstates the witness's testimony.
THE WITNESS: Not specifically, but my vague recollection is it would have been somewhere around that, yes.
BY MS. SCHLUMP PETERS:
**Q. But you don't recall the conversation; correct?**
MR. BRETTLER: Objection.
THE WITNESS: The specifics --
MR. BRETTLER: Objection.
Go ahead.
THE WITNESS: I don't recall the specifics of that conversation, no.
MS. SCHLUMP PETERS: Let's look at and mark a document with the Bates stamp SB001142.
MR. BRETTLER: You said you are marking this separately as Exhibit 6?
MS. SCHLUMP PETERS: No, you know

what, scratch that because it's part of Exhibit 1. So that's fine. We're not going to remark it. So we're looking at the SB001142.

BY MS. SCHLUMP PETERS:

**Q. At 9:06 p.m. on November 29th, plaintiff says to you, I need to know if you sent our videos to anyone or if you sent anything beyond the BJ one. I need to be mentally prepared in case there is anything else.**

MR. BRETTLER: You misread that.

MS. SCHLUMP PETERS: I understand that. That is not part of what I'm asking about. So if you don't mind, this is my deposition and I'll phrase it how -- I'm going to ask the question as I want to phrase it.

MR. BRETTLER: I'm just pointing out that you left out the line that says "I'm 100 percent denying it's me because it's not super clear, my face or anything like that."

MS. SCHLUMP PETERS: Again, I would appreciate if you'd stop testifying.

MR. BRETTLER: I'm just saying to

read the document properly.

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, what is your response to her asking you if you sent the videos to anyone?**

A. Yeah, I'd also note that her last message is edited and I'm not sure when that edit was done. But the message was that I responded at 9:09 was "There shouldn't be. No. I'm so sorry. There is literally zero excuse. I had phone convos and stuff with this person. They were fairly close to me. It's worthless to say this at this point, but I'm super sorry. There is literally no excuse. I won't say or confirm anything about them. If there is any particular action or thing I can do, just let me know."

**Q. So when you said there was literally no excuse, you meant there was no excuse for you to have shared the video with Rose; right? That's what you were referring to?**

MR. BRETTLER: Objection. Misstates the testimony, but you can answer.

THE WITNESS: Absolutely not.

BY MS. SCHLUMP PETERS:

**Q. What are you apologizing for here,**

**Mr. Bonnell?**

A. That a person that I had shared videos with had their account compromised and everything was being leaked on to the Internet.

**Q. Does this say that you are apologizing for something somebody else did?**

MR. BRETTLER: Objection. Calls for speculation.

BY MS. SCHLUMP PETERS:

**Q. Is that what this says?**

A. I'm sorry. I thought you asked me what I was apologizing for.

**Q. Right.**

A. I can reread the statement if you want me to reread the statement, but I'm telling you that --

**Q. No, I'm asking you, you are apologizing for your own conduct here, aren't you? You don't mention anyone else in this statement, do you?**

MR. BRETTLER: Objection. Misstates the document and it also misstates his testimony, but you can answer.

THE WITNESS: The conduct here that I'm apologizing for is that somebody

that I was talking to -- that I wasn't clean enough in deleting old messages that a person that I was having conversations with apparently had their account compromised, and stuff was being disseminated from that account onto the Internet.

BY MS. SCHLUMP PETERS:

**Q. And you're saying, "I'm so sorry. There is literally zero excuse." Zero excuse for your having shared the video?**

MR. BRETTLER: Objection.

MS. SCHLUMP PETERS: Right?

MR. BRETTLER: Asked and answered and misstates his prior testimony.

THE WITNESS: Given that my next sentence is "I had phone convos and stuff with this person. They were fairly close to me." I don't know how that would have any bearing on whether or not I could share a video with the person. My issue here is that a person that I trusted apparently had their account compromised and was leaking everything. So it was -- I should been

have cleaner with deleting old information or, I guess, making sure stuff like that wasn't accessible if somebody gained access to somebody else's account.

BY MS. SCHLUMP PETERS:

**Q. You didn't say here, "I'm sorry, but you gave me consent to share the video and this person leaked it."**

MR. BRETTLER: Objection. There is no question.

BY MS. SCHLUMP PETERS:

**Q. Did you say that?**

A. I don't see that on this page, no.

**Q. And you didn't say "Sorry, this is what we agreed to."**

MR. BRETTLER: Objection. There is no question.

MS. SCHLUMP PETERS: That is a question, Mr. Bonnell.

And, Mr. Brettler, please --

MR. BRETTLER: What's the question?

MS. SCHLUMP PETERS: Please stop interrupting inappropriately.

MR. BRETTLER: What's the question?

MS. SCHLUMP PETERS: I'm asking him if he said that?

MR. BRETTLER: That's a different -- that is a question.

You can answer.

MS. SCHLUMP PETERS: That was the question.

Go ahead.

THE WITNESS: I didn't say that, and I feel that would be an insane thing to say given everything that had transpired by that point.

BY MS. SCHLUMP PETERS:

**Q. Meaning the leak of the video?**

A. Yeah, I don't think I would ever tell somebody, this is what we agreed to. That just sounds like an insane thing to say when both of our lives are kind of being completely blown up online at that moment.

**Q. Okay. And in this message -- so you're now saying that this message is apologizing for Solo's act of leaking the video; is that what you're saying here?**

MR. BRETTLER: Objection. That misstates the witness's prior testimony.

THE WITNESS: So as a public figure, there's a ton of things that can damage me or damage the people around me. Any time there are people that are leaking information or divulging stuff about me that damages people around me, I feel incredibly bad for the people around me.

My apology here again is that there was an account that was compromised of a person that I thought was close to me and all of that information had been posted online and it was obviously damaging to the plaintiff in this case.

BY MS. SCHLUMP PETERS:

**Q. But you don't say here, "Wow. I'm so sorry Solo or whoever did this." You don't say that here. You just say you're sorry; isn't that right?**

A. That is what I say. Again, I don't think it would be appropriate at that time to start -- speaking as a layman, litigating the actions or whatever else. Nothing else in this conversation mentions anything about me not having consent to share any videos. I don't

believe she brings that up in the following two weeks. Yeah, that just wasn't -- that pretty clearly wasn't what I was talking about.

**Q. Well, you're responding to her question about whether or not you sent the video to anyone else; right? This is your response to it and you're saying "I'm so sorry. There is literally no excuse."**

A. What's the question?

MR. BRETTLER: There is no question.

BY MS. SCHLUMP PETERS:

**Q. You are responding to her question about I need to know if you sent the videos to anyone.**

MR. BRETTLER: There is still no question.

THE WITNESS: Are you asking if that is my response?

BY MS. SCHLUMP PETERS:

**Q. And your response to that is "I'm sorry, so sorry. There is literally no excuse"; right?**

A. That's part of --

**Q. Nobody is talking about the leaker, just talking about you here; right?**

A. That is --

**Q. She's asking about your actions, and you're responding about your own actions, aren't you, Mr. Bonnell?**

MR. BRETTLER: Objection. Objection. It misstates the witness's prior testimony.

BY MS. SCHLUMP PETERS:

**Q. Please answer the question, Mr. Bonnell.**

A. Her question to me is she's asking, or she wants to know if I have sent the video to anybody else.

**Q. Right.**

A. I imagine she wants to know if anything else is leaking. And I said no.

I believe this was my very first time communicating with her about the leak. It looks like this was three minutes after I was made aware that the leak happened. And one of my first things is to express sympathy that something, I think, pretty disgusting has happened to both of us and I'm really sorry that this is a person connected to me.

At 9:09 p.m. -- this would have been three minutes -- I'm pretty sure I was standing in the shower, and I found out for the first time

from her, three minutes prior that all of this information started to be leaked online.

**Q. And if you had not shared the video with Rose, this wouldn't have happened; right?**

MR. BRETTLER: Objection. It's an incomplete hypothetical. You need not answer that question. Calls for speculation.

MS. SCHLUMP PETERS: Go ahead.

THE WITNESS: There is no way for me to know that. There are a million ways for stuff to leak online. I'm not sure.

BY MS. SCHLUMP PETERS:

**Q. But this particular leak, Mr. Bonnell, that we're speaking about, you shared the video with Rose and that was leaked; correct?**

A. By another person on the account, yeah.

**Q. Right. So if you had not shared the video to Rose, the video would not have been leaked --**

MR. BRETTLER: Objection. It's an incomplete hypothetical.

MS. SCHLUMP PETERS: -- by Solo; correct?

MR. BRETTLER: Objection. It's an incomplete hypothetical. It's been asked and answered. The witness has already testified --

MS. SCHLUMP PETERS: Go ahead, Mr. Bonnell.

MR. BRETTLER: -- that he could not answer that question.

MS. SCHLUMP PETERS: Go ahead, Mr. Bonnell.

THE WITNESS: If I --

BY MS. SCHLUMP PETERS:

**Q. If you had not shared the video to Rose, Solo could not have leaked it on November 29th; is that correct?**

MR. BRETTLER: Objection. It's an incomplete hypothetical. The witness has already testified that he cannot speculate.

THE WITNESS: I don't know the motivations for Solo leaking everything. I don't know why he posted everything online.

BY MS. SCHLUMP PETERS:

**Q. That wasn't the question, Mr. Bonnell.**

**Listen carefully. And your counsel insists on making improper speaking objections, but I want you to listen to the question because it's very simple.**
**If you had not shared the video to Rose, Solo could not have leaked it on November 29, 2024?**
MR. BRETTLER: Objection.
BY MS. SCHLUMP PETERS:
**Q. Is that a true statement?**
MR. BRETTLER: Objection. It's an incomplete hypothetical. The witness has testified that it calls for speculation.
THE WITNESS: It wouldn't have been in my DM history with Rose. If that is the extent of everything that Solo leaked, then he wouldn't have been able to leak that particular video.
BY MS. SCHLUMP PETERS:
**Q. Thank you.**
MR. BRETTLER: I'd like to note for the record the appearance of another attorney in the room. Can we please have his appearance on the record.

MR. C. GARCIA: Carlos A. Garcia Perez is here on behalf of the plaintiff.
BY MS. SCHLUMP PETERS:
**Q. So in this exchange on November 29th between you and the plaintiff, you're acknowledging that plaintiff had no idea that you shared the video with anyone; right?**
MR. BRETTLER: Objection. Misstates the document.
BY MS. SCHLUMP PETERS:
**Q. She wasn't aware that you shared the video with anyone, was she?**
MR. BRETTLER: Objection. Calls for speculation.
THE WITNESS: I don't think she was specifically aware, but again, we usually didn't mention specific people.
BY MS. SCHLUMP PETERS:
**Q. Well, did you tell her you shared the video with Rose?**
A. Not specifically no, but again it was a general agreement.
**Q. But again, you didn't tell her that and she was not aware of it; right?**

MR. BRETTLER: Objection. Asked and answered.
You can answer it one more time.
THE WITNESS: I would have said at the hotel we made that agreement, yes.
BY MS. SCHLUMP PETERS:
**Q. That you could share with Rose?**
A. No, that we had a general agreement. Reading her message at 9:06 it begins with "I need to know if you sent our videos to anyone or if you sent anything beyond the BJ one."
It reads to me like she was aware that we had some agreement that we could send videos to partners, but specific names were never mentioned.
**Q. That leads you to believe -- that sentence leads you to believe that she told you you could share videos with someone?**
A. No, the conversation we had at the hotel and --
**Q. The one that you told the Court you can't remember, that one?**
A. I can't remember the specifics of it, correct.
**Q. So if you can't remember the specifics,**

**then I don't think you can truthfully state --**

A. If I don't remember the --

MR. BRETTLER: Hang on.

BY MS. SCHLUMP PETERS:

**Q. -- state that she told you that you could share the video; right?**

MR. BRETTLER: It's argumentative, as to what she thinks that you can state.

You can testify to the truth right now.

THE WITNESS: I can testify to what I vaguely remember was the agreement of the conversation we had in the hotel. That does not mean I remember the specifics of everything we said.

All of our conversation after that date seems to reinforce that me and her had a specific understanding. Until December, I think, 12th, I don't think she had ever even mentioned that I was sending videos nonconsensually or that I didn't have permissions to send them. None of this conversation seems to point to that.

BY MS. SCHLUMP PETERS:

**Q. So in the court -- in the preliminary injunction hearing, is that what you testified to the Court that your understanding of the conversation was that you could share the video with other people?**

MR. BRETTLER: Objection. Vague and ambiguous and compound.

If you understand the question --

MS. SCHLUMP PETERS: Did you?

MR. BRETTLER: If you understand the question, you can answer.

THE WITNESS: I believe I testified something to that effect, but I would have to reread the transcript, though, to remember specifically what I testified to. So I'll vaguely reference what I specifically said.

BY MS. SCHLUMP PETERS:

**Q. Well, we already looked at part of your specific testimony, but we'll look at that again.**

A. Sure.

MR. BRETTLER: Why don't we do that after lunch? We have been going for another hour and 15 minutes.

MS. SCHLUMP PETERS: Let me consult if my team is ready for a lunch break.
MR. BRETTLER: I think we can go off the record.
THE VIDEOGRAPHER: We're going off the record. The time is 12:38 p.m.
(Lunch recess taken.)
THE VIDEOGRAPHER: We're back on the record. The time is 1:28 p.m.
BY MS. SCHLUMP PETERS:
**Q. Mr. Bonnell, before we broke for lunch we were talking about your apology to the plaintiff on November 29th; do you recall that?**
A. I don't recall me apologizing to her. I'd have to be more careful with how I characterize that. Could you refresh my memory of the Bates stamp that we're at.
**Q. When you said "I'm so sorry" that is what I'm referring to as an apology.**
A. I did say that. Real quick can I see the Bates stamp.
**Q. You want to look at the apology again?**
MR. BRETTLER: 1442.
THE WITNESS: I have this in front of me now.

BY MS. SCHLUMP PETERS:
**Q. That is an apology; right?**
A. I apologized to plaintiff because an account that I was involved with --
**Q. But --**
A. -- it leaked a bunch of stuff online.
**Q. But you --**
MR. BRETTLER: Excuse me, Ms. Peters, please let my client finish his answer before you interrupt him.
You can finish your answer, Steven. Go ahead.
THE WITNESS: I see where I apologized for the -- there was an account that I had been in communication with whose entire account worth of stuff had been leaked, yes.
BY MS. SCHLUMP PETERS:
**Q. So can we refer to it as an "apology"? Is that an okay characterization for you, Mr. Bonnell?**
A. No.
**Q. It's not an apology, "I'm so sorry"?**
A. No, it's not an okay characterization. I say it's important to clarify what I'm

apologizing for here.
**Q. I'm not specifying that. I'm just referring to it as the apology; is that okay?**
MR. BRETTLER: She can refer to it as an apology. You need not accept that fact that it's an apology.
THE WITNESS: I understand that when you say an apology, I understand you to mean that you're referring to this particular message, yes.
MS. SCHLUMP PETERS: Correct. Thank you.
So I'm going to mark as Exhibit 6 a document with the Bates stamp SB002404.
(Plaintiff's Exhibit No. 6 was marked for identification.)
BY MS. SCHLUMP PETERS:
**Q. So this is direct messages between you and Straighterade on December 12, 2024; correct?**
A. Yes, it looks to be that way, yes.
**Q. And why don't you read the first part, the first communications to yourself for context and then I'll ask you some questions. Okay?**
A. You want me to read this document to myself?

**Q. To yourself, yes, just the first --**

MR. BRETTLER: You can read whatever you want that is in front of you.

MR. C. GARCIA: The instruction for him is to read what you put in front of him; right?

MS. SCHLUMP PETERS: Yes.

MR. C. GARCIA: Okay. We don't need your comment.

MR. BRETTLER: I don't need yours, either, Carlos.

MR. C. GARCIA: So good. So we don't need any of those comments. She's taking the testimony. He needs to read what she put in front of him.

MR. BRETTLER: You can read whatever it is you'd like, Steven.

MR. C. GARCIA: No.

MR. BRETTLER: You can take as much time as you'd like.

MR. C. GARCIA: That you can. All day if you want.

MR. BRETTLER: All day, or at least for another 4 hours and 43 minutes.

THE WITNESS: I'm familiar with the document in front of me. I've read it, yes.

BY MS. SCHLUMP PETERS:

**Q. Thank you. And you asked Straighterade "What do you think would be the appropriate way of even approaching her?" You're referring to plaintiff, right, at 1:53 a.m.?**

A. Yeah, approaching her. "Her" is in reference to the plaintiff, yes.

**Q. And then, Straighterade replies "Which is probably extremely difficult to prove in her case. She's not a high-profile micro celebrity. You did not leak it maliciously. You didn't even leak it at all. You distributed it nonconsensually."**

A. I see that.

**Q. And what is your response to Straighterade saying that you distributed it nonconsensually?**

A. My next message is "Yeah, I know. I looked into it for obvious reasons, just to be sure, but I don't really care much about the legal side of it or whatever. Obviously, I have severely, at the very least, psychologically

damaged her. Covering therapy or whatever is a minimum. And I have no problem helping out or sending her money for anything as a form of repatriation. I just didn't want to come off as like 'hey bitch, LOL. I know I violated your trust in the worst way ever, but here's some money. Have fun.'"

**Q. So you didn't disagree here with Straighterade's characterization that you distributed it nonconsensually; right?**

A. I didn't really address it, yeah.

**Q. No. And then you say, "I violated your" -- meaning the plaintiff -- that you violated the plaintiff's trust, "in the worst way possible"?**

A. Yes.

**Q. You say that; right?**

A. Yes, that is what I say in this message, yeah.

**Q. So if you had permission from plaintiff to share the video, why is that a violation of her trust?**

A. It's going to be the exact same answer I gave earlier, in that I shared the video with a person whose account was compromised and the

video was leaked online and I should have been -- I guess, more cautious about people that I was friends with or cleaning up old messages or there was probably something that was within my power to prevent that account from still having that message in it.

**Q. And you acknowledge here that you violated plaintiff's trust; right?**

A. Well, no, I mean this is a -- it's more like a hypothetical message to not, like, come off as crass or tasteless. I think I'm exaggerating in the message because I'm trying to find an appropriate way to contact plaintiff to, I guess, make her feel like her grievances about the videos being posted online are addressed.

**Q. Well, you do say here, "I know I violated your trust," but --**

A. True, but the entire message here is in quotes, and I think it's pretty clearly a hyperbolic message. There is no world where I'm messaging plaintiff, and saying "Hey bitch, LOL, here is some money; have fun." So the entire message is pretty exaggerated.

**Q. So you don't think you violated plaintiff's trust?**

A. Insofar as I'd sent the video to an account that eventually it was posted online, yes. Much the same that if my ex-wife had posted a video online, I also would have felt equally bad, or if a device of mine had been stolen, I would have felt equally bad.

**Q. So let's look again at your testimony at the preliminary injunction hearing at page 72.**

MR. BRETTLER: It has not been marked.

THE WITNESS: I have it, but it's not been marked as an exhibit.

MS. SCHLUMP PETERS: I do want to mark this as an exhibit.

(Plaintiff's Exhibit No. 7 was marked for identification.)

THE WITNESS: Just to be clear, this is two pages. Is it just the one as the exhibit?

MS. SCHLUMP PETERS: What do you have there? 71 and 72?

THE WITNESS: I have got 63 and 72.

MS. SCHLUMP PETERS: I just want to mark 72 right now.

BY MS. SCHLUMP PETERS:

**Q. Okay. So looking at page 72 of the transcript, we already discussed part of your response here, but you see partway down the page, after you talk about the norm of just kind of trading stuff around, the Court asked you, "So you thought you had some kind of implied consent; is that what you're saying?"**

A. That is what I said in response to the judge, yes.

MR. BRETTLER: Let her ask her question.

THE WITNESS: I'm sorry. I thought she said is that what you're saying? I got you. Okay.

BY MS. SCHLUMP PETERS:

**Q. And your response to the Court's question as to whether or not you thought you had some kind of implied consent is, "Yeah, basically"; right?**

A. That was my response, yes.

**Q. So you believe you had implied consent from the plaintiff to share the video?**

MR. BRETTLER: Objection to the extent that it calls for a legal conclusion, but you can answer.

THE WITNESS: Kind of, so I would say implied consent as to the specific people, but explicit consent as to sharing the video. So it depends on what you're saying with regard to.

BY MS. SCHLUMP PETERS:

**Q. And where is the -- where is explicit consent to share the video?**

A. In the conversation we had in the hotel room on September 12, 2020.

**Q. The one that you can't recall?**

A. The one that I --

MR. BRETTLER: Objection. Misstates the witness's prior testimony.

THE WITNESS: The one that I don't recall the specifics of, yeah.

BY MS. SCHLUMP PETERS:

**Q. Well, let's look at that then again. So how could you recall that you had explicit consent if you don't recall the specifics, Mr. Bonnell?**

A. Quite easily. I'm not entirely sure what the question is.

**Q. You said to the Court -- he asked, "Was there ever any rules on who these videos that you**

**took with plaintiff could be shared with?"**
**And you said, "If those conversations occurred, it would have been in person. It would have been five years ago. I can't recall the specifics of those conversations."**
A. So for instance, if a specific person had been mentioned, I don't recall any of that, but a general agreement for how videos are to be treated, I can recall that.
**Q. But you didn't say that to the Court, did you? You didn't tell the Court, "We had an agreement that I could share the video"? Did you say that anywhere?**
A. Hold on. For? Can you -- which line?
**Q. That you had an agreement with the plaintiff during your conversation, did you ever say that to the Court?**
A. I mean, I would argue that my answer from 18 to 25 was characterizing what I just said, yes.
**Q. 18 to 25?**
A. On page 72, yeah.
**Q. That's talking about you agreeing that you had some kind of implied consent. I asked you about explicit consent.**

A. So the implied would be as to the specific person; the explicit would be as to sharing videos.

So I believe in here I say, for instance, "I don't believe in any of the conversations I've had, for instance, with plaintiff, I don't think there was ever an explicit ask. I don't believe she ever asked me -- I don't believe she asked me if she could send it to her boyfriend at the time, but I wouldn't have objected because my understanding was basically that's what we're doing this for" and then it goes to the next page.

So there was an explicit conversation about sharing the video, but as to who it was shared exactly with, maybe "implied" was a bad way of saying that, but there was an explicit conversation and the people were left up to the plaintiff and defendant, I guess, me and her.

**Q. So today you're saying that you had an explicit conversation with plaintiff at the hotel that you now remember?**

A. I would always say of course we had an explicit conversation about what to do with sexual material we recorded, of course.

**Q. And yet you failed to the tell the judge that, didn't you?**

MR. BRETTLER: Objection. It's argumentative.

Don't answer.

MR. C. GARCIA: What is the answer?

MR. BRETTLER: There is no answer. It wasn't a question.

BY MS. SCHLUMP PETERS:

**Q. The question was:**

**Did you fail to tell the judge that?**

A. No, I would restate that I believe from lines 18 to 25 in this transcript that I explained what was an explicit conversation about sharing videos. The implied part would be specifically who a video is to be shared with.

**Q. The Court asked you, "You thought you had some kind of implied consent?" And you responded, "Yes." Correct?**

**You didn't respond, "No, it wasn't implied; it was explicit." Did you?**

A. That was --

**Q. Do you see that here?**

MR. BRETTLER: Excuse me. She's asking multiple questions at the same

time, so let her finish her question before you answer, and then just answer what she asks you. She asked if you see it.

THE WITNESS: So here --

BY MS. SCHLUMP PETERS:

**Q. Did you tell the Court that you had explicit consent?**

A. To what?

**Q. He asked you, "You thought you had kind of some implied consent" you said "Yes"?**

A. What is he asking me that with reference to?

**Q. Well, you can read the prior part of the page. We already reviewed it.**

A. Okay. My understanding is that at lines 4 to 6 the judge is asking me about sending the particular video to Rose, so the particular person, is what I've said is my -- the implied part would be the people you send it to, but that doesn't preclude an explicit consent conversation from occurring.

So when the Court is asking me from 16 to 17, "So you thought you had some kind of implied consent," that is with reference to the

specific individual I sent the video to, not with the overall permission of whether I could share the video.

**Q. You didn't -- you're telling the Court you did not have explicit consent to share the video to Rose; correct?**

MR. BRETTLER: Objection.

MS. SCHLUMP PETERS: Is that right?

MR. BRETTLER: Objection. That misstates his prior testimony and misstates the document.

BY MS. SCHLUMP PETERS:

**Q. Is that right, Mr. Bonnell?**

A. No, I don't believe that is what I stated.

**Q. Well, you said you had implied consent to share with Rose?**

A. With that particular person but explicit consent --

**Q. Right, but we're talking about Rose here, aren't we?**

A. Yes, but we're talking about sharing an explicit video of which I have explicit consent to share sexual material between me and plaintiff, much the same as she did. And implied

consent for as to who to share it to, much as the -- same as the example I give in my answer from lines 18 to 25.

**Q. So was there a list of people that you could share the video with when you talked at the hotel?**

A. No, if there was a list then it would have been explicit, I would have said.

**Q. Then it wasn't explicit, right. Thank you.**

**And you think explicit consent before sharing intimate images is important, don't you?**

A. Yes.

**Q. But you didn't get explicit consent to share with Rose, did you?**

A. I would reject that characterization. I would say we had explicit consent to share the video with sexual partners.

**Q. Is that what you told the Court, that you had the explicit consent to share the video with sexual partners?**

MR. BRETTLER: Objection. Asked and answered, but you could answer again.

THE WITNESS: I would have to

review the prior transcript of this. I don't remember what the Court specifically asked me in that conversation.

BY MS. SCHLUMP PETERS:

**Q. Do you remember testifying to that effect?**

A. I don't remember.

**Q. That you had explicit consent?**

A. I don't remember explicitly what I would have testified. I would have to review the transcript. If you have it, I can see what the Court asked me and I can summarize my response.

MS. SCHLUMP PETERS: I'm going to mark as the next Exhibit, 8.

(Plaintiff's Exhibit No. 8 was marked for identification.)

BY MS. SCHLUMP PETERS:

**Q. Okay. You have in front of you a document that we have marked as Exhibit 8. And this is a chat thread on your DGG group; correct?**

A. Yeah, it looks like logs from a website that logs some of the chat in my chat room on my website, yes.

**Q. And so the date -- look at the next**

**page, and on January 24th, 2025, you see where it --**

A. The highlighted message?

**Q. You state, "also, regardless of anyone simping for me or attacking me, or whatever in here, if any of you are ever defending sending material to people without their explicit consent or anything like that, I'm banning you. Don't end up defending retarded shit just because you are defending your streamer fan or anything like that."**

**Is that right?**

MR. BRETTLER: Is what right?

MS. SCHLUMP PETERS: That you said that.

THE WITNESS: That is my message in my chat, yes.

BY MS. SCHLUMP PETERS:

**Q. And you agree with that statement; right?**

A. Yes.

**Q. Mr. Bonnell, before you shared the video with Rose, did you do anything to make sure that the video wouldn't be leaked by Rose?**

MR. BRETTLER: Objection. Vague

and ambiguous.
If you understand, you can answer.
THE WITNESS: I don't understand how I could do that, what that would mean.
BY MS. SCHLUMP PETERS:
**Q. Did you ever tell Rose not to share the video with anyone?**
A. I would say we had an understanding that that would be improper. I think most people would.
**Q. But you had that understanding with Rose also?**
A. Yes.
**Q. So that would be reflected in your chat thread with her?**
A. I don't know if that thing would be explicitly stated. I think that would just be a mutual understanding between two people.
**Q. An unspoken understanding?**
A. If you are sharing explicit material with another person that you're not leaking that, if it doesn't involve you, to somebody else, of course.
**Q. Did you delete the video after Rose**

**viewed it so she could not share or leak it?**

MR. BRETTLER: Objection. Vague and ambiguous as to time, but you can answer.

THE WITNESS: I don't think the question -- I don't understand. I don't think that's possible.

BY MS. SCHLUMP PETERS:

**Q. You shared the video with Rose in April 2022?**

A. Yes.

**Q. Did you delete it right after she viewed it so that she could not share it or leak it?**

A. If the person had the ability to view the video, it would be impossible to delete the video so they couldn't save it so I don't understand the question.

**Q. Well, you sent that to her as an attachment in a Discord thread; correct?**

A. Yes, but if he she was able to view the video, she could have saved it upon the first viewing.

**Q. Did you delete it after she saw it?**

A. At some point, yes.

**Q. When?**

A. I guess in the -- I would have to consult earlier papers, but when I found out that somebody had access to the account.

**Q. So in 2024; correct?**

A. Yes.

**Q. And you had no idea of Rose's legal identity before sending her the video; right?**

A. Correct.

**Q. You had no idea of her age before you sent her the video, did you?**

A. Well, she stated an age, so I mean, I believe the age she told me so if that counts as an idea, then, yes, I would say I had an idea, yes.

**Q. Did you ever see a legal identification of hers stating her age?**

MR. BRETTLER: Objection. Vague and ambiguous as to time.

THE WITNESS: I might have seen a student ID, but I don't remember. It would have been in an earlier conversation.

BY MS. SCHLUMP PETERS:

**Q. Now, Rose first reached out to you on Twitter; correct?**

A. Yes.

**Q. How many messages do you think you exchanged with Rose on Twitter?**

A. Maybe 50, maybe 100.

**Q. And you know that plaintiff requested you to produce your with Twitter messages with Rose?**

A. She might have, yeah. I don't remember specifically.

**Q. But you didn't produce any of the Twitter messages, did you?**

A. If it was requested of me, I produced it, if I had it.

**Q. Well, I'm telling you today that you did not produce any Twitter messages with Rose.**

MR. BRETTLER: You don't need to accept that as true, but she can ask you a question.

THE WITNESS: Was there a question there?

BY MS. SCHLUMP PETERS:

**Q. I'm representing that you did not produce any Twitter messages with Rose. You're free to clarify that after this deposition is over.**

A. I'll restate that I produced everything that I have between me and Rose.

**Q. But you didn't produce any Twitter messages; did you delete them?**

MR. BRETTLER: Objection. It assumes facts not in evidence. It calls for speculation, but you can answer.

THE WITNESS: No.

BY MS. SCHLUMP PETERS:

**Q. You didn't delete your Twitter messages with Rose?**

A. I don't believe it's possible to delete them.

**Q. So you still have them?**

A. I don't think that means I have them. I think the account on Discord or on Twitter, I think the account was deleted so I don't think I can access messages with a deleted account.

**Q. You testified earlier that you can't delete Twitter messages?**

A. Correct.

**Q. So it's only if the account is deleted?**

A. Unless Elon has implemented a new feature, that's my understanding. It's possible that has changed since four years ago though.

**Q. And when you first started communicating with Rose on Twitter, you were suspicious about her age; right?**
A. I made a comment that she looked young, but it seems like she was selling sexual material on Twitter, so the chance of her being underage, I imagine, would have been very, very, very low.
**Q. You asked her to confirm her age, didn't you?**
A. I don't recall exactly what I said to her on Twitter.
**Q. Solo leaked your messages with a -- a portion of your messages with Rose on Twitter, didn't he?**
A. I don't remember exactly.
**Q. He asked -- you asked Rose to confirm her age, preferably with an ID, but then you said, "but I understand if that's too much for you"; do you recall that?**
A. I don't recall that specifically, no.
**Q. And you wrote "Writing something on a piece of paper is more than enough"; right? Do you remember that?**
A. I don't recall that message specifically.

**Q. You realize you have a legal obligation to verify someone's age before exchanging pornography?**

MR. BRETTLER: Objection to the extent that it calls for a legal conclusion, otherwise you can answer.

THE WITNESS: I'm not aware of that, no.

BY MS. SCHLUMP PETERS:

**Q. You are not aware of that. Oh.**

**And you are aware now that Rose was actually a minor at the time that you solicited pornography from her; right?**

MR. BRETTLER: Objection. It assumes facts not in evidence and it's vague and ambiguous.

You can answer.

THE WITNESS: My understanding is that the person who was controlling the account was an adult male in the United Kingdom and that that is who I was soliciting or requesting material from for the entire time.

BY MS. SCHLUMP PETERS:

**Q. But you received sexually explicit**

**material from -- of Rose, didn't you?**

MR. BRETTLER: Objection. Vague and ambiguous as to what you mean by "of Rose."

THE WITNESS: I mean, purportedly, but again, the person I was communicating with was an adult from the United Kingdom so it's hard for me to say for sure one way or the other.

BY MS. SCHLUMP PETERS:

**Q. My question was:**

**You received -- in that Discord chat thread you received sexually explicit images and videos of Rose?**

MR. BRETTLER: Same objection.

MS. SCHLUMP PETERS: Correct?

MR. BRETTLER: Vague and ambiguous as to Rose.

THE WITNESS: I received sexually explicit image from an account that was representing to me at the time to be an adult female.

BY MS. SCHLUMP PETERS:

**Q. What did the material depict?**

MR. BRETTLER: Objection.

Objection.
BY MS. SCHLUMP PETERS:
**Q. What did the material depict?**
MR. BRETTLER: First of all, you are interrupting my client's answer.
Were you finished with your prior answer?
THE WITNESS: No, I wasn't.
MR. BRETTLER: Okay. Please finish your prior answer.
THE WITNESS: I had received at the time what was represented to me to be material of an adult woman. And then later through this court process, after her deposition, I found out that I never actually communicated or received anything from her directly. It was an adult male that was operating the account in the United Kingdom to catfish me.
BY MS. SCHLUMP PETERS:
**Q. So there was a go-between between you and Rose; correct?**
MR. BRETTLER: Objection. Misstates prior testimony.

THE WITNESS: Given the nature of catfishing, it's impossible for me to know who the other person was ultimately on the other side.

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, the question is:**

**Did you receive sexually explicit images and videos depicting Rose?**

MR. BRETTLER: Objection to the form of the question. It's vague and ambiguous with respect to Rose.

THE WITNESS: I'm not entirely sure. I don't know at the end of the day who I received material of. This is a person I have never apparently spoken to or communicated with directly.

Again as a result of her deposition, I found out I had never been in contact with her directly, but it had been an adult male that was running the account from the United Kingdom. So it's impossible for me to verify ultimately who the pictures were of or what of.

BY MS. SCHLUMP PETERS:

**Q. Well, your counsel were present at her deposition and you've seen photos of her, haven't you?**

MR. BRETTLER: Objection. Vague and ambiguous. If you know who she's referring to, to the extent that you're referring to this person named Rose --

BY MS. SCHLUMP PETERS:

**Q. You have seen photos of Rose; right?**

MR. BRETTLER: Excuse me. To the extent that you are referring to Rose, I object as vague and ambiguous.

THE WITNESS: I have seen -- in discovery, I believe it was produced a thing of her -- it might have been a birth certificate or driver's license, so insofar as I have seen that picture, yes.

BY MS. SCHLUMP PETERS:

**Q. You saw the driver's license with her date of birth on it?**

A. Yes.

**Q. You have never seen a photo of Rose?**

A. I'm not entirely sure. It's hard for me to say communicating with a catfish how much of

that conversation was authentic or inauthentic.

**Q. So all the material that you received of a young girl, it was of the same young girl; right?**

MR. BRETTLER: Objection. Vague and ambiguous.

THE WITNESS: Given that I was communicating with a catfish the entire time, it is impossible for me to verify that.

MS. SCHLUMP PETERS: That's nonresponsive, Mr. Bonnell.

THE WITNESS: So your question to me was if I received material of a specific person. My understanding is I was communicating with an adult female that ran an account called Rose and later on --

BY MS. SCHLUMP PETERS:

**Q. I didn't --**

A. Let me finish, please.

And later on, it was -- apparently it came out in a deposition that it was an adult male that was running this account.

So the person that I thought I was

communicating with is not who I was communicating with, so ultimately, I would be uncomfortable saying for sure I received anything knowable from this person. I'm not entirely sure.

**Q. So were the sexually explicitly images and videos of Solo, of a man, that you received? Were they of a man?**

A. No.

**Q. Or were they of a young girl?**

A. They were of somebody who seemed to be a woman.

**Q. Okay.**

A. But again--

**Q. Yes?**

A. I don't -- yes.

**Q. And you started communicating with Rose in the beginning of April 2022; do you recall that?**

A. Sometime around there.

**Q. Sometime around there?**

A. Yes.

**Q. And then on April 9, 2022, so only about a week later, you sent her the video of plaintiff; right?**

A. On April 9, 2022? I believe so, yes.

**Q. And when you sent Rose the video of plaintiff, you described the plaintiff as someone who was young and inexperienced; correct?**
A. That's what I described to the person on the Rose account, yes.
**Q. And plaintiff was young and inexperienced; right?**
MR. BRETTLER: Objection. Vague and ambiguous, but you can answer.
THE WITNESS: I mean, "young" is relative. I suppose they were younger than me. "Inexperienced" at this point, I'm not sure anymore, but.
BY MS. SCHLUMP PETERS:
**Q. Okay. So you told Rose though, that she was young and inexperienced; correct?**
MR. BRETTLER: Objection. Asked and answered.
THE WITNESS: I believe that is the message I sent to the account, yes.
MS. SCHLUMP PETERS: We're going to mark as the next exhibit your declaration of Docket 132-1, dated September 19, 2025.
(Plaintiff's Exhibit No. 9 was

marked for identification.)
BY MS. SCHLUMP PETERS:
**Q. Look at paragraph --**
MR. BRETTLER: Just for the record, this document does not include any of the exhibits attached to the declaration.
BY MS. SCHLUMP PETERS:
**Q. So look at paragraph 4, which starts on the first page and then continues to the next page and you say, "Because I am located in Florida, my own logs show the same communications as 4/9/22," April 9, 2022, "at 8:36 p.m. Eastern"; do you see that?**
A. Yes.
**Q. And then again, on April 9, 2022, you submitted a declaration to the court also saying that the transmission to Rose occurred at 8:36 p.m.?**
A. What are you referencing here?
MS. SCHLUMP PETERS: Let me give it to you. This is the next Exhibit 10, Docket 213.
(Plaintiff's Exhibit No. 10 was marked for identification.)

BY MS. SCHLUMP PETERS:

**Q. And if you look at paragraph 7 of this declaration dated January 30th, you state that the transmission with Rose occurred at 8:36 p.m. on April 9, 2022; do you see that?**

A. On paragraph 7, April 9th, at 8:36 p.m., EST, 2022, correct.

**Q. Okay. We're going to mark as the next exhibit -- do you have Exhibit 2 in front of you?**

A. Yes.

**Q. So if you look at paragraph 9 of that exhibit --**

A. Yes.

**Q. And this declaration is dated April 25, 2025; correct?**

A. Uh-huh.

**Q. And in that declaration you state that the transmission occurred at 8:06 p.m., not 8:36 p.m.; do you see that?**

MR. BRETTLER: It does not say that. It misstates the testimony, but you could -- you should read the whole document.

MS. SCHLUMP PETERS: Paragraph 9.

THE WITNESS: I see it, but I don't

agree that that is what it states.
BY MS. SCHLUMP PETERS:
**Q. What does it state?**
A. It states that that's when I began corresponding to Rose regarding the video, which sounds like that is when the messages regarding the video were sent but not when the actual video was transmitted.
**Q. So let's look at Docket 132-3 -- we'll come back to that.**
**Mr. Bonnell, how often did you speak with Rose?**
MR. BRETTLER: Objection. Vague and ambiguous as to time and vague and ambiguous as to Rose.
THE WITNESS: I communicated with the account, I guess, with -- semi-frequently more often in 2022, and then a little bit in 2023 and not as much afterwards.
BY MS. SCHLUMP PETERS:
**Q. No my question is:**
**How often did you speak either via cell phone, Skype or Discord call with the woman who went by the screen name Rose whose legal name is**

[redacted]

MR. BRETTLER: Objection. It's compound. It's vague and ambiguous, but if you understand the question, you can answer.

THE WITNESS: Never.

BY MS. SCHLUMP PETERS:

**Q. You never spoke with her?**

A. Correct.

**Q. Let's look at -- so in the apology that we already looked at, the SB1142, you said you had decent length conversations with her; right?**

A. I sent that message, yes.

**Q. You weren't referring to phone calls?**

A. I think I was mistaken.

MS. SCHLUMP PETERS: Okay. Let's look at SB02392.

MR. BRETTLER: Is that in the binders or are you marking?

MS. SCHLUMP PETERS: This is the next exhibit.

(Plaintiff's Exhibit No. 11 was marked for identification.)

BY MS. SCHLUMP PETERS:

**Q. So this is direct messages between you**

**and your friend Straighterade on November 29th; correct?**

A. Yes.

**Q. And your first message at 10:45 p.m. you say "I feel like this person must have just hacked the Rose person's account, but who knows? Maybe they were just a sociopath the whole time."**

**And then you said "I had, like, decent length phone calls with this person multiple times about both of our personal things. Never had a problem, issue, fight over literally anything ever."**

**Did you say that?**

A. I see where I said that, yes.

**Q. You said "decent length phone calls," didn't you?**

A. I see where I said that, yes.

**Q. You had no reason to lie to Erin; right?**

A. I mean, I would say I arguably could have had a million reasons to lie. I didn't. I was mistaken at the time. This was probably an hour and a half after I had just found out 30 or so explicit videos of me had been leaked online. There were few people that I chatted with about some very personal problems a couple years prior

and I thought that she had been one of the people that I had spoken with on the phone, but I was mistaken when I went to go back and analyze our logs and check.

**Q. So this isn't true, what you told Erin? You lied to her?**

MR. BRETTLER: Objection. Misstates prior testimony.

THE WITNESS: It was a true statement at the time as to what I believed to be correct but it was incorrect.

BY MS. SCHLUMP PETERS:

**Q. But you have good reason to state today, that you did not speak to her; right?**

A. Yes.

**Q. And you didn't have good reason --**

MR. BRETTLER: Objection. Vague and ambiguous.

BY MS. SCHLUMP PETERS:

**Q. -- to tell Erin anything other than the fact that you actually had phone calls with her; right?**

A. I think at the time I believed that I had. After reviewing all of the logs that we

had, I now understand I hadn't, so I believe I had good reason at the time to think that we had chatted. I remember both of us, me and Rose, had brought up talking on Discord or the phone. It just never, I guess, came to pass.

**Q. And you are aware that President Sunday on one of his live streams stated -- produced a message from Solo saying that he has recordings of the phone calls between you and Rose?**

A. I'm aware that President Sunday claimed to have produced that from Solo, yes.

**Q. So, you think this was not true? Your message to plaintiff that you had conversations with Rose was not true? Solo's message was not true?**

MR. BRETTLER: Hold on. I object.

BY MS. SCHLUMP PETERS:

**Q. None of that was true?**

MR. BRETTLER: I object to the question. It's compound. It's vague and ambiguous. You are referring to "this" and you are not being specific about what you're asking him.

If you understand the question, you can answer.

THE WITNESS: I would say that at all points in these messages, I'm representing what I believe to be true at the time. So insofar as anything was not true was because I was mistaken, not because I was intentionally misrepresenting anything.

BY MS. SCHLUMP PETERS:

**Q. Now, you already knew -- you knew from your communications with Rose that she lived in or near Chicago; right?**

MR. BRETTLER: Objection. Vague and ambiguous to the extent that you have ever had any communications with Rose.

THE WITNESS: When you say "knew," this is a statement of, like, absolute universal fact. Apparently, I didn't know anything about this person because I never had a direct communication with them, but I was under the impression that I was communicating with an adult woman, who supposedly lived in Illinois, and now I know that that is not true.

BY MS. SCHLUMP PETERS:

**Q. Well, just for purposes of the simplicity, we will just say you were communicating with Rose. You want to characterize it any way you want, but these --**

MR. BRETTLER: No, I object to that. We are not going to characterize it any way we want.

MS. SCHLUMP PETERS: I'm still speaking, Mr. Brettler.

MR. BRETTLER: I know, but your question is --

MS. SCHLUMP PETERS: You are interrupting me.

MR. BRETTLER: -- already flawed. We are not accepting any of her predicate.

BY MS. SCHLUMP PETERS:

**Q. I am going to refer to your communications with Rose -- that's how I am characterizing it. Do you understand that?**

A. I understand that. If you characterize it that way, I'm going to continue to refer to the Discord account of Rose because the person I thought this was referring to I had never actually spoken with before.

**Q. So this person that you were communicating with stated that they lived in or near Chicago; right? You knew that?**

MR. BRETTLER: Objection. That's two separate questions, but you can answer.

THE WITNESS: I knew that the person on the account had stated that, but I didn't truly know, I guess, where the person lived because I didn't know they lived in the United Kingdom and they were an adult male.

BY MS. SCHLUMP PETERS:

**Q. But you made a declaration to the Court in April of 2025 where you asserted that Rose was in Europe when she sent the video -- when you sent her the video; right?**

MR. BRETTLER: Objection. Misstates documents and evidence, but you can answer.

THE WITNESS: Can I look at the -- my exact statement there, so that I can see what I stated?

BY MS. SCHLUMP PETERS:

**Q. I think you have that declaration.**

A. Can you remind me the exhibit.
**Q. It's your first declaration.**
A. Which paragraph was this?
**Q. So it's in paragraph 9.**
A. Yep.
**Q. And on page 3, in paragraph 9, you refer to your exhibit, the Discord exchange with Rose where you sent her the video. The date of the transmission is reflected in European format. "The timestamps on page 2 of the exhibit reflect that Rose was corresponding from a time zone five hours ahead of me in Miami, Florida"; do you see that?**
A. Yes.
**Q. So you didn't tell the Court that she lived in Chicago; correct?**
MR. BRETTLER: Objection. Argumentative and vague and ambiguous.
THE WITNESS: I don't know if I've made any declarations to the Court as to where the person who I thought was operating Rose's account lived. I can ask you if I have made that declaration? Is that something I declared to the Court?

BY MS. SCHLUMP PETERS:

**Q. Well, that is what your declaration says. You're saying that Rose was in Europe at the time.**

A. So the sentence reads "The timestamps on page 2 of the exhibit reflect that Rose was corresponding from a time zone five hours ahead of me in Miami, Florida."

As far as I'm aware that is a true statement. I don't have the exhibit in front of me, but my understanding is the timestamps were formatted in a European date format that was five hours ahead of me in Miami, Florida.

**Q. You were trying to explain the European timestamp, but you knew that Rose, whose legal identity is [redacted] did not live in Europe, didn't you?**

MR. BRETTLER: Objection. Misstates the witness's prior testimony. It's vague and ambiguous.

THE WITNESS: I don't know. I'm not entirely sure what those two statements have to do with each other.

BY MS. SCHLUMP PETERS:

**Q. Okay. What attempts did you make to**

**find out Rose's identity?**

MR. BRETTLER: Objection. Vague and ambiguous as to time.

THE WITNESS: From when I first knew her or --

BY MS. SCHLUMP PETERS:

**Q. Tell me any attempts you made to find out her identity.**

A. I tried to find her identity based on her Twitter account. I couldn't really find anything there.

**Q. When was this?**

A. It probably would have been after the leaks.

**Q. Okay.**

A. I hired a private investigator in New York to find out her identity; wasn't able to --

**Q. What is the name of the private investigator?**

A. I would have to go look it up. I don't remember off the top of my head. I think I paid him $900.

**Q. Did you submit any evidence of that?**

A. I don't -- if I had it, I submitted it, but the private investigator ultimately turned up

nothing, so.

**Q. And you were making efforts to subpoena Cameo; is that right?**

MR. BRETTLER: Objection. Vague and ambiguous as to time.

THE WITNESS: I'm also uncomfortable touching that because that would involve communications I had with my litigation firm in New York.

BY MS. SCHLUMP PETERS:

**Q. Why were you trying to subpoena Cameo to find out Rose's identity?**

MR. BRETTLER: Objection. It assumes facts not in evidences, number one.

And number two, to the extent it calls for the disclosure of attorney-client privilege with Attorney Goldberg, I instruct you not to answer.

THE WITNESS: Also I wanted to know who the person was behind the account.

MS. SCHLUMP PETERS: So you produced this evidence, Mr. Bonnell, so there is no privilege on documents that you've produced. I'm going to mark this

as the next exhibit.

THE WITNESS: Just to be clear, I'm not sure what you're saying when you say I produced this evidence.

MR. BRETTLER: Neither am I, but we'll get there.

MS. SCHLUMP PETERS: When I say you produced evidence, it means your Bates stamp is on it.

THE WITNESS: Okay. I understand. Well, I haven't received the document yet, so I'm sure I'll see what you are referring to.

(Plaintiff's Exhibit No. 12 was marked for identification.)

BY MS. SCHLUMP PETERS:

**Q. So do you see in here that you were trying to subpoena -- efforts were being made to subpoena Cameo in order to find out Rose's identity? Do you see that in these documents?**

A. Can you point me to the page specifically you're referring to.

**Q. Well, the entire document is about subpoenaing.**

A. Well, I can see that, yeah, we were

making efforts to subpoena Cameo.

**Q. And then on page SB002487 --**

A. Yes.

**Q. There is a message saying, "On or about July 2022, you purchased a T-shirt sold by Mr. Bonnell through an online storefront that was fulfilled by Cameo." So is this why you were submitting a subpoena on Cameo to try to find out the identity of Rose? That was the question.**

A. Yes, the reason that I stated earlier, yes.

**Q. And then on 2484, there is an e-mail from Roxanne Rimonte from the Goldberg law firm to Eric, and it says -- she says that the -- her response is now moot. "In an unfortunate twist of events, my client is now defending a suit against him by one of the females in the disseminated videos. So in the end we are going through legal procedure."**

A. I see that sentence, yes.

**Q. And above that she says "This case has ramped up exponentially since we last spoke, so it's moot at this point."**

**And she's referring to moot being serving Cameo with a subpoena; right?**

MR. BRETTLER: Objection. Calls for speculation. And it also could implicate the attorney-client privilege.

If you know outside of -- if you have independent knowledge outside of your communications with counsel, you can answer.

BY MS. SCHLUMP PETERS:

**Q. It's based on this e-mail thread.**

A. Then I would say based on what she said it seems like she feels like it's not worth pursuing a subpoena or it's not worth making the request that she made. Sorry.

**Q. So did you think that it was moot to try to find out Rose's identity because plaintiff filed her suit?**

MR. BRETTLER: Objection. Are you asking if he thought it was moot?

MS. SCHLUMP PETERS: Yes.

MR. BRETTLER: Or if Ms. Goldberg thought it was moot?

MS. SCHLUMP PETERS: I'm asking you, Mr. Bonnell.

MR. BRETTLER: To the extent that it calls for the disclosure of

attorney-client communications, I
instruct you not to answer.
THE WITNESS: I never stated that
it was moot.
BY MS. SCHLUMP PETERS:
**Q. Do you think that it's moot?**
A. Absolutely not.
**Q. And yet your attorneys did not proceed**
**with the subpoena; right?**
MR. BRETTLER: Objection. It's
argumentative. It's also been asked and
answered.
You don't need to respond.
BY MS. SCHLUMP PETERS:
**Q. Did they?**
A. When you say my attorneys, I'm
uncomfortable with that phrasing because these
attorneys are not representing me in any
litigation right now.
**Q. So there is no attorney-client privilege**
**here then?**
MR. BRETTLER: Excuse me. First of
all, don't engage with her. It was a
silly statement.
BY MS. SCHLUMP PETERS:

**Q. So was this subpoena ever served on Cameo to your knowledge?**

A. To my knowledge, no.

**Q. And apart from the -- apart from that did you make any other efforts to find out Rose's identity?**

MR. BRETTLER: Objection. Vague and ambiguous what you mean by "that" and also the "any other efforts."

MS. SCHLUMP PETERS: The Cameo subpoena.

THE WITNESS: No, and the private investigator.

BY MS. SCHLUMP PETERS:

**Q. In December 2024 you created a Discord server in order to identify Rose, didn't you?**

A. I had group chats where I was chatting with people to ask questions about if they could identify any of the Twitter material or anything that had been posted, if we could see if anybody knew where she could have lived.

**Q. But you had a specific group of people, about ten people?**

A. I don't recall that specifically.

**Q. You don't recall that? Is that server**

**still active?**

A. I don't think so. The question doesn't make sense. If you have a group chat with people and everybody leaves the group chat, the group chat doesn't exist anymore.

**Q. Did you send photos and videos that you had received from the Rose account to that Discord group to help with identification?**

A. I don't recall specifically what would have been sent because a lot of the materials was already posted online publicly.

**Q. When did you find out Rose's legal identity?**

A. Apparently at the same time you guys did; when it was posted online on Kiwi Farms.

**Q. Have you communicated with her in any way since November 2024?**

MR. BRETTLER: Communicated with whom?

MS. SCHLUMP PETERS: Rose.

MR. BRETTLER: Objection to the extent that we don't know who Rose is.

THE WITNESS: So for the [redacted] I sent a single message on Facebook and I was, I'm guessing, blocked because

I didn't get a response and the account disappeared, so beyond that, no.

BY MS. SCHLUMP PETERS:

**Q. Are you familiar with how Discord stores message attachments on its content delivery network?**

A. Very familiar, yes.

**Q. And were you aware that sometime between April 2021 and December 2023, that time period, Discord attachment links were permanent and publicly accessible to anyone with the URL?**

MR. BRETTLER: Objection. Vague and ambiguous. Also it may call for expert testimony, but to the extent you can answer, you can.

MS. SCHLUMP PETERS: He just testified that he's very familiar.

THE WITNESS: I would say that would be similar to saying a house is publicly available if you have the key to the front door. So now Discord links are long enough that the characters can't be guessed by any random person without already possessing the link or having the link shared with them.

BY MS. SCHLUMP PETERS:

**Q. The question was publicly accessible to anyone with the URL; that was the question.**

A. The phrasing doesn't make sense, though, publicly accessible URL --

**Q. So if somebody had the URL --**

A. Hold on. Can I please finish my answer?

**Q. Yes. Go ahead.**

A. Publicly accessible with the URL is like saying publicly accessible with a password. The URL is some 100 characters long. It's not a publicly accessible link, so if you have the link, it's a private -- essentially -- link that is being shared with you.

**Q. So if somebody got the URL, it was accessible? The Discord attachment link was accessible?**

MR. BRETTLER: Objection. Vague and ambiguous. It may call for expert testimony, but you can answer, if you can.

THE WITNESS: If somebody personally, if somebody sends you the URL?

BY MS. SCHLUMP PETERS:

**Q. If somebody has the URL, that attachment link is accessible?**

MR. BRETTLER: Objection. It's also an incomplete hypothetical.

MS. SCHLUMP PETERS: It's a simple question, Mr. Bonnell.

MR. BRETTLER: It's a simple hypothetical.

THE WITNESS: Well, I would argue that it's misleading much the same that you can have access to an account if somebody gives you the password. If you had the password to an account, you have access to an account. If you have a link to the file, then you can download the file, yes.

BY MS. SCHLUMP PETERS:

**Q. Okay. And the question specifically was if they have the URL, so that is like a password; right?**

A. Yes.

**Q. So it would be accessible; right?**

A. If somebody has that, yes.

**Q. Thank you. Now, the issue with the accessibility of the Discord attachment links,**

**that was reported in various different articles in November 2023. Were you aware of that, that there was an issue with that being accessible?**

MR. BRETTLER: Objection. Vague and ambiguous as to what you're even talking about.

THE WITNESS: Is this with regards to the submission by the expert witness?

BY MS. SCHLUMP PETERS:

**Q. I'm just asking if you are aware of these security risks that Discord was encountering?**

A. I would need more specificity as to what you mean by "security risks."

**Q. So now, you said that after you sent the Pxie video to Rose in April 2022, you didn't delete it until November 2024; correct?**

MR. BRETTLER: Objection. It misstates his prior testimony, but you can answer.

THE WITNESS: Sometime around there, maybe, yeah.

BY MS. SCHLUMP PETERS:

**Q. So, until you deleted it sometime in November of 2024, the video was still available**

**to the Rose Discord account; correct?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: In my Discord account, anybody would be logged in to either one.

THE COURT REPORTER: Could you repeat your answer.

THE WITNESS: It would be available to anybody logged into either Discord account.

BY MS. SCHLUMP PETERS:

**Q. But if you had deleted that video attachment -- we're speaking about the video of plaintiff now. If you had deleted that video attachment from your message after you had sent it to Rose, it would have been removed from the Discord CDN; correct?**

A. From the Discord CDN, yes. They could have still potentially had access to it, but yes.

**Q. If they had downloaded it?**

A. If they downloaded it, if they logged into their Discord while it was still there but then disconnected from the Internet, it could still be there.

**Q. Did you access Kiwi Farms using a VPN, Tor Browser or any anonymizing proxy service?**

MR. BRETTLER: Objection. Vague and ambiguous as to time, but you can answer.

THE WITNESS: I don't --

BY MS. SCHLUMP PETERS:

**Q. Have you ever?**

A. I have been to Kiwi Farms before, yes.

**Q. No, but using a VPN or any other proxy -- anonymizing proxy sever?**

A. I don't know with any degree of specificity.

**Q. You don't know if you have ever used a VPN with Kiwi Farms?**

A. Some cell phones have automatic VPNs. If you have got a Pixel phone, I think it automatically VPNs you when you log in.

At times I've been sponsored by VPN companies, so I might have had a browser extension for Nord VPN, but I don't remember specifically when I was accessing Kiwi Farms and if I would have been on a VPN or not.

**Q. Have you ever accessed RustleSearch to search for your own username or specific keywords**

**related to this litigation?**
A. Not that I can recall specifically.
**Q. And you are aware that a third-party archive, RustleSearch, exists for Destiny DGG Chat?**
A. Sure. A third-party archive can exist for anything, yes.
**Q. And did you review those logs to ensure that the DGG data you produced in discovery matches what is publicly archived?**
MR. BRETTLER: Vague and ambiguous as to what you mean by those logs, but if you understand, you can answer.
THE WITNESS: I have produced everything that I was asked to produce. Everything that was in my possession, I was able to, I produced. I can't speak to anything that is archived or managed by a third party online. I don't have control over those archivers or over who is archiving what.
BY MS. SCHLUMP PETERS:
**Q. That wasn't the question. I just asked if you reviewed the RustleSearch archives to see if they corresponded with what you were**

**producing.**

A. The RustleSearch archives would span tens of thousands of pages. I did not review all of those before coming to this deposition.

**Q. But you can do specific searches? I don't mean about this deposition. I mean before your document production.**

A. I don't recall having to search for my Rustle archive, no, I don't

THE COURT REPORTER: Can we take a break?

MR. BRETTLER: Yes, let's take a break.

MS. SCHLUMP PETERS: Is five minutes okay?

THE COURT REPORTER: Yes, that's fine.

THE VIDEOGRAPHER: We're going off the record. The time is 2:33 p.m.

(A brief break was had.)

THE VIDEOGRAPHER: We're back on the record. The time is 2:42 p.m.

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, earlier today when we were talking about you at the hotel with plaintiff**

**recording the video, you stated that you put the three videos that you recorded into your Google Drive; is that right?**

MR. BRETTLER: Objection. Misstates his testimony.

THE WITNESS: I uploaded three individual files to my Google Drive that would generate three unique Google Drive links to those three individual files, yes.

BY MS. SCHLUMP PETERS:

**Q. And how did you share those three individual Google Drive links to the plaintiff?**

A. I sent her each of the three links.

**Q. How did you do that?**

A. Through Discord.

**Q. So it was a Discord message?**

A. Correct.

**Q. Did you produce that?**

A. No.

**Q. Why not?**

A. Because that message is no longer in my possession.

**Q. Why isn't it?**

A. Because we would have deleted it

probably after sending the links to her.

**Q. You would have deleted the Discord message?**

A. Yes.

**Q. Why?**

A. So links to the file wouldn't just be in our Discord for the comfort of the both of us, I guess.

**Q. You didn't do that with the Google Drive links you sent to Rose, did you?**

MR. BRETTLER: Objection. It assumes facts not in evidence.

You can answer.

THE WITNESS: I'm not aware of sending Google Drive links to Rose. I don't remember that.

BY MS. SCHLUMP PETERS:

**Q. You didn't send her any Google Drive links?**

A. I don't remember sending her any Google Drive links.

**Q. Now, if you deleted it on your side -- and I'm going back to you sending the three Google Drive links to plaintiff in the Discord messages -- you deleted it on your side, but you**

**still -- would plaintiff still have her response to those messages?**

MR. BRETTLER: Objection. It calls for speculation, but you can answer if you know, if you are able to.

THE WITNESS: I mean, technically, if she didn't delete her response to those messages and if she did respond to those messages and nobody else deleted the response to those messages, then she should still have them, yes.

BY MS. SCHLUMP PETERS:

**Q. Okay. But you're -- what you're saying today -- I just want to make sure I have this right -- is that you deleted those Discord messages with the three Google Drive links right away or when? When was that?**

MR. BRETTLER: Objection. Vague and ambiguous. It's been asked and answered.

THE WITNESS: It could have been right after. It could have been the next day. It could have been a couple of hours. I don't remember.

BY MS. SCHLUMP PETERS:

**Q. Shortly after, you would say, sometime within a day or two?**

A. Probably within a day or two.

**Q. How did you first meet AbbyMC?**

A. I can't recall exactly. I'm sure she messaged me online. She was friends with a group of friends that I already had and we probably started talking from there.

**Q. And you communicated with her on Discord and Instagram; anywhere else?**

MR. BRETTLER: Objection. Assumes facts not in evidence. Compound.

You can answer.

THE WITNESS: I know Discord for sure.

BY MS. SCHLUMP PETERS:

**Q. You don't recall if you also communicated on Instagram?**

A. We might have. I don't remember.

**Q. When was the last time you communicated with Abby?**

A. I think I might have typed a message at her in a public Discord, maybe a few months ago, maybe, while she was typing in a public Discord, but we never had a personal conversation.

And then prior to that, it would have been when she messaged me on Twitter. It was a week before I got a letter from you guys claiming to represent her in some damages case against me.

**Q. The public Discord, that means it was a public Discord chat thread?**

A. Publicly.

**Q. Is that what you're referring to?**

A. Yeah.

**Q. What was the substance of those communications?**

A. Probably just putting an emoji and laughing and saying hi or something. I think she was laughing at people and saying hi or whatever, just talking.

**Q. So it was a friendly interaction between the two of you?**

A. I don't know if I would emotively load it. Again, we never even directly communicated with each other, so.

**Q. And then her message on Twitter, what was the substance of that?**

A. I don't recall exactly. I think she was reaching out to me to have a conversation saying that she had gotten better after a bunch of

dramatic events, I guess, had unfolded where she lived. And then, I think, she asked me if I had sent a video that she had sent me to anybody else, and then that was it.

**Q. And what was your response to her?**

A. I think I said I was trying to limit conversation about stuff related to my case because I know that I would have to produce any conversation in discovery and I didn't want to have to be digging through tons of my Discord logs having to produce a ton of erroneous conversations.

**Q. Did you tell her that you wanted to speak to her?**

A. I don't recall that exactly.

**Q. You don't recall that. And if you had wanted to communicate with Abby over the past year, you could have reached out -- you had her contact information; correct?**

MR. BRETTLER: Objection. Misstates the record.

You can answer.

THE WITNESS: Not really, no.

BY MS. SCHLUMP PETERS:

**Q. You never communicated on -- via cell**

**phone?**
A. I don't believe we ever did.
**Q. She came to visit you in person, didn't she?**
A. She did.
**Q. So you never messaged each other via text message?**
A. I don't think so.
MR. BRETTLER: Asked and answered.
THE WITNESS: I don't believe we did.
BY MS. SCHLUMP PETERS:
**Q. And you don't recall ever having her phone number?**
A. I don't recall it directly, no.
**Q. You never spoke to her on the phone?**
A. I don't believe we have.
**Q. Would you be able to look in your phone and see if you have her contact information in there?**
A. I can produce it potentially at a later date. I don't have my phone on me right now though.
**Q. You didn't bring your phone with you?**
A. No.

**Q. Okay. You produced messages from Abby to you under this -- she has a screen name Icwiener. And I can show them to you, but if you recall, they were all just one-sided messages with none of your responses. Do you know why you produced it that way?**

MR. BRETTLER: Objection to the extent that it calls for speculation, but you can answer if you know.

THE WITNESS: My understanding is I produced everything I had. I believe we had two-sided conversations. I don't think it was just one-sided.

(Plaintiff's Exhibit No. 13 was marked for identification.)

BY MS. SCHLUMP PETERS:

**Q. Have you had a chance to review this document?**

MR. BRETTLER: Objection. The document is -- it looks like it's about a hundred pages long. So take as much time as you need to review it.

THE WITNESS: I have cycled through it. I have, yeah.

BY MS. SCHLUMP PETERS:

**Q. Okay. And do you see that these are -- it says direct messages, Icwiener, and the date of the first message is March 6, 2023?**

A. Yes.

**Q. And do you see -- and then the last -- and also for the record, this exhibit is SB00063 through SB000168.**

**And do you see in this exhibit any responses from you to ICwiener's messages?**

MR. BRETTLER: Look very carefully because there are messages from both of you.

THE WITNESS: In this exhibit?

MR. BRETTLER: Yes.

THE WITNESS: Am I allowed to ask what page or what Bates stamp?

BY MS. SCHLUMP PETERS:

**Q. It's towards the end. Let me ask you differently then.**

**If you just flip through -- I don't know how many pages these are -- but you don't see any of your responses to any of these messages, do you, until --**

MR. BRETTLER: Objection --

BY MS. SCHLUMP PETERS:

**Q. -- until Bates stamp 000163 on -- and that would be the date of May 1, 2025?**

MR. BRETTLER: Objection. You are misstating the document. There are messages prior to 163.

BY MS. SCHLUMP PETERS:

**Q. You are welcome to look through it, Mr. Bonnell, and tell me what messages you see, but the question is:**

**Where are all of your responses?**

A. The earliest response I see here on Bates stamp 162 starting May 1st.

**Q. May 1st of what year?**

A. 2025.

**Q. So why aren't your responses here for the time between March 6, 2023, and May 2025?**

MR. BRETTLER: Objection. To the extent that it calls for speculation, but if you know, you can answer.

THE WITNESS: If I had messages with Abby, I produced them for you. If I didn't have those messages, I did not produce them.

BY MS. SCHLUMP PETERS:

**Q. And why wouldn't you have the responses**

**here?**

MR. BRETTLER: Objection to the extent that it calls for speculation.

THE WITNESS: My guess would be I deleted them on my end.

BY MS. SCHLUMP PETERS:

**Q. Why did you delete them?**

MR. BRETTLER: Objection to the extent that it calls for you to speculate, but if you know, you can answer.

THE WITNESS: I think we had fallen out of contact and it had been a while since we spoke. If I deleted these messages, it would have been prior to the signaling of any litigation from plaintiff in this case.

BY MS. SCHLUMP PETERS:

**Q. So you just -- you're stating under oath today that you deleted your messages -- your responses to Abby prior to what date?**

MR. BRETTLER: Objection to the extent it calls for speculation.

If you know, you can answer, but if you have to guess, you should not.

THE WITNESS: I can't honestly say what day I did, but it was definitely prior to any litigation with plaintiff.

BY MS. SCHLUMP PETERS:

**Q. But your messages in May of 2025 are not deleted?**

A. Correct, because those would be after litigation, yeah.

**Q. And then was that your custom to delete messages when you stopped communicating with people?**

A. Sometimes. It depends on the account.

**Q. You didn't delete your side of the messages with Rose, did you?**

A. No.

**Q. And you weren't in communication with her anymore; right?**

A. Kind of.

**Q. Up until the time of the leak you were in communication with her?**

A. I think we traded a message, maybe almost a year prior just checking on each other.

**Q. The year prior?**

A. Uh-huh.

**Q. But you didn't delete those -- your**

**messages with her, did you?**

A. No.

**Q. Just with Abby?**

MR. BRETTLER: Objection. Misstates the testimony. Misstates the record.

THE WITNESS: I'm sure there are plenty of other people I've deleted messages with.

BY MS. SCHLUMP PETERS:

**Q. Okay. Let's look at -- and one more question about this.**

**So you deleted these messages. There was no way to retrieve them when you deleted them?**

A. It would have depended on how they were deleted. If I used an archiving program, then I would have had a copy all of those, but if I did have a copy of those, then I would have produced those as part of discovery for this case, if they were requested.

**Q. So how did you delete these, your responses here, specifically?**

MR. BRETTLER: Objection to the extent it calls for speculation.

You can answer. Don't guess.
THE WITNESS: I can't think off the top of my head how I deleted these messages.
BY MS. SCHLUMP PETERS:
**Q. But you didn't archive them?**
A. I don't know off the top of my head if I did or did not archive them. I would have to go back and check. I would have to go back and check. I can't recall off the top of my head right now.
**Q. You thought you had archived them?**
A. The messages with Abby, I believe.
**Q. So if you did archive them, you would still have them available to you to produce; correct?**
A. Correct, they would have already been produced for this case.
**Q. We want to look at your September 19th declaration and also your January 30th declaration, which I believe you have.**
**Do you have those two declarations?**
A. Yes.
**Q. So in your September 19th declaration, ECF132-1 at paragraph 9 --**

A. Yes.

**Q. -- you state that you sent two videos of Peach to AbbyMC on November 3, 2023; correct?**

A. Correct.

**Q. And then look at the other declaration January 30th, 2026, ECF213 paragraph 12.**

A. Yes.

**Q. And you have the same declaration there, right, that you sent the two videos of Peach to Abby on November 3rd?**

A. Yes.

MS. SCHLUMP PETERS: I'm going to show you what is the unredacted version of Docket 86-1.

MR. BRETTLER: Are we marking this?

MS. SCHLUMP PETERS: Yes.

(Plaintiff's Exhibit No. 14 was marked for identification.)

BY MS. SCHLUMP PETERS:

**Q. Now this is a screenshot of Abby's November 3, 2023, message and she says -- and what is the time on that?**

A. I can read the timestamp on it, but I'm not entirely sure, to be clear, what I'm looking at. The timestamp on the thing that is in front

of me though is 10:41 a.m.

**Q. 10:41 a.m. Okay. So that's what time Abby sent the message to her friend saying that she had seen videos of you with Chaeiry and also with Pxie; correct? That is what it says there?**

MR. BRETTLER: Objection. If you're asking what is written on the page, you can answer that question. If you're asking for what Abby meant by that, we have no idea.

THE WITNESS: I see that here, but I'm not fully sure what I'm looking at right now.

BY MS. SCHLUMP PETERS:

**Q. Okay. I'm just asking you. That she's confirming --**

A. I see those sentences written on the paper in front of me, yes.

**Q. And that is a timestamp of 10:41 on November 3rd; right?**

A. I don't know if I would characterize it as a timestamp, but I see that there is -- the time 10:41 is written on here. I see the sentence written as well, yes.

MS. SCHLUMP PETERS: And I'm going

to show you now what you submitted to the Court, Docket 213-5.
(Plaintiff's Exhibit No. 15 was marked for identification.)
BY MS. SCHLUMP PETERS:
**Q. And what is this document?**
A. This appears to be an exhibit that we attached to whatever Docket Entry 213 is, the fifth exhibit. It seems to contain a list of files that I sent to the Discord account AbbyMC.
**Q. And then the next page of the same exhibit?**
A. It seems to be some messages back and forth between -- I believe between me and AbbyMC.
**Q. Inbloom1991 is AbbyMC; correct? That what you represented to the Court.**
A. At the time that the log was produced that could have been her name.
In Discord you can change your username though, so it could have been that name then. She could have been on a different account later or she could have changed this name later as well.
**Q. Okay. And now look at that page. And you have highlighted on that page, two Google**

**Drive links that you sent to Abby on November 3, 2023. And what is the timestamp on that?**

A. 2:39 -- well, it's 2:39 p.m. I'm not entirely sure which time zone though. I don't know if this is the entire exhibit. I'm guessing EST or it could be universal time zone.

**Q. Well, that would be 2:39 p.m., wouldn't it?**

MR. BRETTLER: Objection. Misstates the prior testimony.

THE WITNESS: It could be 2:39 p.m. I'm just not entirely sure what time zone. I'm not 100 percent sure.

BY MS. SCHLUMP PETERS:

**Q. And then what time does Abby say she viewed the videos of Chaeiry and Pxie?**

A. Again, I can't -- I don't know what this -- I can't attest to anything related to this here. I'm not entirely sure what I'm looking at.

**Q. This screenshot that was submitted to the Court --**

A. I don't know what it's --

**Q. -- and accepted by the Court in evidence.**

A. So I mean, I'm not entirely what it's a screenshot of though.

**Q. Well, it's a message by Abby. You understand that; right? And she's saying that she received a sex tape of both Chaeiry and Pxie and she sends that message at 10:41 a.m., but you didn't send these two videos until 2:39 p.m. that same day.**

MR. BRETTLER: Objection, to the extent that it misstates the witness's prior testimony regarding the time zone, but you can answer.

THE WITNESS: I can attest to the production that I gave for this case. I produced everything that was within my power to produce that I archived. I can't -- I don't know what I'm looking at here. This was presented to me as an unredacted screenshot of some Discord conversations, but for instance, I can't read any of the message at 10:42 a.m. on this page. So I'm not sure what "unredacted" means. And there are huge chunks missing so I don't even know if this is even Discord. I just -- I can't

speak to this. I don't know what this is at all unfortunately.

BY MS. SCHLUMP PETERS:

**Q. Okay. But you also saw Abby's declaration to the Court, where she said she received videos of Chaeiry and Pxie on November 3, 2023; right?**

A. I don't know if she said she received videos of Chaeiry. I think it was just of Pxie.

**Q. Well, I'm going to represent to you the declaration said Chaeiry and Pxie and this was the corroborating evidence that was submitted later.**

A. I acknowledge that Abby wrote that on her affidavit then, yes.

**Q. Okay. And this shows that she received those -- the videos on or before because she already looked at them when she sent this message, so she received them before 10:41 a.m.?**

MR. BRETTLER: Objection. Vague and ambiguous.

MS. SCHLUMP PETERS: Right?

MR. BRETTLER: Excuse me. Objection. It's vague and ambiguous. It misstates the document. It misstates

prior testimony and it calls for speculation.

THE WITNESS: You can represent that to me, but this could be a picture with Crayola crayon and I can't speak to anything on this page. I have already said what I've had to say about it.

I don't see complete messages here. It seems like some of it is like scratched out. There's chunks missing. I'm not entirely sure what this is supposed to be a screenshot of.

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, we're not concerned about the later part of the message. I'm only asking you about the top part of the message and the fact that she received the videos and viewed them prior to 10:41 a.m. on November 3, 2023, and you sent these videos purportedly of Peach later that same day; correct?**

MR. BRETTLER: Objection. It misstates the prior testimony. It misstates the document. It's been asked and answered.

You can explain it one more time,

but you need not accept any of counsel's characterizations.

MS. SCHLUMP PETERS: No speaking objections, please, Counselor.

MR. BRETTLER: Joan, please stop.

MS. SCHLUMP PETERS: No, you please stop.

THE WITNESS: I can read the sentence that is given to me on this piece of paper. I don't know how I'm supposed to tie that to the production that I have given that I know to be true that I can testify to, that I had in my possession, that I produced for this case. I just can't speak to this sentence at all. I don't know -- I really don't know what I'm looking at. I'm sorry.

BY MS. SCHLUMP PETERS:

**Q. Okay. And you testified earlier that the reason your messages between you and Icwiener were predominantly one-sided is because you deleted your half of the messages?**

MR. BRETTLER: Objection. It misstates the witness's prior testimony.

You can clarify it and give your response.

THE WITNESS: So I believe I was asked what would be a reason for there to be no messages on my side. I think one of the things I said was it could have been that I deleted it. Another could have been that I archived it.

I believe for Abby's messages, I think I archived everything that we had before they were removed from Discord, so I have an archived -- a true and correct copy of our messages.

MR. BRETTLER: And I will state for the record that we produced those documents. You are only showing the witness a select document with one-sided conversations. There are two-sided conversation documents.

MS. SCHLUMP PETERS: Excuse me. I'm asking the questions.

MR. BRETTLER: Okay. Go ahead.

BY MS. SCHLUMP PETERS:

**Q. So if you had them archived, why didn't you present it as a complete document with both**

**sides of the conversation?**

MR. BRETTLER: Objection. It calls for speculation and to the extent that it --

MS. SCHLUMP PETERS: He produced the document.

MR. BRETTLER: Excuse me. We produced the documents on his behalf.

And to the extent that it calls for attorney-client privilege, I instruct you not to answer.

THE WITNESS: I mean, one of the exhibits that you had me look at earlier for Docket Entry 213, Exhibit E, I do see part of a conversation produced from both sides. So my understanding is that I did produce both sides of the conversation with me and Abby for as much as I was requested to and as many as I had.

Can I ask for a quick clarification. On an earlier question you presented that Abby screenshot. You said that was the unredacted version. Does redaction refer to a thing that

only you guys do or are you representing
that this was the total thing that you
received from the affidavit?

MS. SCHLUMP PETERS: No, when I say
unredacted version it's because when we
submit something that's confidential and
her name was protected by the court, it
was submitted in redacted format to the
Court and then later submitted privately
to the Court.

THE WITNESS: I understand. So
that was the exact copy that you were
given?

MS. SCHLUMP PETERS: This is what
was submitted to the Court in unredacted
format.

MR. BRETTLER: That is not true.
This document was never submitted to the
Court. If it was, you never provided us
with a copy. We object to this
document. This is a document that you
created for the purposes of this
deposition only.

BY MS. SCHLUMP PETERS:

**Q. Okay. I'm going to now show you --**

MR. BRETTLER: You produced a redacted version of that document to us even though you claimed it was unredacted. And we still can't read the rest of the message that -- it continues to be redacted.

MS. SCHLUMP PETERS: Let's look at ECF132-6 and 132-7 that you submitted to the Court. And we can mark it as 16.

(Plaintiff's Exhibit No. 16 was marked for identification.)

BY MS. SCHLUMP PETERS:

**Q. These are two exhibits that you submitted to the Court in support of your motion to dismiss and in support of your declaration?**

A. Okay.

**Q. Of the motion to dismiss; right?**

A. I see that.

**Q. And then 132-6, you see the two Google Drive URLs that you contend were sent to Abby?**

A. On page 3 of 3, of 132-6?

**Q. I believe so.**

A. Yes, I see them, the highlighted ones.

**Q. And then in ECF132-7, you see the two Google Drive URLs?**

A. Yeah. I see them, yeah.

**Q. And these URLs are not identical, are they?**

A. They --

MR. BRETTLER: Objection. Vague and ambiguous, but you can answer.

THE WITNESS: I believe they represent an identical URL, yes.

BY MS. SCHLUMP PETERS:

**Q. Did you read Mr. Pena's expert report?**

A. Unfortunately, yes -- I am sorry, yes.

**Q. Okay. Well, these URLs are actually different. They differ in lower case; they differ in numbers. So from this page, the one sent to Abby and the one sent to Peach --**

MR. BRETTLER: There is no question.

BY MS. SCHLUMP PETERS:

**Q. -- can you say that they're different?**

A. Can you point me to the first difference?

**Q. Okay. Do you see -- the problem is my eyesight is not that great.**

**So there is a lower case "L" as opposed to a number "1"?**

A. In which link are we at here?
**Q. So we're comparing the ones to -- from you to Inbloom1991 to the ones from you to BabyPeach; correct?**
A. I'm asking where the lower case "L" is.
**Q. Somebody with better eyesight might be able to see it.**
**And there is also in the one to Abby is WBT. The one to Peach is WBV, not T?**
A. Can you show me that? So for instance on link one you've represented to me in one it was WBT and in the other it was WBV. I'm guessing you're talking about near the end of the link where it says WBT/view, but I see WBT on both of the documents in front of me.
MR. BRETTLER: So do I.
UNIDENTIFIED SPEAKER: They are the same.
MR. BRETTLER: Do you want to move on to a different line of questioning?
MS. SCHLUMP PETERS: If I could see this tiny little thing, I would tell you, but I can't.
MR. BRETTLER: But they are the same and your colleagues just confirmed

that.

MS. SCHLUMP PETERS: I think it's too small for them to see. They are actually not the same.

MR. BRETTLER: Says you. Excuse me. For the record, we will state --

MS. SCHLUMP PETERS: No, for the record, you just testified, Mr. Brettler, and your testimony is disregarded. Thank you.

MR. BRETTLER: By whom?

For the record, Ms. Peters produced a document and misrepresented what was on the document and she and her colleagues identified that the documents were the same.

BY MS. SCHLUMP PETERS:

**Q. Okay. This is a blowup of those so maybe you could see it better here. Do you still have those?**

A. I have what's marked as Exhibit 16 that you've given me. That's what I'm looking at.

**Q. When I said those differences of "WTV," those are the differences.**

MR. BRETTLER: Are we marking those

as an exhibit?

MS. SCHLUMP PETERS: I'm showing them to Mr. Bonnell first.

MR. BRETTLER: Okay. But can we have a copy?

MS. SCHLUMP PETERS: You can look at that copy also.

MR. BRETTLER: No.

MS. SCHLUMP PETERS: I don't know if we have another copy.

MR. BRETTLER: No.

MS. SCHLUMP PETERS: Then don't.

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, can you take a look at it please --**

MR. BRETTLER: Excuse me.

MS. SCHLUMP PETERS: -- to refresh your recollection.

MR. BRETTLER: Until you can provide counsel with copies, you are not going to show the witness anything.

You are extremely rude, extremely rude. Let's take a five-minute break. Let's go off the record.

MS. SCHLUMP PETERS: I guess I'm

tired of you being rude.
MR. BRETTLER: You threw papers at me.
THE VIDEOGRAPHER: Counsel, we're going off the record. The time is 3:17 p.m.
(A brief break was had.)
THE VIDEOGRAPHER: We're back on the record. The time is 3:26 p.m.
BY MS. SCHLUMP PETERS:
**Q. Mr. Bonnell, I showed you a document. It's ECF139-1 and we're looking at page 12 of that document.**
A. Okay. I see this.
**Q. Okay. And do you see that these are the same URLs that we were looking at in the two different exhibits that you submitted to the court, that we had just looked at, Exhibit E and F?**
A. So I'm not sure. I didn't --
**Q. You can compare them if you want to the --**
A. So on Exhibit E, I see that I have given a link with the -- the three letters I'm focusing on WBT. And I see that listed on Exhibit E and I

see that listed on Exhibit F, but I see you have given me the expert witness testimony and on page 12 he's comparing this WBT/ with another link that I suppose we must have brought in another exhibit as WBV. I see that, yes.

**Q. So if you look at page 12 --**

A. Yeah.

**Q. I'm sorry. Page 11 of ECF139-1?**

A. Uh-huh.

**Q. That's a screenshot of your exhibit that you produced, Docket 132-6E; right?**

A. Yes.

**Q. And it's blown up on the top of page 12?**

A. Yes, I see that.

**Q. And then another screenshot, and then blown up again so that you can see the differences?**

A. I see that.

**Q. Do you see that the two URLs are different?**

A. Slightly, yes.

**Q. Slightly?**

A. Yes.

**Q. Do you have an explanation for that?**

MR. BRETTLER: Objection to the

extent that it calls for expert testimony. I also object on the grounds that it's vague and ambiguous.

THE WITNESS: I'm familiar that there are scanning technologies. A common one I think is OCR and sometimes it will mistake two things that look similar to another for something else, so this statement here, the letters "WBT/" that "T/" to a machine can look like an upper case "V" and a lower case "V."

And it appears that the other inconsistency that is brought out is the same type of error, but it seems to be just a scanning and a text interpreter mismatch, not a significant or meaningful alteration of either link.

BY MS. SCHLUMP PETERS:

**Q. But if it's a different URL, then it's a different file; correct?**

MR. BRETTLER: Objection to the extent that it misstates the witness's testimony that it's even an different URL.

THE WITNESS: I mean, a URL is a uniform resource locator, would have pointed to a file online. By the time I produced anything for this case, those files are not existing anymore. No URL is pointing to any of these things. It seems that the machine made a slight error in translating between the top and the bottom link, but I mean, from my production it seems pretty obvious that both links are identical that were produced, yes.

BY MS. SCHLUMP PETERS:

**Q. You're saying the machine. You just said -- can you repeat the last part?**

A. So whatever scanned the URL and transferred it to another page, looks like it made an error in translation.

**Q. And in your experience, does that happen often?**

A. Yeah, it can with certain technologies.

**Q. But if there was no error in the translation, URLs have to be identical, right, to be the same file?**

MR. BRETTLER: Objection.

THE WITNESS: Not necessarily.
MR. BRETTLER: It's vague and ambiguous, but you can answer.
THE WITNESS: Not necessarily, but most likely, yes.
BY MS. SCHLUMP PETERS:
**Q. When you look at Exhibit E --**
A. This wasn't marked. Do you want it back?
When you say Exhibit E, are you referring to Exhibit 16, Exhibit E?
**Q. I think E is 213-5; does that make sense?**
A. I believe Exhibit 15 and 16 --
**Q. 213-5 and then we have 213-6. So E is 213-6, my apologies.**
MR. BRETTLER: No, that's not true.
MS. SCHLUMP PETERS: It's 132-6.
So you have that; right?
THE WITNESS: Yeah, just to be clear, it's Exhibit 16 that we're looking at?
BY MS. SCHLUMP PETERS:
**Q. I don't know. It's marked on your exhibit, not mine.**

A. I believe I was given Exhibit E twice because Exhibit 15 is also Exhibit E. So I just want to make sure 16 we're looking at the same --

**Q. It's together. E and F were together. I believe. Well, maybe not. Yeah, I do see two of the same.**

**Can you show me which one you're looking at that was marked?**

A. Exhibit 16 is marked here.

**Q. What is the ECF number?**

A. 132-6.

**Q. Okay. So just look at that. And it shows MP4 files, correct, from a Google Pixel phone and the file names contain a date -- creation date stamp, for example, PXL dash and then a number. And then I'm looking at May 15, 2023, 00307UTC; do you see the 307UTC?**

A. On which page?

**Q. We're looking at 132-6.**

A. Not the first page though; right?

**Q. No, the media files that were sent.**

A. Page 2 of 3?

**Q. Yes.**

A. And you're asking for date May 15th?

**Q. Uh-huh.**

A. I don't see the -- what are the timestamps you are referring to? May 15th what?

**Q. It says 307UTC.**

MR. BRETTLER: I don't see that.

MS. SCHLUMP PETERS: I don't see UTC on that one either. Let me see if it's on the other one.

BY MS. SCHLUMP PETERS:

**Q. Do you see a transmission time?**

A. I see lots of times. Can you be more specific.

**Q. And then this is the creation -- so this is the transmission side time on the left; right?**

MR. BRETTLER: We don't know what you're referring to, Ms. Peters.

MS. SCHLUMP PETERS: Mr. Bonnell knows because he's looking at 132-6, page 2.

THE WITNESS: I see timestamps on the left of this column, yeah.

BY MS. SCHLUMP PETERS:

**Q. And on the right is the creation date and timestamp?**

MR. BRETTLER: Objection. Vague and ambiguous.

THE WITNESS: I would represent no. Those represent file names.

BY MS. SCHLUMP PETERS:

**Q. Well, we're going to move on. I can't see it. It's too small.**

**Now did you use an application called Redact to delete and archive your Discord messages --**

MR. BRETTLER: Objection. Vague and ambiguous.

MS. SCHLUMP PETERS: I haven't finished my question, Mr. Brettler.

MR. BRETTLER: Go ahead. I thought you were done.

BY MS. SCHLUMP PETERS:

**Q. -- after November 29, 2024?**

A. For which messages?

**Q. Your Discord messages, did you use an application call Redact?**

A. For all of my Discord messages, no.

**Q. Did you use an application called Redact to delete and archive any of your Discord messages?**

A. Yes.

MR. BRETTLER: Objection to the

extent that it's compound, "delete and archive."

THE WITNESS: I have used it to create archives and remove messages from my Discord, yes.

BY MS. SCHLUMP PETERS:

**Q. Okay. Which messages would it be that you used Redact for? And we're talking again after November 29, 2024.**

A. There is no possible way I could remember every message. I communicated with hundreds of people, thousands of people on Discord.

**Q. But you did use Redact?**

A. I have used it, yes.

**Q. And then did you try to merge the Redact archives with messages exported from your active Discord account at some point?**

MR. BRETTLER: Objection. Vague and ambiguous, but if you understand, you can answer.

THE WITNESS: I have produced messages for this case in accordance with my responsibility to. Some of those archives have been created by

Redact. Other archives have been created by Discord. Like you can request an export from Discord. And other archives have been screenshots of messages. I can speak with specificity to a particular message if you show me one.

BY MS. SCHLUMP PETERS:

**Q. Okay. We'll get into that.**

**So Abby's declaration that she submitted to the court stated that sometime in February 2025 she reviewed her Discord messages and discovered you had deleted her messages to her including the message in which you sent her the video of Pxie; is that correct?**

MR. BRETTLER: Objection to the extent that it calls for speculation or if you remember.

THE WITNESS: It's correct insofar as that's what she put in her declaration, yes.

BY MS. SCHLUMP PETERS:

**Q. Is that correct that that is what you did? You deleted the messages?**

A. I deleted my messages with Abby sometime

after our last communication before May of 2025, so sometime maybe at the end of 2024 based on what I saw earlier.

**Q. You deleted your messages with Abby sometime --**

A. I used Redact to archive my messages with Abby at the end of 2024, I believe.

**Q. And you still have those archives?**

A. Yeah, I have produced them for this case, yes.

**Q. How do you know Hannah Brooks?**

A. I don't really know Hannah Brooks.

**Q. But you have communicated with her; correct?**

A. I have communicated with a Discord account that I think went by the name Hannah. I didn't know the name was Hannah Brooks until they submitted an affidavit to the court.

**Q. And this was on Discord that you communicated?**

A. Yes.

**Q. Did you produce those communications with Hannah in this litigation?**

A. If I had it, I produced it.

**Q. Well, I'm going to represent to you**

**today that you did not produce them and they were requested. So where would they be?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: If I have them, I produced them. If I didn't produce them then I don't have them, so I didn't produce them.

BY MS. SCHLUMP PETERS:

**Q. That means you deleted them?**

MR. BRETTLER: Objection. Assumes facts not in evidence.

THE WITNESS: It could be. I'm not sure. It would have been archived.

BY MS. SCHLUMP PETERS:

**Q. Well, you just testified that you did communicate with her. We requested those communications. You didn't produce them, so I'm asking you:**

**What happened to those communications?**

A. You asked me if I'd communicated with Hannah. I've communicated with her in the past. And then you asked me if I've produced or if I had conversations with her with relation to this case. Anything that was requested in relation to

this case, I have produced. Anything that I've possessed, I have produced, yeah.

**Q. But you didn't produce any of your communications that you just testified you had with Hannah Brooks?**

MR. BRETTLER: Objection. That misstates the witness's testimony.

THE WITNESS: I would have to go through my Bates stamps. I think I have produced thousands of documents in this case. I don't remember, but if I had conversations with Hannah, I certainly produced them.

BY MS. SCHLUMP PETERS:

**Q. Well, I'm going to represent to you today that you did not because we did not receive them. Is there a possibility you archived them?**

MR. BRETTLER: Objection to the extent that it calls for speculation.

Anything is possible, but you can answer.

THE WITNESS: I mean, if they are gone, I would imagine I could have, yeah, it's possible.

BY MS. SCHLUMP PETERS:

**Q. Who is Liquidlaugh?**
A. I'm not sure.
**Q. So one of plaintiff's request for admissions had asked if you had deleted your DMs with Liquidlaugh and you said no, you had not?**
MR. BRETTLER: Is that a question?
BY MS. SCHLUMP PETERS:
**Q. Is that correct?**
MR. BRETTLER: If you remember, you can answer.
THE WITNESS: I don't recall. If you have my answers to interrogatories, I can review them, but I don't recall the specific answer to that.
MS. SCHLUMP PETERS: We will pull it up. That was Request for Admission Number 12.
BY MS. SCHLUMP PETERS:
**Q. Who is Dan Saltman?**
A. A friend of mine.
**Q. Is he also a professional partner of yours in any way?**
A. I would say so, sure.
**Q. In what way?**
A. He's appeared on stream with me a number

of times. He kind of streams with a friend of mine, sometimes now. We had a podcast together for maybe about a year.

**Q. When was that?**

A. Maybe throughout 2024, maybe, yeah.

**Q. And plaintiff requested that you produce all your communications between you and Dan Saltman pertaining to plaintiff and/or the allegations of the amended complaint and you did not produce any communications from Dan Saltman, did you?**

A. I produced all the communications I had with him that were relevant to the complaint.

**Q. So you never discussed the plaintiff with Dan Saltman?**

MR. BRETTLER: Objection. It misstates the witness's prior testimony, but you can answer.

THE WITNESS: I very explicitly with a lot of people in my life said that once the plaintiff had kind of assumed a more, I'll say, aggressive posture, when she started threatening suicide that I ceased communications with people about anything related to

the plaintiff because I was
uncomfortable carrying on those
communications.
BY MS. SCHLUMP PETERS:
**Q. But you received from Dan Saltman a screenshot of a message that plaintiff sent to Dan, didn't you?**
A. I don't remember that.
**Q. Well, you live streamed about it.**
A. On the live stream did I say that I -- I'm sorry, what was the question?
MR. BRETTLER: There was none.
BY MS. SCHLUMP PETERS:
**Q. I said you received from Dan Saltman a screenshot of a message that plaintiff had sent to Dan?**
MR. BRETTLER: Still not a question.
BY MS. SCHLUMP PETERS:
**Q. Is that right?**
A. I don't remember if I received a screenshot from Dan or Dan posted it publicly somewhere. He could have posted it on Twitter. I don't recall 100 percent.
**Q. Who is Kyla Turner?**

A. A friend of mine, another streamer person.

**Q. And she was also friends with the plaintiff; right?**

A. I believe so.

**Q. Who is Darius?**

A. Darius is the online screen name to another kind of friend -- kind of streamer friend that I have.

**Q. And he also had been in a relationship with Abby; correct?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: I couldn't speak to the details of their interactions.

BY MS. SCHLUMP PETERS:

**Q. You don't know that he had a relationship with Abby?**

A. I don't know if I would characterize it as a relationship.

**Q. Did she tell you that she was in a relationship with Darius?**

A. I don't remember.

**Q. And you communicated with him about the allegations in this complaint, didn't you?**

A. I believe so, yeah.

**Q. Did you produce those communications?**

MR. BRETTLER: Objection. It assumes facts not in evidence that there is any communications to produce.

THE WITNESS: If I had communications with him related to this, I would have produced them, yes.

BY MS. SCHLUMP PETERS:

**Q. You referred to those communications -- I'll refresh your recollection -- in your pleadings but you never produced any of those communications. I'll represent that to you.**

**So where are those communications?**

MR. BRETTLER: Objection. Calls for speculation. It also misstates testimony and the record.

THE WITNESS: It could have been a phone call. I'm not sure. I would have to see specifically what I said.

BY MS. SCHLUMP PETERS:

**Q. Now, in your initial disclosures at the beginning of this litigation, you identified various individuals as having knowledge of the allegations of the complaint. One of them is**

**Chaeiry.**

**And who is Chaeiry?**

A. I believe the request is for people who could potentially have knowledge of the complaint. I don't think it was necessarily -- that's my recollection.

**Q. People that you identified as having knowledge of the allegations of the complaint.**

A. Okay. I don't specifically remember what the sentence asked for, but I think Chaeiry is a person who could have potentially, so I think I produced her name, yes.

**Q. And who is she?**

A. An old friend of mine.

**Q. And did you have a sexual relationship with Chaeiry?**

A. Yes.

**Q. And plaintiff's first request for production requested all your communications with Chaeiry but none were produced.**

A. I don't know if I actually have communications with Chaeiry. Chaeiry was somebody who liked to keep everything deleted and wiped.

**Q. But you would still have your side of**

**the communications even if she wiped her side; correct?**

A. She would have requested me to wipe my side as well.

**Q. So you listed her as a person of interest in this case. When would you have deleted the messages with her?**

MR. BRETTLER: Objection. It misrepresents his prior testimony. He never said she was a person of interest. And secondly, it calls for speculation.

THE WITNESS: It would have been prior to the start of this litigation, prior to publishing of the Substack, probably prior to the leaks from Solo.

BY MS. SCHLUMP PETERS:

**Q. So again, you deleted your messages with Chaeiry, but you never deleted your message with Rose?**

MR. BRETTLER: Objection. Misstates prior testimony.

MS. SCHLUMP PETERS: Correct?

THE WITNESS: I did delete my messages with Rose.

BY MS. SCHLUMP PETERS:

**Q. You produced them?**
A. Yeah.
**Q. You didn't produce any of your messages with Chaeiry?**
MR. BRETTLER: Objection. It misstates prior testimony.
THE WITNESS: I would have to revisit specifically what was asked to be produced. If it was related to this litigation, then I would have produced those messages.
BY MS. SCHLUMP PETERS:
**Q. Well, I --**
A. I'll represent that it's possible that I deleted messages with Chaeiry before I deleted messages with Rose though.
**Q. Now, you were asked to produce communications with Kyla Turner who goes by the name Erudite; is that right?**
A. Notsoerudite.
**Q. And you produced SB002498 through SB002556, your messages with Kyla Turner starting on November 1, 2024, and -- between November 1, 2024, and December 31, 2024, what you produced is only messages from her side of the conversation.**

**Why would that be?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: I'd have to go through my Bates stamps. It could have been I produced my side of them in a separate production.

BY MS. SCHLUMP PETERS:

**Q. Well, I'm going to represent to you that you did not because I have your whole production. So where are they, because starting in January 2020 -- or December 2024 all of a sudden you appear responding to the messages and it's a two-way conversation through May 2025.**

MR. BRETTLER: There's no question pending.

BY MS. SCHLUMP PETERS:

**Q. So why is the first year of messages just a one-sided conversation?**

MR. BRETTLER: Objection. Calls for speculation.

If you know, you can answer.

THE WITNESS: I'm not sure. I'd have to revisit all of them and see, but if it was relevant to this case, I

produced it.

BY MS. SCHLUMP PETERS:

**Q. Well, you produced her side of the communications and the request was to produce communications between the two of you, so why is only one side of the communication produced?**

MR. BRETTLER: Same objection. Same instruction.

THE WITNESS: I'm not sure. I would have to revisit it and check.

BY MS. SCHLUMP PETERS:

**Q. What would you have to check?**

A. Well, I don't know without checking.

**Q. What would you check, though? Do you have these original messages between you and Kyla Turner?**

A. I'm not sure. I would have to check.

**Q. Well, I'm going to represent that I want you to check. I'm going to ask you to do that and I'm going to ask you to produce the two-way conversation. That's your duty to preserve evidence. And --**

MR. BRETTLER: Don't argue with the witness.

Don't answer that. Don't answer

the question.
BY MS. SCHLUMP PETERS:
**Q. You do understand that; right, Mr. Bonnell?**
A. I understand I have a duty to preserve evidence that is relevant to this case, yes.
**Q. So relevant to this case would be something that plaintiff requested; correct?**
MR. BRETTLER: Objection. First of all, you don't need to accept that as true. Don't argue with her.
BY MS. SCHLUMP PETERS:
**Q. What about Lav? You identified Lav as an individual with knowledge of the allegations of the complaint.**
**Who is Lav?**
A. Online person, old friend of mine, maybe.
**Q. And you didn't produce any communications with him?**
A. I don't think I have communicated with her in a while, definitely not over anything related to this case.
**Q. So why did you identify Lav as somebody with knowledge of the allegations of the**

**complaint?**

A. Well, if the complaint had been publicly filed or if Pxie had made a public Substack that would give her information related to allegations of the complaint.

**Q. That would be true for everybody who has seen the Substack; right?**

A. I would have to revisit the specific request for interrogatories, but my understanding is it was quite a broad request for anyone who might know or have information related to the complaint. So I produced her name as somebody who might know something about it. I don't know what her relationship is with Pxie.

**Q. The request was for all communications between you and the individuals that you identified in your initial disclosures as having -- as being individuals with knowledge of the allegations of the complaint. And you identified Lav, but you didn't produce any documents.**

A. If I didn't produce any documents with her, it's because there were no documents that were relevant to this complaint between me and her.

**Q. The request was for all communications between you and Lav. It wasn't up to you to decide whether it was relevant or not.**

MR. BRETTLER: There is no question pending. Don't argue with her.

BY MS. SCHLUMP PETERS:

**Q. So do you have those communications between you and Lav?**

A. I don't believe I have any communications with Lav for over a year.

**Q. And prior to over a year?**

A. I don't know. I haven't been friends with her for quite a while.

**Q. And Lauren DeLaguna, a friend of yours, you had a sexual relationship with her; correct?**

A. Yes.

**Q. And you actually identified her as an individual with knowledge of the allegations of the complaint; correct?**

A. Yes.

**Q. And yet, you didn't produce any of your communications with Lauren?**

MR. BRETTLER: Objection. Misstates the record.

THE WITNESS: I'm not aware if I

haven't produced everything and I don't have every Bates stamp in front of me, but if it was relevant to this case, then I produced that evidence.

BY MS. SCHLUMP PETERS:

**Q. And if I represent to you that you did not produce your communications with Lauren, where would they be?**

MR. BRETTLER: Objection. Calls for speculation. It also assumes facts not in evidence.

THE WITNESS: I would have to check my computer.

BY MS. SCHLUMP PETERS:

**Q. You also identified [redacted] as an individual with knowledge of the allegations in the complaint; did you ever have any communications with him?**

A. No.

**Q. How about Jared -- somebody .lycan?**

A. Not related to this complaint.

**Q. You identified him as an individual with knowledge of the allegations of the complaint.**

MR. BRETTLER: There is no question.

BY MS. SCHLUMP PETERS:

**Q. So wouldn't you have communications with him that would be relevant to the allegations in the complaint?**

MR. BRETTLER: Objection. Calls for speculation and it assumes facts not in evidence.

THE WITNESS: No, not necessarily.

BY MS. SCHLUMP PETERS:

**Q. Do you have your communications with Jared still?**

A. I don't remember when our last communications where. I would have to check.

**Q. What platforms did you communicate with him on?**

A. Discord.

**Q. And what knowledge does he have of the allegations in the complaint?**

A. I'm not sure. He's friends with me and he's friends with the plaintiff.

**Q. So you weren't sure of what knowledge he had, but you identified him?**

A. Yes.

**Q. And how about Brianna Wu? You also identified her as an individual with knowledge?**

A. Yes.

**Q. And who is she?**

A. An online figure, ex-colleague of mine. My understanding is somewhat of a friend to the plaintiff.

**Q. And why did you think she had knowledge of the allegations in the complaint?**

A. I heard it said that plaintiff went to Brianna, seeking, I guess, legal help related to this matter and was unsuccessful in that.

**Q. Is Brianna an attorney?**

A. No.

**Q. Why would you think she was seeking legal help from her?**

A. I've said that that was what was represented to me.

**Q. And that is why you listed her as an individual with knowledge of the allegations in the complaint?**

A. Yes.

**Q. And you didn't produce any communications between you and Brianna even though they were requested; correct?**

A. Correct.

**Q. Why didn't you?**

A. I don't think I have communications between me and Brianna.

**Q. You never communicated with her?**

A. If I did, it would have been years ago.

**Q. How about Adam Ali? Who is he?**

A. I'm not sure.

**Q. Well, you listed him as an individual with knowledge of the allegations in the complaint.**

A. It might have been an old mutual friend, maybe from a long time ago.

**Q. So what would he know about the allegations in the complaint?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: I don't know.

BY MS. SCHLUMP PETERS:

**Q. But you listed him; I didn't.**

A. Sure. My understanding is the people listed are people that could potentially have information related to the complaint, not that I know for certain that each of these people have information related to the complaint.

**Q. So why did you think he potentially had information related to the allegations in the**

**complaint?**

A. Because I believe he was a close mutual friend to Pxie and the ex-boyfriend [redacted].

**Q. How many other women besides plaintiff have publicly stated that you shared or recorded sexually explicit content of them without their consent?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: I have no idea.

BY MS. SCHLUMP PETERS:

**Q. Is there that many?**

MR. BRETTLER: Don't answer. There is nothing -- there's no question pending.

BY MS. SCHLUMP PETERS:

**Q. I'm asking you.**

A. Asking me what?

**Q. How many other women besides plaintiff have publicly stated that you shared or recorded sexually explicit content of them without their consent? I'm sure you must be aware of them.**

MR. BRETTLER: Now it's argumentative, but I'm also going to reinstate my objection that it calls for

speculation and it's been asked and answered.

MS. SCHLUMP PETERS: And I'm going to object to your speaking objections again.

MR. BRETTLER: Keep objecting.

BY MS. SCHLUMP PETERS:

**Q. You may answer.**

A. I'm not aware of the -- I don't know the number. I'm not sure.

**Q. You think it's more than three?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: People write so much stuff online. I have no idea.

BY MS. SCHLUMP PETERS:

**Q. So you know your ex-wife Melina has claimed you shared her content without her consent; correct?**

MR. BRETTLER: Objection. Misstates the record and it calls for speculation.

THE WITNESS: I'm not aware of her exact statements related to past sexual experiences or recordings we've had.

BY MS. SCHLUMP PETERS:

**Q. So your understanding is that Melina has not said you did not nonconsensually share her intimate details?**

MR. BRETTLER: Objection. Vague and ambiguous. Calls for speculation and it's been asked and answered.

THE WITNESS: Can you restate that.

BY MS. SCHLUMP PETERS:

**Q. Melina -- I didn't ask if you saw the video she published. I'm asking you if you are aware that she has publicly stated that you shared her content without her consent?**

A. I'm not aware of the specifics of what she said publicly, no.

**Q. I'm not asking you about the specifics. I'm asking if you are aware that she shared your content -- her content without her consent?**

A. Objection.

MR. BRETTLER: Objection. It's been asked and answered three times.

You can --

MS. SCHLUMP PETERS: Are you aware of that?

MR. BRETTLER: It's been asked and

answered three times. You can answer it one more time and then we'll move on.

MS. SCHLUMP PETERS: You can answer as many times as I ask you.

MR. BRETTLER: I don't think so.

THE WITNESS: That to me sounds like a very specific claim. I'm not aware of the specific claims that she's made publicly about me.

BY MS. SCHLUMP PETERS:

**Q. You are not aware that your ex-wife claims that?**

MR. BRETTLER: Correct. It's been asked and answered. Move on.

MS. SCHLUMP PETERS: Is that right?

MR. C. GARCIA: What is the answer? What is the answer to your question?

THE WITNESS: What was the question again?

MR. C. GARCIA: Can we read the question back, please.

(Whereupon, the requested portion of the record was read by the reporter.)

BY MS. SCHLUMP PETERS:

**Q. That your ex-wife, Melina, has stated**

**that you have publicly -- that you shared her explicit content without her consent? You have no awareness of that?**

MR. BRETTLER: Objection. It's been asked and answered. It's vague and ambiguous.

MS. SCHLUMP PETERS: I want to know the answer, Mr. Bonnell.

MR. BRETTLER: It's been asked and answered. You can answer it one last time, and that's it.

THE WITNESS: I'm not aware of the specific claims that she's made publicly with regards to me, no.

BY MS. SCHLUMP PETERS:

**Q. That's a very evasive answer, Mr. Bonnell.**

MR. BRETTLER: Don't engage with her. She's just trying to rile you up.

BY MS. SCHLUMP PETERS:

**Q. What about Chaeiry? Are you aware that -- going back to Melina for a second.**

**So if we played for the jury a video where you admitted, where you actually state that Melina said that, that you shared her explicit**

**content without her consent, would that surprise you?**

MR. BRETTLER: Objection. It's an incomplete hypothetical and it calls for speculation. We have no idea what video you are referring to even if one exists.

MS. SCHLUMP PETERS: I'm asking Mr. Bonnell.

THE WITNESS: I mean I'm not trying to even engage with that question.

BY MS. SCHLUMP PETERS:

**Q. Well, you stated it publicly that she had said it. You are not aware of that? You don't remember stating that?**

MR. BRETTLER: It's a compound, ambiguous question.

THE WITNESS: I don't recall stating anything or looking into the specifics of anything that Melina has stated about me or our relationship.

BY MS. SCHLUMP PETERS:

**Q. What about Chaeiry? You are aware that she's publicly stated that you shared her explicit content without her consent; right?**

A. I'm not aware of the specific statements

that Chaeiry has made regarding that.

**Q. I didn't ask you about her specific statements. I'm asking:**

**Are you aware that she claims that you shared her content without her consent?**

MR. BRETTLER: It's been asked and answered.

BY MS. SCHLUMP PETERS:

**Q. Are you aware of those claims by Chaeiry?**

A. When you say claims, what do you mean? Claims where?

**Q. She publicly stated that you shared her claims -- her content without her consent.**

A. That sounds like a specific message or statement to me. I'm not aware of the specific --

**Q. I'm not asking for the specifics of the message. It's a broad question.**

MR. BRETTLER: You continue to interrupt my client, Ms. Peters. Let him finish his answer and then you can ask your repeated questions, over and over and over again.

THE WITNESS: So there is a huge

amount of stuff that gets said online by many different people in many different communities. If I don't have specific knowledge or haven't seen myself a particular claim being made, then I wouldn't say that I have specific knowledge of any particular claim being made.

My understanding is Chaeiry has said many things online, deleted many things online. I'm not aware of the specifics of the claim that she has made against me. As far as I'm aware, she hasn't joined this lawsuit or any others, so I'm not aware of those specific claims.

BY MS. SCHLUMP PETERS:

**Q. Did you share her explicit content without her consent?**

A. No.

**Q. What about Stacsia?**

A. What is the question?

**Q. Did you share her explicit content without her consent?**

A. No.

**Q. And you are aware that she also claims that you shared her content without her consent; right?**

MR. BRETTLER: Assumes facts not in evidence. Misstates the record.

BY MS. SCHLUMP PETERS:

**Q. Are you aware of that, Mr. Bonnell?**

A. I believe that there is an affidavit that she's filled out with regard to this case. I disagree with her characterization of it, but I'm aware of the declaration that she signed.

Although I think -- I would clarify, I think you misstated it. I think she said I had permission to share it with my wife I think was her statement in that declaration.

**Q. Her declaration states that you shared her content without her consent, doesn't it?**

MR. BRETTLER: If you remember, you can answer it.

THE WITNESS: I would consult the declaration.

BY MS. SCHLUMP PETERS:

**Q. After November 29, 2024, you told plaintiff you were going to try to get the videos removed -- the video removed from Kiwi Farms;**

**correct?**

A. Yes.

**Q. In your declaration submitted in opposition to plaintiff's motion for preliminary injunction, you stated that "In or about the first week of December 2024, I retained specialized legal counsel with expertise in revenge pornography matters to assist me in having my sexually explicit content including the video I made with plaintiff removed from the Internet."**

**Do you recollect something like that?**

A. Yeah.

**Q. And you wanted the Court to think that, that you were trying to reduce the harm to plaintiff; right?**

MR. BRETTLER: Objection. It's argumentative.

BY MS. SCHLUMP PETERS:

**Q. Were you? That was your intent in saying that?**

A. My intent in saying that was to state that I had tried -- I had a law firm that was trying to remove explicit material of mine and the plaintiff's from the Internet.

**Q. So what exactly did you do to try to remove the content from the Internet?**

MR. BRETTLER: Objection. It's been asked and answered. It's also the subject of his declaration that you're reading from so you can see it, but if she's asking you to give your best recollection --

THE WITNESS: I think there might be more that I can't remember, but I know I had my manager person at the time e-mail the owner of Kiwi Farms to try to get the video removed from there.

I believe I filed, I think, a couple of reports or DMCAs from various websites on the Internet. That's what I can remember at the time. Yeah.

MR. C. GARCIA: Can we take a five-minute break?

MR. BRETTLER: Sure.

MS. SCHLUMP PETERS: Sure.

THE VIDEOGRAPHER: We're going off the record. The time is 4:08 p.m.

(A brief break was had.)

THE VIDEOGRAPHER: We're back on

the record. The time is 4:19 p.m.

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, before the break we were talking about efforts that you had made to remove the pornography from the Internet. You hired Carrie Goldberg's firm to do that; is that correct?**

A. That is part of why I did it, yes.

**Q. Did you know Carrie personally?**

A. No.

**Q. How about Marc Randazza?**

A. No.

**Q. Did you know him?**

A. No.

**Q. So what did you do? You told me about some e-mails that you had sent before we went on the break. What else? Anything else?**

MR. BRETTLER: Objection. It's been asked and answered. You weren't paying attention, Ms. Peters, while he was giving his answer. You were reading a note that was passed to you.

MS. SCHLUMP PETERS: I'm going to object to your speaking --

MR. BRETTLER: You can object, but

he has already answered this question. It's your job to pay attention and then ask him questions.

MS. SCHLUMP PETERS: Please don't tell me what my job is, Mr. Brettler

MR. BRETTLER: Okay. Well, he's already answered it.

MS. SCHLUMP PETERS: Your job is to follow the rules.

MR. BRETTLER: He's already answered your question.

MS. SCHLUMP PETERS: And not do speaking objections.

MR. BRETTLER: You should pay attention to the testimony.

MS. SCHLUMP PETERS: Mr. Bonnell, I can ask you the question --

MR. BRETTLER: Again.

MS. SCHLUMP PETERS: -- as many times as I want. That's my right. So just so we're clear on the record here.

MR. BRETTLER: And I can object as much as I'd like.

MS. SCHLUMP PETERS: You think you can.

MR. BRETTLER: Okay, Joan. Don't fight with me about everything like you have since January of 2025.

MS. SCHLUMP PETERS: Enough. Enough. At some point it becomes ridiculous.

MR. BRETTLER: You are still going. You are still going. You are the one that asked to stop fighting --

MS. SCHLUMP PETERS: Please stop.

MR. BRETTLER: -- yet you are still fighting.

MS. SCHLUMP PETERS: I'm not even speaking to you.

MR. BRETTLER: You were --

MS. SCHLUMP PETERS: Stop.

MR. BRETTLER: -- under your breath.

MS. SCHLUMP PETERS: So plaintiff's request for production asked for all evidence supporting your claim that you made efforts to have the video removed. I'm going to show you the only documents that we received that were responsive to that request and we're going to have

this marked as the next exhibit.
(Plaintiff's Exhibit No. 17 was marked for identification.)
BY MS. SCHLUMP PETERS:
**Q. And these are Bates stamped SB0004 and SB0005. And can you tell me what these two documents are?**
A. The first document for Exhibit 17 appears to be an e-mail from my manager to the legal team at Kiwi Farms requesting a removal of all of the videos posted by Solo of me, which includes the video that is the subject matter of the complaint.
And then the second image appears to be a DMCA takedown e-mail that I sent to a website that was hosting revenge pornography that contained me in the video. And I believe at least one of these is the video that is subject matter of the complaint.
**Q. In the list here on SB005, I think it is?**
A. Correct.
**Q. So did they -- were these e-mails successful?**
MR. BRETTLER: Objection. Calls

for speculation. Also vague and ambiguous by the term "successful."

THE WITNESS: My understanding is that the videos remained hosted. On the e-mail that I sent -- I don't know if it's a U.S.-based company or not. The videos were eventually removed from Kiwi Farms but I think that they were at plaintiff's request, not mine.

BY MS. SCHLUMP PETERS:

**Q. Correct. So besides these two e-mails, was there anything else done on your part to try to remove the video of plaintiff or any other porn that was published on November 29, 2024?**

A. I believe in one of the documents that I produced between my conversation with me and [redacted] with the plaintiff, I believe that there was a Reddit thread where we reported the material. And then just phone calls I'd made to law firms, but I don't have those memorialized in any way.

**Q. Did those law firms take any actions on your behalf?**

MR. BRETTLER: Objection.

Don't answer any questions about

what law firms may or may not have done on your behalf.

Next question.

BY MS. SCHLUMP PETERS:

**Q. Well, at the preliminary hearing injunction, you testified you had another litigation firm in New York. You said "I had another litigation firm in New York that I was hoping to get an injunction to potentially explore going after Kiwi Farms," but you didn't -- you didn't pursue that, did you?**

A. I did pursue that.

**Q. You pursued getting an injunction?**

A. I pursued contacting a law firm with the goal of eventually getting an injunction, yes.

**Q. Were there any efforts made to get the injunction?**

MR. BRETTLER: Objection. Asked and answered.

THE WITNESS: There were efforts made by me to engage with a law firm to ideally secure an injunction, yes. My understanding is that usually comes at the end of a court case, so we didn't get that far.

BY MS. SCHLUMP PETERS:
**Q. And in fact, as you just testified, it was actually plaintiff, not you, that managed to have the video removed from Kiwi Farms; correct?**
A. That's my understanding. I don't know 100 percent.
**Q. And then you actually blocked her efforts to have the video removed, didn't you?**
A. That is absolutely and categorically not true.
**Q. Are you aware that plaintiff filed a motion with the court seeking an order requiring Kiwi Farms to remove the videos?**
A. No, I don't believe you're stating the record correctly.
**Q. Yes, we filed -- I'll represent to you that we filed a motion seeking an order from the court to have the videos -- to have Kiwi Farms ordered to remove the videos.**
A. I'm representing to you that that is absolutely not the record.
**Q. Well, it's in the record, anyway, Mr. Bonnell, that your attorneys opposed that motion.**
MR. BRETTLER: Objection. Vague

and ambiguous with respect to that motion. You've misstated what that motion is.

THE WITNESS: My understanding is our goal was to remove videos from Kiwi Farms, all of the videos. You guys were seeking to remove a singular video, only the one containing the plaintiff while leaving all of mine and the other victims' on Kiwi, Farms, which is why we opposed that particular motion.

BY MS. SCHLUMP PETERS:

**Q. So you do know exactly what I'm talking about; right?**

MR. BRETTLER: Objection.

THE WITNESS: No.

MR. BRETTLER: Objection. Argumentative.

Don't engage with her.

BY MS. SCHLUMP PETERS:

**Q. So you opposed it because plaintiff didn't also try to get Kiwi Farms to remove all your videos; is that correct?**

MR. BRETTLER: Objection.

I'm going to instruct you not to

answer to the extent it requires you to disclose attorney-client communication or legal advice, strategy that you've discussed with your lawyers.

THE WITNESS: I wanted all of the videos removed. My understanding is plaintiff did not want all the videos removed.

BY MS. SCHLUMP PETERS:

**Q. But plaintiff is the one who incurred the expense of subpoenaing Kiwi Farms, not you; correct?**

MR. BRETTLER: Objection. It calls for speculation.

THE WITNESS: I don't have access to the plaintiff's legal fees so I'm not sure and I don't know --

BY MS. SCHLUMP PETERS:

**Q. I didn't ask you how much money she spent.**

MR. BRETTLER: You did.

BY MS. SCHLUMP PETERS:

**Q. I said she incurred the expense of subpoenaing Kiwi Farms. You did not subpoena Kiwi Farms, did you?**

MR. BRETTLER: Same objection.
THE WITNESS: But it's misstating the record as well. We have sent -- we did send subpoenas to Kiwi Farms.
BY MS. SCHLUMP PETERS:
**Q. What happened with those subpoenas?**
A. I don't believe they turned up anything relevant to the case.
**Q. I have not seen those subpoenas.**
MR. BRETTLER: There's no question.
BY MS. SCHLUMP PETERS:
**Q. Do you know whether they were produced?**
A. If it was relevant to the case, it was produced.
MS. SCHLUMP PETERS: Mr. Brettler, you are aware that you have an obligation to provide notice of any subpoena that is served; correct? Mr. Brettler?
MR. BRETTLER: Are you inquiring of me today?
MS. SCHLUMP PETERS: Yes, I'm asking you that.
MR. BRETTLER: I'm not answering your questions today.

MS. SCHLUMP PETERS: Well, I want a copy of that subpoena. I'm requesting it.

MR. BRETTLER: I have no idea what you're talking about. I have no idea what you're talking about. Put it in writing. I have no idea what you're talking about.

MS. SCHLUMP PETERS: Well, your client just testified that you served a subpoena on Kiwi Farms.

MR. BRETTLER: No, he didn't. He didn't testify to that.

BY MS. SCHLUMP PETERS:

**Q. Did you testify to that, Mr. Bonnell, just now that you served -- that a subpoena was served on Kiwi Farms on your behalf?**

A. It may have been a request instead of a subpoena.

**Q. Okay. You did say subpoena though; right?**

A. I might have misspoken. I'm not an actual lawyer. I'm sorry.

**Q. That's okay. No worries.**

**So the fact is, though, that you opposed**

**plaintiff's request to have her video removed from Kiwi Farms in the court filings; correct?**

MR. BRETTLER: Objection. It's been asked and answered.

BY MS. SCHLUMP PETERS:

**Q. How did you go about finding your current counsel?**

MR. BRETTLER: You can answer that to the extent that it does not require you to disclose privileged information with either me or with your New York lawyers.

THE WITNESS: I don't believe I can answer that question.

BY MS. SCHLUMP PETERS:

**Q. Did you do a Google search for somebody experienced --**

A. I don't think I can answer that question.

**Q. -- in handling sexual misconduct cases?**

A. I believe that would implicate attorney-client privilege to discuss that.

**Q. How much have you paid Mr. Brettler's firm to date to defend you in this action?**

MR. BRETTLER: Don't answer that.

MS. SCHLUMP PETERS: You can answer that, Mr. Bonnell.
MR. BRETTLER: I instruct you not to answer it.
MS. SCHLUMP PETERS: That is not privileged.
THE WITNESS: The payment to my law firm is not privileged?
MS. SCHLUMP PETERS: No.
MR. BRETTLER: Of course it is. Don't answer it. Don't answer it.
BY MS. SCHLUMP PETERS:
**Q. You were present at plaintiff's deposition, weren't you?**
A. Yes.
**Q. Do you recall that same question being asked by your counsel to plaintiff, how much she had paid her -- in legal fees to date?**
A. Possibly.
**Q. And she responded, didn't she?**
A. She might have, yeah.
**Q. Because it's a valid question.**
A. I don't know that that necessarily follows.
**Q. Have you paid more than half a million**

**dollars?**

MR. BRETTLER: Don't answer. I instruct you not to answer.

MS. SCHLUMP PETERS: That is not a privileged communication, Mr. Brettler. Tell me on what basis you are objecting to that question.

MR. BRETTLER: Attorney-client privilege.

MS. SCHLUMP PETERS: The amount of legal fees is attorney-client privilege?

MR. BRETTLER: I'm not going to argue with you, Joan.

Ask your next question.

MS. SCHLUMP PETERS: You should check the law a little better.

MR. BRETTLER: Again, I don't appreciate your snide remarks. You're completely unprofessional and you really need to really tone it down, Joan.

BY MS. SCHLUMP PETERS:

**Q. So you received a formal preservation demand letter from plaintiff's counsel on or about January 22, 2025. Tell me everything you did after that to preserve evidence.**

MR. BRETTLER: Objection to the extent it calls for a narrative, but you can answer.

THE WITNESS: Whatever requests were made of me or anything I felt was relevant or could be relevant to the plaintiff's request for information.

BY MS. SCHLUMP PETERS:

**Q. And how were you preserving evidence?**

A. It would depend on the type of evidence we're talking about.

**Q. Okay. Let's talk about Discord.**

A. It could have been done through an export of the chat. So something that just exports both sides of the chat if it's there.

It could have been an archive that I had on my computer made by Redact.

It could have been a request from Discord itself for information.

**Q. Well, which one was it?**

A. It depends on which Bates stamp you're talking about. It depends on the log.

**Q. So you used all these three methods that you just discussed? You used all three of them --**

MR. BRETTLER: Misstates the evidence.

BY MS. SCHLUMP PETERS:

**Q. -- in preserving evidence in this case?**

MR. BRETTLER: Misstates his testimony. There's more than three.

THE WITNESS: I have used a variety of methods to archive and preserve evidence.

BY MS. SCHLUMP PETERS:

**Q. Did you include your -- preserving your YouTube live stream archives?**

A. If it was relevant to anything related to this litigation, then they would have been, but I'm not aware of anything that was relevant that wasn't preserved or produced.

**Q. Well, one of plaintiff's claims in this case is a violation of privacy; right? And part of that claim is that you published a lot of her private sexual messages. It's in the amended complaint; do you recall that?**

A. Is that one of the torts she's suing me under?

**Q. Yeah, it's a Florida tort.**

A. Which one?

**Q. Invasion of privacy.**
A. Okay.
**Q. Okay. So that would include comments and posts you made on YouTube including plaintiff's personal messages; correct?**
MR. BRETTLER: Objection to the extent it calls for a legal conclusion.
If you have a layman's understanding of it, you can answer the question.
THE WITNESS: I'm not aware of -- to what extent that would go through, but if I received a specific request to preserve anything, then I would have preserved it.
BY MS. SCHLUMP PETERS:
**Q. You recently deleted a lot of your YouTube archives, didn't you?**
MR. BRETTLER: Objection. Vague and ambiguous as to time.
THE WITNESS: I privated a lot of them, yes.
BY MS. SCHLUMP PETERS:
**Q. You privated them?**
A. Yes.

**Q. But you still have them?**
A. Probably still backed up, yes.
**Q. So they are removed from public access; correct?**
A. Yes.
**Q. Were some of the videos, YouTube videos that you removed from public access, did they reference the plaintiff?**
A. I have no idea.
**Q. Did you, after you received the preservation letter, did you place a litigation hold on your DGG Chat logs?**
MR. BRETTLER: Objection to the extent it calls for a legal conclusion, but you can answer.
THE WITNESS: I'm not sure what a "litigation hold" means.
BY MS. SCHLUMP PETERS:
**Q. Did you instruct anyone with access to the DGG Chat logs to preserve them, the logs?**
MR. BRETTLER: Objection. Vague and ambiguous.
BY MS. SCHLUMP PETERS:
**Q. That might be relevant to this case?**
A. I'm not sure. It's a chat room. I

don't think so, but I imagine there are ways to screenshot stuff or find it, but I don't think anything in that chat room would be relevant to this case. If it was, it was produced or there could be a screenshot of it.

**Q. So the amended complaint describes specific posts you made in your DGG Chat about the plaintiff in January and February 2025. Are those posts still retrievable from your server logs?**

A. I'm not sure. I would have to check.

**Q. Why wouldn't they still be retrievable? Would there be a reason for that?**

A. There could be a million reasons for that.

**Q. Like what?**

A. There could have been a flood that destroyed the server center and all the backups were destroyed.

**Q. Was there a flood?**

A. I don't keep track of the status of every server that I have rented for backups of chat logs for my website.

**Q. What is your DGG Chat retention policy?**

A. I don't think I technically retain any

of it. I think there is a separate site called OverRustle Archives that retains it.

MR. BRETTLER: I'd just like to note for the record that you have accused me, Ms. Peters, of not producing subpoenas to you. You should read your own e-mails. On October 8, 2025, copies of all subpoenas were provided.

MS. SCHLUMP PETERS: Mr. Brettler, you can address me after the deposition.

MR. BRETTLER: You addressed me during the deposition and I'm responding so you should read your e-mails.

MS. SCHLUMP PETERS: Okay.

BY MS. SCHLUMP PETERS:

**Q. You deleted your Google Drive that you've referred to in the court during the preliminary injunction hearing sometime in January 2025, didn't you?**

MR. BRETTLER: Objection. That misstates his prior testimony and misstates the record.

THE WITNESS: No.

BY MS. SCHLUMP PETERS:

**Q. You didn't delete the Google Drive**

**sometime in January 2025?**
A. No.
**Q. Okay. Plaintiff asked for the Google Drive in her document production request. And you did not produce it.**
A. I'm not sure what that means.
**Q. The contents of the Google Drive.**
MR. BRETTLER: The contents of the entire Google Drive?
MS. SCHLUMP PETERS: The link.
MR. BRETTLER: Well, that's a different question.
THE WITNESS: The link to?
BY MS. SCHLUMP PETERS:
**Q. The videos.**
A. Those would have been deleted five years ago.
**Q. Did you use a forensic collection tool such as a Discord-specific scraper or forensic imaging capturing software to capture the ESI from the Discord messages that are relevant to this case?**
A. Not that I am aware of, no.
**Q. So did you rely on manual methods like copy-pasting screenshots?**

A. Every method to retrieve data from Discord would be a manual method. One of the methods that I used was requesting from Discord a backup of my messages. If I received those, those were produced for my side of the messages here, but every method to retrieve text messages from Discord is going to be some kind of manual retrieval method.

**Q. What about on Kiwi Farms? Did you preserve any of your posts or things on Kiwi Farms that were requested in this case?**

A. I haven't posted on Kiwi Farms in five years, six years. I don't know.

**Q. And did you use RustleSearch at all to search for any documents relevant -- to produce in this case?**

A. I don't think so. RustleSearch I think is another chat archive of my DGG Chat.

**Q. Have you used any alternative handles on Destiny.gg that would appear under different search terms in RustleSearch?**

MR. BRETTLER: Objection. Vague and ambiguous.

If you understand, you can answer.

THE WITNESS: Not really, no.

BY MS. SCHLUMP PETERS:
**Q. So in one of your -- your first declaration to this Court you stated that you used a program called "Discord Log Exporter" to export all relevant messages into an HTML file; is that -- you stated that in your declaration?**
A. I believe I remember it, yeah.
**Q. And Discord Log Exporter is a third-party tool, right, not affiliated with Discord?**
MR. BRETTLER: Objection. Calls for speculation.
If you know, you can answer.
THE WITNESS: Correct.
BY MS. SCHLUMP PETERS:
**Q. Did you generate or receive cryptographic hash values or metadata from Discord Log Exporter at the time of the export?**
A. No, I don't think there would be a meaningful way to do that.
**Q. Are you aware that Discord itself provides an official avenue to request a copy of all your messages, a Discord data package?**
A. Yes, that was one of the things I referenced earlier; however, that data package

only contains your side of the messages and not the other side's.

**Q. Did you use Relativity or any other recognized e-discovery platform to preserve evidence from your laptop, computer, phone?**

A. No.

**Q. Did you prepare any acquisition log describing the method, tool, collection date, ESI source, digital fingerprint of your Discord exports?**

MR. BRETTLER: Objection. It's compound, vague and ambiguous.

You can answer.

THE WITNESS: No, I don't think it would be meaningful.

BY MS. SCHLUMP PETERS:

**Q. So when you collected your -- the materials in your production that you produced, from Discord, you did not generate cryptographic hash values at the time of the collection; correct?**

MR. BRETTLER: Objection. It's been asked and answered.

THE WITNESS: No, but it would be meaningless to do so.

BY MS. SCHLUMP PETERS:

**Q. Why would it be meaningless?**

A. Well, since the chain of custody starts with me, if I were to delete something initially, then whether I create a cryptographic hash or not doesn't ensure the integrity of those messages.

For instance, plaintiff deleted messages and admitted to doing so in deposition, but she's also given me cryptographic hashes so they are not very valuable.

**Q. Her testimony is she deleted one message; isn't that right?**

MR. BRETTLER: If you know.

BY MS. SCHLUMP PETERS:

**Q. You were there.**

A. I know personally that she's deleted one and edited at least one other, but it's hard to speak to me knowing what she's deleted given the nature of a deleted message is unseeable by the person it was deleted for.

**Q. Now on -- tell me about the streamer who uses the handle Foodshops.**

A. They are just another streamer that covers content related to me sometimes.

**Q. Is she a friend of yours?**

A. I would say colleague.

**Q. Colleague. And how long have you known her?**

A. Maybe two years.

**Q. How often have you appeared as a guest on her live stream in the past two years?**

A. Maybe a dozen times.

**Q. Do you recall appearing on her live stream on September 8th, around September 8, 2025?**

A. No, not on that exact date or for that exact appearance.

**Q. Do you recall an appearance on her live stream and it was in September of 2025 prior to your document production in this case?**

A. I don't recall specifically --

**Q. I wasn't finished. Sorry -- discussing document production issues with her; do you recall that?**

A. Vaguely, I recall, yes.

**Q. And on that live stream with Foodshops, did you ask about using artificial intelligence to format a file?**

A. To format a file to make it readable, yes.

**Q. And do you recall saying you had a CSV and a JSON file that you wanted to upload into ChatGPT to create an Excel spreadsheet.**

A. Kind of. It's a bit simplistic, but yeah.

MS. SCHLUMP PETERS: Okay.

(Audio recording begins playing.)

"If I ask an AI to do something for me, if I give it a file and say, 'can you format this,' it will never like spit that file out onto the Internet and do some random crazy shit with it; right?"

"For safety sake, you probably shouldn't do that. I think you should probably have some professional do that."

(Audio recording stopped.)

MR. BRETTLER: We can't hear because of all the noise in the hallway.

MR. CORRIAS: Let me go ask them to be quiet real quick. We'll restart it and raise the volume. That should take care of that.

(Audio recording begins playing.)

"If I ask an AI to do something for me, if I give it a file and say, 'can you format this,' it will never, like, spit that file out onto the Internet and do some random crazy shit with it; right?"

"For safety sake, you probably shouldn't do that. I think you should probably have some professional do that. That sounds like a safety risk, a cybersecurity risk."

"Well, I can't hand it over to anyone else because it's child porn. I'm just kidding."

"Okay. Don't feed ChatGPT child porn."

"I just -- I have, like, a CSV with, like, 30,000 lines, but this -- but the -- and then I have like a sister, like, JSON file, but the problem is that, it doesn't actually -- like, I can't copy paste this into a spreadsheet because all of the data rows are just separated by commas. But I imagine if I upload the file into ChatGPT and say,

'Hey, can you create a neat Excel sheet where you treat the commas as like a new cell' that it could just give me a finished file of something."

"100 percent, someone can quickly program a Python script for you that can do that on your own local environment."

"Oh, my fucking God."

"Just run -- just run a fucking Python script. Like it's a simple -- it's a fucking simple CSV processing Python script that someone can just run and then process it all, like really quickly. Right. Like, you don't need to risk, like, fucking public exposure. It's a safety risk. Like you have -- dude, just ask the fucking DGG server CS programmer. Actually, they don't even -- they don't even care about coding anymore. Just like -- I don't know. Just ask someone to -- it probably already exists. It already exists on the Internet."

"Learn to code."

(Audio recording ends.)

BY MS. SCHLUMP PETERS:

**Q. Do you recognize your voice, Mr. Bonnell?**

A. Yes.

**Q. Okay. That audio file was submitted to the court in support of plaintiff's opposition to the motion to dismiss and you said that on Foodshops's live stream?**

A. Yes.

**Q. Is there anything in that recording that does not reflect what you actually said?**

MR. BRETTLER: Objection. Vague and ambiguous. I don't even know what you mean by that.

THE WITNESS: What do you mean by "reflect"? I didn't actually submit --

BY MS. SCHLUMP PETERS:

**Q. Does it seem like an actual -- does it seem like what you said?**

A. I spoke the words on that. Some of that was clearly a joke; I did not send child porn to ChatGPT, just to be clear.

**Q. I just wanted you to authenticate that that was your voice and what you said.**

A. Yes.

**Q. On the Foodshops live stream. Okay.**
**Now which Excel spreadsheet were you referring to in that discussion with -- on Foodshops's live stream?**
MR. BRETTLER: Objection to the extent it's a hypothetical, but you can answer if you know.
THE WITNESS: I don't remember which one exactly or if it was one I even ended up submitting.
BY MS. SCHLUMP PETERS:
**Q. But it was specifically about an Excel spreadsheet; right?**
A. It was about creating a hypothetical Excel spreadsheet, but I don't know if I ended up using that or even submitting that as part of discovery or if I used it. There were several methods I used to export data.
**Q. So what method did you use to create the Excel spreadsheet that we looked at earlier today, ECF132-6?**
A. On page 2?
**Q. Yes. Is that the Excel spreadsheet? Yes.**
A. It looks to me like I have sorted all

the sent messages to AbbyMC's Discord account, and then I deleted every message that didn't contain a media file and then I sent the -- or I put into a spreadsheet the timestamps for which I sent any media files to the AbbyMC Discord account.

**Q. And did you use an AI tool to help you do that?**

A. Probably not for this. I don't think I needed to, no.

**Q. So what Excel spreadsheet do you think you were referring to in that Foodshops live stream?**

MR. BRETTLER: Objection. Calls for a hypothetical.

THE WITNESS: It was a long time ago. I don't even remember exactly what -- if I was even successful in that.

The audio was just me trying to merge my side of a conversation and another conversation but both of them had different timestamps, so to make it line up. I think one was written in like Unix code and the other was written

in universal time code, so I needed to
merge both files so that the
conversation would be readable.
BY MS. SCHLUMP PETERS:
**Q. Okay. And that Foodshops live stream audio that we just listened to was September 2025. And your motion to dismiss came out shortly after that with that Excel spreadsheet?**
A. Well, I don't know if it was that -- wait. When you say that Excel spreadsheet --
**Q. The one you're looking at.**
A. Okay. So there would be no reason to use AI to generate this particular spreadsheet, though. It looks like I did a simple search of a conversation history and deleted every non-media file message and then put those media messages in the spreadsheet. I don't know why I would have to use AI for that.
MS. SCHLUMP PETERS: Okay.
Let's -- I want to just play a video
now.
(Video recording begins playing.)
"If I ask an AI to do something for
me, if I give it a file and say, 'can

you format this,' it will never, like, spit that file out onto the Internet and do some random crazy shit with it; right?"

"For safety sake, you probably shouldn't do that. I think you should probably have some professional do that. That sounds like a safety risk, a cybersecurity risk."

"Well, I can't hand it over to anyone else because it's child porn. I'm just kidding."

"Okay. Don't feed ChatGPT child porn.

"I just -- I have, like, a CSV with like 30,000 lines, but this -- but the -- and then I have like a sister JSON file, but the problem is that, it doesn't actually -- like, I can't copy paste this into a spreadsheet because all of the data rows are just separated by commas. But I imagine if I upload the file into ChatGPT and say, 'Hey, can you create a neat Excel sheet where you treat the commas as like a new cell'

that it could just give me a finished file of something."

"100 percent, someone can quickly program a Python script for you, on your own local environment."

"Oh, my God"

"Just run -- just run a fucking Python script. Like it's a fucking simple CSV processing Python script that someone can just run and then process it all like really quickly. Right. Like, you don't need to risk, like, fucking public exposure. It's a safety risk. Like you have -- dude, just ask the fucking DGG server CS programmer. Actually, they don't even -- they don't care about coding anymore. Just like -- I don't know. Just ask someone to -- it probably already exists. It already exists on the Internet."

"Learn to code."

(Video recording ends.)

BY MS. SCHLUMP PETERS:

**Q. So okay. So that was you talking on that video; correct?**

A. Yes.
**Q. And is it the same voice that you just identified in the audio file that we played?**
A. Yes.
**Q. From what you can -- saw on that video, do you believe anything was altered, edited or modified from what you said?**
MR. BRETTLER: Objection. Calls for speculation.
THE WITNESS: I mean, I have no reason to believe it was altered or edited in any way.
MS. SCHLUMP PETERS: Okay. We're going to submit the audio file and the video to you. And so the audio file will be one exhibit that we just saw, and then the video will be the next exhibit.
(Plaintiff's Exhibit No. 18 was marked for identification.)
(Plaintiff's Exhibit No. 19 was marked for identification.)
MS. SCHLUMP PETERS: And then you appeared on Foodshops's live stream the following day, September 9, 2025. And

this is an audio of what we submitted to the court of what you said in that stream. We're going to play it now.

(Audio recording begins playing.)

"Challenged Kamala Harris but she's --

"Are you okay? Jesus Christ. What is going on?

"No, I'm not okay.

"Why?

"I'm not okay. It's not working. I don't know why."

"What is not fucking working? Jesus Christ."

"I don't know."

"Dude."

(Overlapping speakers.)

"These files I'm trying to combine into a singular file.

(Overlapping speakers.)

"CSV, you can --"

"No."

(Overlapping speakers.)

"I don't know how it's getting the time for any of it though. I don't know

with respect to what. Because it should all just do it in Unix time code, but it does not. Sometimes it does it with respect to when you export. Sometimes it does it with respect to when the program exported it 12 years ago and then it converts it to some other fucking timestamp and the Unix time code is lost and in data time sign."

(Overlapping speakers.)

"You can drag and drop and convert to UNIX, like, it's not that hard."

"No, you don't understand. You don't understand."

"No, that's not true."

"You don't understand. Information is lost. Information is lost. I can tell."

"Okay."

(Overlapping speakers.)

"You have the original files. You can just like recombine it. Like, it's not that hard."

"There is no original file. I'm trying to reconstruct the file. I'm

artificially creating a file by reconstructing a log of stuff. That's what I'm trying to do. And it's not working."

"But you can just like -- dude, you are -- oh, my God. Okay. I'm pretty sure you can program --"

"I just need to stare at it and eventually it will click. I don't care. It doesn't matter. Don't worry."

"You have -- oh, my God, just pay somebody to program it for you. Hold on. Radiant wants to help."

"Who is Radiant? Who is this guy?"

"Listen, dude, it's not that hard. Just give someone $20 to do it -- oh, my God -- or create a program that can do it."

"Okay. Anyway."

(Audio recording ends.)

BY MS. SCHLUMP PETERS:

**Q. Do you recognize your voice on that audio?**

A. Yes.

**Q. And you recognize Foodshop s's voice?**

A. Yes.

**Q. And you said what was played on that audio on Foodshops's live stream; correct?**

A. Yes.

**Q. Okay. At one point you said information was lost. What information were you referring to that was lost?**

A. For timestamps for computers in a perfect world there is a Unix timestamp that's printed which is counted in microseconds since, I think, January 1, 1969. In a perfect world, the computer will read that long number and then print a date.

In an imperfect world, the date for a message might be read by a computer and it just reads the date and then it creates backwards the Unix timestamp.

So the issue that I had in recreating a file that showed both sides of the conversation is that Discord, when you request the official data package from them, it only has messages on your side; it does not have messages from the other person. But when I export the messages using Discord Chat Exporter it has the other person's messages and mine but it will use a

different timestamp.

So the frustration in this video -- it's very technical; I'm sorry -- is trying to get the real timestamps for what is actually -- the real timestamp for when a message is being sent or received.

For instance, I might have an issue where in one log when I'm speaking, the other person appears not to reply for six hours if it's a time zone issue, 24 hours, if it's a day issue, one hour if it's a daylight saving times issue. And sometimes in the log exporters, they don't actually have the correct original information about whether it was daylight savings time or not. So it was just a matter of getting the timestamps to line up, but the content of all of the messages is unchanged. It's only referring to the timestamps for the messages themselves.

**Q. And were you able to accomplish that?**

A. I would say so, yeah.

**Q. And then you also said "there is no original file." What file would you have been referring to?**

A. None. There is no original file. Several times plaintiff and you have referred to

the concept of an original Discord log or an original Discord file, but there is no original file. It's not a meaningful term.

**Q. Why not? Can you explain that?**

A. In a very, very, very technical sense, the original file would be whatever Discord has on their servers that encode for messages that are then displayed using some front-end algorithm to decode stuff and show it to the user, but that file is never accessible to the user. If you were looking for that kind of a file, you would need like a criminal subpoena or I don't even know if Discord has those files available.

So, for instance, when you ask Discord for their export, that's also not an original file. It's just a CSV that's filled with a whole bunch of timestamps and messages but there are no images or anything else contained within those Discord exported files that they send you.

**Q. Okay. So when you were saying there was no original file, you were saying that because the original file doesn't exist, the complete file?**

A. Correct.

**Q. And then you said you were -- you said,**

**"I'm artificially creating a file by reconstructing a log."**

MR. BRETTLER: Objection. That misstates what he said.

MS. SCHLUMP PETERS: No, I'm quoting from the transcript of the audio file.

BY MS. SCHLUMP PETERS:

**Q. "I'm artificially creating a file by reconstructing a log of stuff." Is that because you could only get one side of the messages or --**

A. No, that would imply I'm creating messages on the other side.

**Q. Okay.**

A. The artificial file I'm creating is I have an export from either Discord or Redact and then I have a Discord log exporter that is giving me the other messages. And it's just a matter of combining both of these so that they are readable to a user, otherwise if I were to produce, for instance the file that Discord gives you, it would just be a huge spreadsheet of a ton of numbers and things that would be meaningless. You wouldn't be able to read them as a human.

**Q. Okay. That's probably beyond my**

**comprehension level, but thank you for the response.**

A. Sure, but I will say for everything I have spoken about with regards to the last two videos, the only error or issue I'm having is getting the time code to match up between all the messages. There are no -- the content of all the messages is unchanged between every formation of trying to get things to line up.

MS. SCHLUMP PETERS: Okay. We're going to play a video now, if you have that.

MR. BRETTLER: Are we marking that last audio?

MS. SCHLUMP PETERS: Yes, we're going to mark the last audio. And then we're going to mark this video.

The last audio was submitted to the court as an exhibit in support of plaintiff's opposition to the motion to dismiss.

(Plaintiff's Exhibit No. 20 was marked for identification.)

MS. SCHLUMP PETERS: And now we're going to play a video that's going to be

the next exhibit.

MR. BRETTLER: The audio was Exhibit 20.

THE COURT REPORTER: So now we're playing Exhibit 21?

MR. BRETTLER: Correct.

(Plaintiff's Exhibit No. 21 was marked for identification.)

(Video recording begins playing.)

"Challenged Kamala Harris but she's --"

"Are you okay? Jesus Christ. What is going on?

"No, I'm not okay."

"Why?"

"I'm not okay. It's not working. I don't know why --"

"What is not fucking working?

Jesus Christ."

"I don't know."

"Dude."

(Overlapping speakers.)

"These files I'm trying to combine into a singular file.

(Overlapping speakers.)

"CSV, you can -- much.

"No."

"I don't know. I have two different files I'm trying to combine into a singular file, but I don't know how any of these fucking files are exporting their dates. It's just so fucking gay."

(Overlapping speakers.)

"Oh, my God."

"CSVs, you can import CSVs into another fucking CSV. It's not hard."

"I don't know. I don't know. I don't know how it's getting the time for any of it though, I don't know with respect to what. Because it should all do it in Unix time code, but it does not. Sometimes it does it with respect to when you export. Sometimes it does it with respect to -- when the program exported it 12 years ago and then it converts it to some other fucking timestamp. And the Unix time code is lost and it's in a time zone."

(Overlapping speakers.)

"You can drag and drop and convert to Unix. Like, it's not that hard."

"No, dude, you don't understand. You don't understand."

"No, that's not true."

"You don't understand."

(Overlapping speakers.)

"Drag and drop."

"No. I can tell."

"Information is lost. Information is lost."

"Okay."

(Overlapping speakers.)

"You have the original files, you can recombine it.

"There is no original file. I'm trying to reconstruct the file. I'm artificially creating a file by reconstructing a log of stuff. That's what I'm trying to do and it's not working."

"But you could just like, dude -- dude. You can, just -- oh, my God, you -- I am pretty sure you can --"

"I will just stare it at and

eventually it will click so I don't care.

"Just pay somebody to program it for you. Hold on Radiant wants to help."

"Who is Radiant? Who is this guy?"

"Listen, dude, it's not that hard. Just give someone $20 to do it -- oh, my God -- or create a program that can do it."

"Okay. Anyway."

(Video recording ends.)

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, that was you appearing -- in -- speaking in that video with Foodshops; correct?**

A. Yes.

**Q. And that is the same content as what you just heard in the audio file that was marked as Exhibit 20?**

A. Yes.

**Q. Okay. And then, after this -- sometime in early October, Foodshop privatized those two videos; are you aware of that?**

A. You are representing that to me. I'm

not sure. I don't know.

**Q. You don't know that from your own knowledge?**

A. No.

**Q. So you didn't speak to Foodshop about privatizing her streams?**

A. No. I believe the only message I have ever said publicly, is I'm not telling anybody what to do with any of their stuff because I explicitly don't want to be instructing anyone to do anything that would be outside of the boundaries of what my requirements are for this case.

**Q. Now you communicated -- you talked earlier that you had received a message from Solo; correct?**

MR. BRETTLER: Objection. Vague and ambiguous as to what message.

THE WITNESS: What message and when?

BY MS. SCHLUMP PETERS:

**Q. On November 29th. We discussed this earlier.**

A. Yes.

**Q. Okay. And you were requested but did**

**not produce those communications between you and Solo?**

MR. BRETTLER: Objection. Misstates the record.

THE WITNESS: My understanding is I did produce those communications.

MS. SCHLUMP PETERS: Well, we don't have them.

MR. BRETTLER: You do.

BY MS. SCHLUMP PETERS:

**Q. In the preliminary injunction hearing, you testified that you had a backup of all your messages with Rose. What did you mean by a backup?**

MR. BRETTLER: Objection to the extent it misstates your prior testimony and if you need to review your transcript, you can, but if you remember, you can answer.

THE WITNESS: I would have to check, but my guess is it's going to be in the discovery I produced for this case.

BY MS. SCHLUMP PETERS:

**Q. That would be a backup of your messages?**

A. Sure. You could refer to it as such, a backup, an archive, a history.

**Q. So your income comes from multiple sources; right? You have YouTube ad revenue? Yes?**

A. Not at the moment.

**Q. No? Why not?**

A. Because my channel is not monetized on YouTube right now.

**Q. Why isn't it?**

A. YouTube never stated a reason, but I think it had to do with political speech after Charlie Kirk's assassination.

**Q. So you were demonetized shortly after Charlie Kirk's assassination?**

A. Yes.

**Q. And it still hasn't been reinstated?**

A. Not yet.

**Q. But prior to that you did have YouTube ad revenue; correct?**

A. Yes.

**Q. And then you have Kick subscriptions?**

A. Yes.

**Q. And a Kick contract?**

A. No.

**Q. No Kick contract?**
A. No.
**Q. Did you have one?**
A. At one point.
**Q. And what happened to that?**
A. I think it expired.
**Q. And it was not renewed?**
A. I think they stopped renewing them.
**Q. You also receive revenue from Super Chats; right?**
A. No, no longer, because that was part of YouTube.
**Q. That is part of where you get demonetized is the Super Chats?**
A. From YouTube, yes.
**Q. What about sponsorships, merchandise?**
A. Prior to the lawsuit, sponsorships, yes, after, no. Merchandise, yes.
**Q. And you receive subscription revenue from your Destiny.gg subscribers?**
A. Yes.
**Q. Is there any other source of income that I haven't mentioned?**
A. Not that I can think of, no.
**Q. What was your total income from all**

**those sources combined in 2025, just an approximate?**

A. I would have to consult my taxes.

**Q. Do you have a ballpark?**

A. More than one million, less than ten million.

**Q. That's a big -- a pretty big range. How about was it more than five million do you think?**

A. I can't specify.

**Q. You don't know. How about in 2024? Was it approximately the same?**

A. I wouldn't know. I'm not sure.

**Q. So you don't know if your income was less in 2025 than it was in 2024?**

A. I imagine it was less due to the demonetization on YouTube.

**Q. Now you've been streaming about this case pretty regularly now for more than a year; right?**

A. It depends on how you define "regularly."

**Q. How would you define it?**

A. Not -- with respect to this, I would say not regularly. I stream for eight hours a day, every single day of the week ideally, so if I

mention this case once every three weeks, that wouldn't be regularly to me. So it depends on --

**Q. So you think you mentioned this case once every three weeks?**

A. I'm sure when there are lots of motions coming, I probably cover more. When there is not as much activity happening, I probably cover less, so you can probably follow the docket and see pretty closely how much I cover.

**Q. And when you stream about this case, does your viewership go up?**

MR. BRETTLER: Objection. Vague and ambiguous.

If you know, you can answer.

THE WITNESS: It's hard to say, probably not.

BY MS. SCHLUMP PETERS:

**Q. Hard to say.**

**But at the preliminary injunction hearing, you did tell the Court that you monetized this lawsuit through your streaming; correct?**

MR. BRETTLER: Objection. Misstates his prior testimony.

If you understand, you can answer.

THE WITNESS: That's a very vague statement. Technically, anything I talk about on stream is monetized. So I don't know if it's a very meaningful statement.

BY MS. SCHLUMP PETERS:

**Q. And you also testified at the hearing that you lost more than you gained from streaming about this case as a result of this case; do you recall that?**

A. Yes.

**Q. Okay. And you testified that your revenue dropped 50 to $60,000 over two to three months?**

A. That sounds right, yes.

**Q. And you said you lost tens of thousands of subscribers?**

A. Yes.

**Q. So what percentage of your revenue dropped 50 to $60,000 over two to three months? What percentage of that would have been of your overall income?**

A. I have an external money management team and then I have my business with a CFO. In terms of like trying to estimate a percentage

year-to-year change in revenue, I would have to have my tax documents in front of me to give you any kind of approximate answer there.

**Q. And your subscriber and your revenue -- your revenue decline that you testified about, about when did that begin?**

A. That probably would have been right after the lawsuit -- well, right after the Substack was posted, but I would clarify revenue loss is not revenue decline. You can lose revenue while still gaining more revenue; you just could have lost out on a potential larger gain.

**Q. Okay. Did you lose -- start losing revenue and see a decline after November 29, 2024?**

A. I believe so. I believe we submitted that -- evidence of that as part of the discovery.

So for instance there was at least one sponsor, Ground News, that I believe I had -- I think it was a $20,000 deal over three months that dropped me as a result of the litigation.

**Q. The litigation or the leaks?**

A. It would have been the allegations,

Pxie's Substack.

**Q. So in plaintiff's request for production, we asked you to produce all documents supporting your claim of financial harm. And you submitted the e-mail that you just referenced about the sponsorship from Ground News that would be paused by Ground News?**

A. Yes.

**Q. Okay. And that e-mail is dated January 22, 2025, so that was prior to the filing of this lawsuit; correct?**

A. It sounds like it, yes, but after the publishing of the Substack.

**Q. And that's actually the same date that you made your public statement; isn't it?**

A. Which was after plaintiff's Substack, yes.

**Q. And the invoice that you presented for the two streaming productions totalled $7,050; does that sound right?**

A. It sounds about right.

**Q. So you didn't produce any other evidence other than what we just talked about, which was SB001 and SB002 to support your claim of financial harm; is that right?**

MR. BRETTLER: Just to make it clear for the record, Mr. Bonnell, doesn't have any claims. He is a defendant in this lawsuit that your client filed so I'm not sure what the basis is for your question, but if you understand it, you can answer.

THE WITNESS: I think I submitted more as well with regards to potential lost YouTube revenue, but I don't have a claim at the moment relating to damages or anything like that. So I don't believe I have been updating the court or you guys with ongoing revenue harm or business loss or anything.

MS. SCHLUMP PETERS: To be clear for the record, we did not receive any YouTube loss revenue in your production, only those -- e-mail about the sponsorships. And when I reference that it was a claim, I'm referring to the fact that you claimed to the court that you lost this money.

MR. BRETTLER: Same objection. There is no question pending.

MS. SCHLUMP PETERS: Now, we talked earlier about the message you sent to plaintiff on November 29th after she found out about the leaks in which you said you were very, very sorry. And you also acknowledged the amount of pain that you caused her; right?

This will be the next exhibit.

(Plaintiff's Exhibit No. 22 was marked for identification.)

BY MS. SCHLUMP PETERS:

**Q. Now you see that this is direct messages between you and your friend Straighterade on November 29, 2024?**

A. Yes.

**Q. And so if you could just review it and then if you look at the bottom of the first page of that exhibit at 11:06 p.m. you say -- you're referring to the prior message about the video of plaintiff; do you see that?**

A. Yes.

**Q. So then go to the second page. And you state, "regardless of it," meaning the video; right?**

A. Uh-huh.

**Q. "Being hot or not, though, it is super ultra horrendously shitty what Pxie might go through now, even if it never spread, it's still such an insanely, shitty, horrible stupid thing."**

**You wrote that to Straighterade; right?**

A. Yes.

**Q. And so you were acknowledging just how horrible this was for the plaintiff to be going through; correct?**

MR. BRETTLER: Objection. It misstates the document.

You can answer in your own words what you meant by that.

THE WITNESS: Can you clarify when you say "this."

BY MS. SCHLUMP PETERS:

**Q. The leak of the video.**

A. The video being posted publicly on Kiwi Farms, yes.

**Q. And you understood by December -- early December that plaintiff was experiencing suicidal thoughts about the video being published; correct?**

MR. BRETTLER: Objection. Calls for speculation as to what the plaintiff

may have been experiencing.

THE WITNESS: I saw conflicting statements on that. I'm not entirely sure. I would have to see the messages you're referring to.

MR. CORRIAS: It's going to be in the binder, the second one.

MR. SICHEL: What is the Bates stamp?

MR. CORRIAS: 1448.

BY MS. SCHLUMP PETERS:

**Q. Now, Mr. Bonnell, do you see your -- the message you received from Pxie at 2:09 p.m. "Hi Steven, as my life on this earth comes to a close, I want to ask you to be please more careful with the people who place their trust in you in the future. Life is unfair, but you should do your best in preventing that, not contributing to that"**

**Do you see that?**

A. Yes.

**Q. And then at 2:47 p.m., she tells you, "I'm just tired of living anymore. It's a matter of time until my family discovers what happened. And I feel there is no way to obtain justice."**

**And then she goes on talking about her suicidal thoughts and the impact that this has had on her; right?**

A. I see her message for that, yes.

MR. BRETTLER: And you missed -- you did not read the entire message.

MS. SCHLUMP PETERS: No, I did not.

BY MS. SCHLUMP PETERS:

**Q. And you acknowledged to plaintiff that your actions in sharing the video caused her serious harm; correct?**

MR. BRETTLER: Objection. Misstates the document and the witness's prior testimony.

THE WITNESS: I'm sorry. What part are you referring to with that?

BY MS. SCHLUMP PETERS:

**Q. Let's look at 1444. So at 4:10 p.m. on December 12, 2024, on the document Bates stamped SB001444, you state, "If you have any discrete requests or specific things you want, need from me, let me know. You got severely fucked over in this through absolutely no fault of your own. Okay?"**

**Do you see that? And that is a partial**

**read of the message.**
A. Yes.
**Q. And if you had not shared the video, plaintiff would not have been harmed; right?**
MR. BRETTLER: Objection. That is an incomplete hypothetical and calls for speculation.
THE WITNESS: Yeah, that's a counterfactual. I have no way of knowing.
BY MS. SCHLUMP PETERS:
**Q. Well, that's how it got leaked, right, because you shared it with Rose?**
MR. BRETTLER: Objection. Calls for speculation and it's an incomplete hypothetical.
BY MS. SCHLUMP PETERS:
**Q. It's a fact; right, Mr. Bonnell?**
MR. BRETTLER: It's not a fact. And you don't need to accept it as a fact, but you can answer.
MS. SCHLUMP PETERS: We've already discussed it.
MR. BRETTLER: I agree. Move on.
BY MS. SCHLUMP PETERS:

**Q. So you acknowledged that she got quote-unquote, "severely fucked over, through no fault of her own."**

**And then -- please turn to 1449. On December 12th at 2:05 p.m., you were offering to help her out financially. Does that sound -- is that what you're doing there?**

MR. BRETTLER: Take time to read the message.

THE WITNESS: At the request of her friend Erin I think she originally suggested it and then I sent her a message, yes.

BY MS. SCHLUMP PETERS:

**Q. Let me clarify that. Who requested it? Erin?**

A. Erin, I think, initially suggested it, yes.

**Q. That you offer money to plaintiff?**

A. Yes.

**Q. Okay. So that's the reason you made this offer on December 12th?**

A. Yeah.

**Q. And how much money were you thinking you were going to give her?**

A. I have no idea.

**Q. But you made the offer. Who would know?**

MR. BRETTLER: Objection. It's vague and ambiguous.

If you know, you can answer. You've already answered.

THE WITNESS: By the way --

MS. SCHLUMP PETERS: Again, coaching the witness, Mr. Brettler, speaking objections --

MR. BRETTLER: There has been no coaching, Joan.

MS. SCHLUMP PETERS: Yes.

MR. BRETTLER: You've got to stop. We've been going for almost seven hours.

MS. SCHLUMP PETERS: Almost, not quite.

MR. BRETTLER: You've got to chill.

THE WITNESS: No specific dollar amount was talked about. Plaintiff never offered a dollar amount. No specific dollar amount was ever spoken about.

BY MS. SCHLUMP PETERS:

**Q. Were you thinking $500 would make her**

**pain go away?**

MR. BRETTLER: Objection. Calls for speculation.

THE WITNESS: I have absolutely no idea.

BY MS. SCHLUMP PETERS:

**Q. You didn't have any number in your head?**

A. No.

**Q. And then after plaintiff posted her Substack, you ceased being willing to make any monetary compensation; is that right?**

MR. BRETTLER: Objection. Vague and ambiguous. Calls for speculation.

THE WITNESS: "Ceased"?

BY MS. SCHLUMP PETERS:

**Q. Ceased -- stopped being willing to make any monetary compensation to plaintiff?**

A. We never really got to that point in the conversation. I think -- this conversation on December 12th, I think, was the last time we communicated, and then she removed me, I believe, from Discord as a friend and we didn't speak after that.

**Q. No, you did not speak after that, but through counsel, you spoke, right, in terms of**

**trying to resolve this matter amicably without filing suit?**

MR. BRETTLER: Objection. Vague and ambiguous, but if you understand, you can answer.

THE WITNESS: Just to be clear -- is a $1 million demand letter considered amicably trying to resolve?

MR. BRETTLER: 15.

THE WITNESS: 15 I think was the lawsuit, but the initial demand letter --

BY MS. SCHLUMP PETERS:

**Q. I wasn't asking what plaintiff was asking. I'm asking you what you were offering at that point?**

A. There was no specific dollar amount that I discussed.

**Q. And you've maintained ever since plaintiff's served the demand letter on you that you wouldn't resolve this case unless she apologized to you; is that right?**

A. For the Substack that she posted, correct. Not apologized to me, but clarified a lot of the misleading or libelous statements in

the Substack, yes.

**Q. Okay. You didn't say that you wanted her to apologize to you?**

A. I don't recall saying that. If I did, it was part of a longer statement, but that is meaningless without context.

**Q. So after you disclosed the video without her consent and it was published and you acknowledged that she was severely fucked over and suffering from suicidal ideation, you then went on a campaign to harass and smear her, didn't you?**

MR. BRETTLER: I object to the question. It misstates the record. It falsely suggests that Mr. Bonnell transmitted the video and leaked the video, which is contrary to his testimony today.

THE WITNESS: So obviously, I have a big disagreement with the plaintiff over whether or not I had the consent to share that video with anybody. And then I would disagree with the characterization that I went on a harassment campaign.

Unfortunately, with this type of back-and-forth, it's the -- the only way to defend yourself seems to be to cast the other person in a negative light by byproduct of defending your own actions. So I wouldn't characterize my statement of my side of things as a harassment campaign against her.

BY MS. SCHLUMP PETERS:

**Q. So when you went online and posted that plaintiff is just trying to extort you, is that -- that's not harassment?**

A. My understanding was that that was a fair statement of what had factually occurred up to that point. I wouldn't consider that harassment any more than her public statements towards me.

**Q. And we've talked about Jstlk. Who is Kuihman?**

A. I'm not actually sure. He's kind of a weird guy that lives online. Might be British, might not be, I'm not sure.

**Q. Does he stream?**

A. I don't know. He does YouTube videos.

**Q. Jstlk does -- is a streamer; correct?**

A. Yes.

**Q. And both of them have talked -- spoken publicly about this case; right?**

A. Among other things, yes.

**Q. And you're aware that Kuihman actually spoke to Solo about the leaks?**

A. I'm not aware of that.

**Q. He said it, though. You are aware that Kuihman said that?**

A. You're making me aware of that now, so if what you're saying is true, yes, but I'm not aware of that personally, no.

**Q. And sometime in April 2025, you recall you did an interview with the content creator Willymac?**

A. Yes.

**Q. And he asked you about doxxing Kuihman and Jstlk.**

A. Among other things, yes.

**Q. And do you recall responding for Jstlk and Kuihman "I would kill them if I could. I would show up to their fucking house and do it"; do you recall that?**

A. That sounds like a statement I made, yeah.

**Q. And then you also said, "I do want someone to kill Jstlk or Lav or MrGirl or Kuihman. All those people can go die." Does that --**

A. When you read it like that, it sounds kind of psychotic, but yes, those were statements I made, yes.

**Q. Okay. And those are people -- Jstlk and Kuihman and you identified Lav as somebody -- those are all people with knowledge of the allegations of the complaint?**

MR. BRETTLER: Objection. Calls for speculation as to what those people might or might not know.

THE WITNESS: I think I listed them but all of these people have been involved in long-term harassment campaigns against me that are preceding this complaint.

BY MS. SCHLUMP PETERS:

**Q. You realize that they were -- because they have knowledge of the allegations of the complaint that they are potential witnesses in this case; right?**

MR. BRETTLER: Sure.

THE WITNESS: My understanding is anybody --

MS. SCHLUMP PETERS: Are you testifying on his behalf, Mr. Brettler?

MR. BRETTLER: That's not a question. Does he realize that they are potential witnesses? Anyone is a potential witness.

MS. SCHLUMP PETERS: No.

MR. BRETTLER: No?

MS. SCHLUMP PETERS: That wouldn't be the case and I would appreciate if you don't testify on behalf of --

MR. BRETTLER: Why don't we take our last break? We have an hour and nine minutes left on the record. Let's take five minutes, please.

MS. SCHLUMP PETERS: Off the record.

THE VIDEOGRAPHER: Going off the record. The time is 5:33 p.m.

(A brief break was had.)

THE VIDEOGRAPHER: We're back on the record. The time is 5:43 p.m.

BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, you're aware that there is a protective order in this case protecting plaintiff's legal name and also her legal identity and also the identity of her family members? Are you aware of that?**

A. I know there are protective orders filed for this case. I would have to read the exact language to feel comfortable repeating them, but --

MS. SCHLUMP PETERS: Okay. Well, I'm going to represent to you that the protective order Docket 7, protects plaintiff's legal name, that's why she's proceeding under a pseudonym, Jane Doe.

And I am going to mark this deposition transcript confidential because I believe at one point you did mention her legal name and there are other confidential things, but for the time being I want this deposition to be marked confidential.

BY MS. SCHLUMP PETERS:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

BY MS. SCHLUMP PETERS:

**Q. Is that why you posted this, to harass her?**

A. No, both of us had been making public commentary related to our case. I think this was after she had publicly accused me of being a pedophile so I'm making public tweets as well. I think we're just having a row back and forth at each other.

**Q. So you think it's been a mutual back-and-forth?**

A. Absolutely, yeah.

**Q. And then, more recently this is back in October -- sometime in April, I believe, you told Foodshops when this case is over, you'll be filing a complaint to try and begin the process of getting plaintiff's spouse deported. Do you remember that?**

A. I don't remember specifically making that statement, but I generally, yes.

**Q. Generally remember it? So why would you wait for the case to be over before doing that?**

A. I don't think I can say insofar as it implicates conversations I've had with attorneys.

**Q. I see. Is it because you didn't want to**

**look bad in front of the jury?**
A. No, that's not entering my mind at all.
**Q. Now, not only have you harassed plaintiff online as well as her witnesses, you have even harassed and insulted her counsel, haven't you, including myself?**
A. I wouldn't say -- "harass" is one way maybe you could phrase it, but I have definitely shared my opinions about the ongoing litigation, yes.
**Q. That's what you call sharing your opinion? Calling somebody a "dumb fuck"?**
A. That is an opinion, yes. Sounds like an opinionated statement and I did share it, so yes.
**Q. So on December --**
MS. SCHLUMP PETERS: Let's mark this as Exhibit 25.
(Plaintiff's Exhibit No. 25 was marked for identification.)
BY MS. SCHLUMP PETERS:
**Q. And do you see this? It is a post that you made on December 6, 2025; is that right?**
A. Correct.
**Q. Okay. What did you say here -- what did you post here about the plaintiff?**

[redacted]

**Q. So you recognize this as your post?**

A. Yes.

**Q. And you are aware that plaintiff's counsel requested that the post be removed?**

A. It might have shown up. I don't remember specifically.

MR. BRETTLER: Don't reveal any communications you may have learned through us.

THE WITNESS: I don't remember

specifically.

BY MS. SCHLUMP PETERS:

**Q. You don't remember that.**

**And then after the leaks in November, the publication of the plaintiff's video November 29th, you also published on your streams plaintiff's messages that she had written to you about feeling suicidal; correct?**

A. That sounds correct.

MR. BRETTLER: Objection. Vague and ambiguous, but if you know.

THE WITNESS: I think I published publicly about our communications back and forth, yes.

BY MS. SCHLUMP PETERS:

**Q. Those were private communications between you and plaintiff, weren't they?**

MR. BRETTLER: Objection. Vague and ambiguous. Calls for a legal conclusion.

THE WITNESS: Apparently not since they -- messages between us had shown up in other videos on the Internet from President Sunday.

BY MS. SCHLUMP PETERS:

**Q. And then even after the leaks on November 29th, on January 9, 2025, you messaged Hannah Brooks. And you said "I guess now that some shit has leaked LMAO," laughing my ass off, "if you want videos of me eating out, got them." Right? You said that to Hannah Brooks?**

MR. BRETTLER: Objection. Vague and ambiguous.

THE WITNESS: That sounds like a snippet of a message between a conversation, yeah.

BY MS. SCHLUMP PETERS:

**Q. Okay. She submitted a declaration to the court attesting to this; do you recall?**

A. Yes, I recall her declaration.

I would note, though, that from that sentence that doesn't sound like the video referenced in the complaint.

**Q. No, that's fine. I didn't ask that and I didn't say that either.**

**But you were still offering to send pornography to somebody that you barely knew; right?**

MR. BRETTLER: Objection. Misstates the record. Misstates his

prior testimony.

THE WITNESS: I don't believe I offered that. I don't believe I sent anything to that person.

BY MS. SCHLUMP PETERS:

**Q. It says "If you want videos of me eating, I've got them."**

A. I would have to see the full context of the messages rather than a single sentence that's being read to me.

**Q. But you deleted your messages to Hannah Brooks; right?**

MR. BRETTLER: Objection. Misstates his testimony and misstates the record and the evidence.

THE WITNESS: My understanding is I did submit -- I did produce communication between me and Hannah, but regardless if she submitted something to the court, I would need to reread our messages. I did not offer to send her anything. I did not send her anything, especially not anything related to this complaint.

BY MS. SCHLUMP PETERS:

**Q. So it's your understanding that you did produce messages between you and Hannah Brooks?**

A. To my recollection, yes. If they were relevant to this case, I produced them, yes.

MS. SCHLUMP PETERS: Well, I'm going to represent that we did not receive them.

(Plaintiff's Exhibit No. 26 was marked for identification.)

BY MS. SCHLUMP PETERS:

**Q. This is our next exhibit. Do you see that, Mr. Bonnell? If you -- you can look at the next page also.**

A. I see this.

**Q. Okay. And this is a subpoena requesting the identity of the Vultr accountholder for a certain IP address on July 14, 2025, and January 18, 2025; correct?**

A. Yes, that's what it says there, yeah.

**Q. What were you looking for with this subpoena?**

MR. BRETTLER: Objection to the extent it requires you to disclose attorney-client communications.

If you can answer independently,

please do.
THE WITNESS: I would have to review my documents. I would have to review my documents to know what specifically I was requesting information about this account for.
BY MS. SCHLUMP PETERS:
**Q. Do those two dates mean anything to you, July 14, 2025, and January 18, 2025?**
A. Not really, no.
**Q. And what is Vultr?**
A. I have no idea.
**Q. You don't know what a Vultr account is?**
A. Not off the top of my head. I would have to consult my records.
MS. SCHLUMP PETERS: We are about done here. Can we have two minutes just to consult.
MR. BRETTLER: Sure.
THE VIDEOGRAPHER: We're going off the record. It's 6:02 p.m.
(A brief break was had.)
THE VIDEOGRAPHER: We're back on the record. The time is 6:11 p.m.
BY MS. SCHLUMP PETERS:

**Q. Mr. Bonnell, we talked about your message to Hannah Brooks offering to send her a video of you eating -- I'm not quite sure what you meant there -- but you recall this; right?**

A. I recall you characterizing it that way. I don't remember the message being that way.

**Q. In her declaration, you remember she put that in there; right?**

A. Again, I reject the characterization that I was offering to send her something, but I understand that that's -- I know what you are referring to, the declaration, yes.

**Q. Okay. And then on your DGG Chat group. In January 30, 2025, after plaintiff had posted her Substack, they asked you to be clear if she said, yes -- Hannah Brooks -- what would you have sent. And your response was, "I'd probably just tell her to go to KF" Kiwi Farms, "LOL"; do you recall that?**

A. I don't recall sending that specific message.

**Q. So you were saying that you would direct Hannah to the Kiwi Farms site; is that the intent of that message?**

A. I don't recall the specific message

you're referencing.

**Q. Maybe not the specifics, but do you remember messaging about that --**

MR. BRETTLER: Objection.

MS. SCHLUMP PETERS: -- incident.

MR. BRETTLER: Objection. Asked and answered.

THE WITNESS: There were so many people messaging me about this particular thing and everybody knew that the leaks were located on Kiwi Farms. But I don't recall any specific messages, no.

BY MS. SCHLUMP PETERS:

**Q. And do you remember that -- talking on a video stream where you said if you share something with one person, soon everyone will know?**

MR. BRETTLER: Objection. Vague and ambiguous as to time.

BY MS. SCHLUMP PETERS:

**Q. Do you remember that, anything to that effect?**

A. That is a single statement. I could have been referring to a lot of things, but it

sounds like I'm talking more about gossip, rumors, secrets.

**Q. Okay. And do you recall it in that context then?**

A. I don't recall. I don't recall. I don't recall that exact statement, no.

MS. SCHLUMP PETERS: All right. I have no further questions.

MR. BRETTLER: Very briefly.

CROSS-EXAMINATION

BY MR. BRETTLER:

**Q. Mr. Bonnell, since receiving the document preservation demand from plaintiff's counsel prior to them filing the lawsuit, have you deleted, permanently deleted or permanently destroyed any documents related to plaintiff's claims?**

A. No.

**Q. And have you produced all documents in your custody, possession or control that are responsive to plaintiff's document requests served on you and your lawyers in this litigation?**

A. Multiple times, yes.

**Q. Have you fabricated any evidence or**

**documents in connection with this case?**

A. Absolutely not.

**Q. And since April of 2022, have you transmitted the video, the one that is at issue in this case, to anyone?**

A. Absolutely not.

MR. BRETTLER: I have no further questions.

REDIRECT EXAMINATION

BY MS. SCHLUMP PETERS:

**Q. So you just responded to Mr. Brettler that you have not permanently deleted any documents; is that right?**

A. I believe his question was whether or not I deleted anything that would have been relevant to the request for the evidence -- of preservation for this case. I have not deleted anything that would have fallen within those boundaries.

**Q. And so if there are documents that you have not produced in this case that we have requested in our discovery requests, you would still have those?**

MR. BRETTLER: Objection.

To the extent any such document

exists, you can answer the question.
THE WITNESS: If such documents exist, and nothing happened to them prior to receiving that request for the preservation of evidence, I would be able to produce those, yes.
BY MS. SCHLUMP PETERS:
**Q. So if you have not produced them, it's not because you don't have them; right?**
MR. BRETTLER: Objection. Misstates his testimony entirely.
THE WITNESS: Correct, it would be if I haven't produced them it's -- then it was because either they weren't responsive or I don't have them if --
I'm sorry. Could you restate the question.
BY MS. SCHLUMP PETERS:
**Q. So if I asked for a document that wasn't produced, documents that are relevant to this case, and they were not produced, you would still have them; right?**
MR. BRETTLER: Objection to the question. It misstates his prior testimony. It's vague and ambiguous,

but you can answer.
THE WITNESS: Insofar as those documents exist and I have them in my possession, yes, I would be able to produce those.
BY MS. SCHLUMP PETERS:
**Q. And we've talked repeatedly today about communications you had with various individuals; right?**
A. Yes.
**Q. And you deleted some of the documents but not others; right?**
MR. BRETTLER: Objection. Misstates prior testimony.
MS. SCHLUMP PETERS: Abby's documents?
MR. BRETTLER: Excuse me. Misstates the witness's prior testimony. It misstates the record and the production in this case.
THE WITNESS: I produced every communication I have ever had with Abby. I don't believe anything has been deleted with the Abby stuff even though I'm pretty sure the request for the

preservation of evidence wouldn't have even initially covered Abby. I've produced every single thing related to my communications with her. I've archived stuff with Redact. I don't believe I have permanently deleted any messages with Abby at all.

BY MS. SCHLUMP PETERS:

**Q. So you have all your evidence archived on Redact?**

MR. BRETTLER: Objection.

MS. SCHLUMP PETERS: Yes?

MR. BRETTLER: Objection. Misstates the witness's prior testimony. You have all of the documents that are responsive to your discovery requests.

MS. SCHLUMP PETERS: We haven't received all the documents that we requested.

MR. BRETTLER: That's your position.

MS. SCHLUMP PETERS: That's why I'm asking.

BY MS. SCHLUMP PETERS:

**Q. So they would be archived on redact; is**

**that right, Mr. Bonnell?**
A. Insofar as it's responsive to any requests that were covered under the preservation of evidence, yes.
MS. SCHLUMP PETERS: I have no further questions.
Mr. Brettler?
MR. BRETTLER: We can go off the record.
MS. SCHLUMP PETERS: Thank you, Mr. Bonnell. I appreciate your time here today.
THE VIDEOGRAPHER: We're going off the record. This concludes the deposition.
The time is 6:19 p.m.
(Thereupon, the taking of the deposition was concluded at 6:19 p.m.)

# CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, the undersigned Notary Public, in and for the State of Florida, hereby certify that STEVEN K. BONNELL II personally appeared before me on April 30, 2026, and was duly sworn by me.

WITNESS my hand and official seal this 30th day of April, 2026.

Katiana Louis

KATIANA LOUIS
Notary Public-State of Florida
COMMISSION #HH 443618
EXPIRES September 13, 2027

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, Katiana Louis, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true and correct transcription of the testimony given by the witness; and that the reading and signing of the deposition were not waived.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 30th day of April, 2026.

Katiana Louis

Katiana Louis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:25-cv-20757-JB/Torres

JANE DOE,
Plaintiff,

vs.

STEVEN K. BONNELL II,
Defendant,
/

IN RE: DEPOSITION OF STEVEN K. BONNELL II
TAKEN: April 30, 2026
DATE SENT TO WITNESS: May 6, 2026

TO: STEVEN K. BONNELL II
C/o ANDREW BRETTLER, ESQ
Abrettler@berkbrettler.com

The above-referenced transcript has been completed and awaits reading and signing.

Please arrange to schedule an appointment to read and sign the transcript. The transcript is 375 pages long, and you should allow yourself sufficient time.

Please review, complete, and return any corrections or signature pages within thirty (30) calendar days from the date this notice was sent.

The original of this deposition has been forwarded to the ordering party. Your errata, once received, will be forwarded to all ordering parties as listed below.

Thank you.

________________________________
KATIANA LOUIS

ERRATA SHEET

RE : JANE DOE v. STEVEN K. BONNELL II
DEPO OF : STEVEN K. BONNELL II
TAKEN : April 30, 2026

DO NOT WRITE ON TRANSCRIPT. ENTER ANY CHANGES HERE.

Page No.__ Line No.__ Change to:________________
________________________________________________
Reason for change: ______________________________

Page No.__ Line No.__ Change to:________________
________________________________________________
Reason for change: ______________________________

Page No.__ Line No.__ Change to:________________
________________________________________________
Reason for change: ______________________________

Page No.__ Line No.__ Change to:________________
________________________________________________
Reason for change: ______________________________

Page No.__ Line No.__ Change to:________________
________________________________________________
Reason for change: ______________________________

Page No.__ Line No.__ Change to:________________
________________________________________________
Reason for change: ______________________________

Page No.__ Line No.__ Change to:________________
________________________________________________
Reason for change: ______________________________

Page No.__ Line No.__ Change to:________________
________________________________________________
Reason for change: ______________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

________________________________________________
DATE STEVEN K. BONNELL II

| | | | | |
|---|---|---|---|---|
| | | | | |

| | | | | |
|---|---|---|---|---|
| | [redacted] | | | |

| | | | | |
|---|---|---|---|---|
| | | [redacted] | | |

[redacted]

[redacted]

[redacted]